**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| State of Kansas,<br>State of Georgia,<br>State of South Carolina,<br>State of Arkansas,<br>State of Florida,<br>State of Idaho,<br>State of Indiana,<br>State of Iowa,<br>State of Louisiana,<br>State of Missouri,<br>State of Montana,<br>State of Nebraska,<br>State of North Dakota,<br>State of Oklahoma,<br>State of Tennessee,<br>State of Texas,<br>State of Virginia,<br>Miles Berry Farm, and<br>Georgia Fruit and Vegetable Growers Association,<br><br>                Plaintiffs,<br><br>v.<br><br>The United States Department of Labor,<br><br>JOSÉ JAVIER RODRÍGUEZ, Assistant Secretary for Employment & Training, U.S. Department of Labor, *in his official capacity,* and<br><br>JESSICA LOOMAN, Administrator, Wage & Hour Division, U.S. Department of Labor, *in her official capacity,*<br><br>                Defendants. | Civil Action No.  2:24-cv-076 |

## COMPLAINT

## INTRODUCTION

The right to collective bargaining in America came about through the National Labor Relations Act of 1935 (NLRA), after decades of contentious relationships between labor and management.  Labor turmoil led to violent uprisings such as the Colorado Coalfield War of 1913–14 where coalminers engaged in vicious warfare against Rockefeller-owned Colorado Fuel and Iron.  The death toll reached nearly 70 individuals on both sides. It was against this backdrop that Congress passed the NLRA. Since its inception nearly 90 years ago, the NLRA has expressly excluded all agricultural workers.  *See* 29 U.S.C. § 152(3).  There have been efforts to legislatively remove that exception, but none have succeeded.

However, the Defendants now attempt to unilaterally change that delicate, congressionally-created balance through a new rule entitled, "*Improving Protections for Workers in Temporary Agricultural Employment in the United States*" (Final Rule).  89 Fed. Reg. 33,898.  But they only want to change it for the benefit of farmworkers who are in the United States temporarily on H-2A visas.  In other words, they hope to give certain federal rights to alien workers that are *not enjoyed* by Americans.  To justify this unlawful (and counterintuitive) Final Rule, the Department points to its employer-certification authority under the Immigration and Nationality Act.  But that certification authority exists to protect *American* workers and to prevent *Americans'* wages from being adversely affected by the H-2A system.  That is fundamentally at odds with what Defendants want to do here,

2

which is give temporary foreign workers collective bargaining rights that American farmworkers lack.  Defendants' actions are wrong and, more importantly here, unlawful.  The Plaintiffs include a group of states, Miles Berry Farm, and the Georgia Fruit & Vegetable Growers Association (GFVGA), who are suing to vindicate their interests and prevent this injustice from taking effect.

## THE PARTIES

1.      Plaintiff Kansas is a sovereign State of the United States of America. It sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

2.      Kansas brings this suit through its attorney general, Kris W. Kobach. He is the chief legal officer of the State of Kansas and has the authority to represent Kansas in federal court. Kan. Stat. Ann. 75-702(a).

3.      Plaintiff Georgia is a sovereign State of the United States of America. It sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

4.      Georgia brings this suit through its attorney general, Christopher M. Carr. He is the chief legal officer of the State of Georgia and has the authority to represent Georgia in federal court.

5.      Plaintiff South Carolina is a sovereign State of the United States of America.  It sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

6.      South Carolina brings this suit through its attorney general, Alan Wilson.  He is the chief legal officer of the state of South Carolina and has the authority to represent South Carolina in federal court.  *State ex rel. Condon v.*

3

*Hodges*, 349 S.C. 232, 239–40, 562 S.E.2d 623, 627 (2002) (the South Carolina attorney general "'may institute, conduct and maintain all such suits and *proceedings* as *he deems* necessary for *the enforcement of the laws of the State,* the *preservation of order,* and the *protection* of *public rights.*'" (emphasis in original) (quoting *State ex rel. Daniel v. Broad River Power Co.*, 157 S.C. 1, 68, 153 S.E. 537, 560 (1929), *aff'd* 282 U.S. 187 (1930)).

7.     Plaintiff Arkansas is a sovereign State of the United States of America.  Arkansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests through its Attorney General, Tim Griffin, who has authority to represent Arkansas in federal court. Ark. Code Ann. § 25-16-702-703.

8.     Plaintiff Florida is a sovereign State of the United States of America.  It sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

9.     Ashley Moody, the Attorney General of Florida, has authority to sue in the name of the State. *See* § 16.01(4)–(5), Fla. Stat. That power is incredibly broad and includes the power to vindicate injuries to the State at any governmental level. *See, e.g., Florida v. Nelson*, 576 F. Supp. 3d 1017, 1030 (M.D. Fla. 2021) (finding standing based on an injury to a state university); *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1253–54 (M.D. Fla. 2021) (finding standing based on injuries to political subdivisions of the State).

10.     Plaintiff Idaho is a sovereign State of the United States of America.  It sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

11.     Idaho brings this suit through its attorney general, Raúl R. Labrador. He is the chief legal officer of the State of Idaho and has the authority to represent Idaho in federal court. Idaho Code § 67-1401; *see also* IDAHO CONST. art. IV.

12.     Plaintiff Indiana is a sovereign State of the United States of America. It sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

13.     Theodore E. Rokita is the Attorney General of Indiana. The Attorney General is authorized to "represent the state in any matter involving the rights or interests of the state." Ind. Code § 4-6-1-6.

14.     Plaintiff Iowa is a sovereign State of the United States of America. Iowa sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

15.     Iowa brings this suit through its attorney general, Brenna Bird. She is authorized by Iowa law to sue on the State's behalf under Iowa Code § 13.2.

16.     Plaintiff Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

17.     Louisiana brings this suit through its attorney general, Liz Murrill. She is the chief legal officer of the State of Louisiana and has authority to institute any civil action. LA Const. Art. IV, § 8.

18.     Plaintiff Missouri is a sovereign State of the United States of America.  Missouri sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

19.     Andrew Bailey is the 44th Attorney General of the State of Missouri.  Attorney General Bailey is authorized to bring actions on behalf of Missouri that are "necessary to protect the rights and interests of the state, and enforce any and all rights, interests or claims against any and all persons, firms or corporations in whatever court or jurisdiction such action may be necessary."  Mo. Rev. Stat. § 27.060.

20.     Plaintiff Montana is a sovereign State of the United States of America. Montana sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

21.     Montana brings this suit through its attorney general, Austin Knudsen, who is the chief legal officer of the State. Mont. Const. Art. IV § 4(4). He is authorized to bring legal actions to protect the interests of the State of Montana and its citizens.

22.     Plaintiff Nebraska is a sovereign State of the United States of America. Nebraska sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

23.     Nebraska brings this suit through its attorney general, Mike Hilgers. General Hilgers is the chief legal officer of the State of Nebraska and is authorized to represent Nebraska in federal court. Neb. Rev. Stat. § 84-203.

24.     Plaintiff North Dakota is a sovereign State of the United States of America and brings this lawsuit to vindicate its sovereign, quasi-sovereign, and proprietary interests.

25.     North Dakota brings this lawsuit through its attorney general, who has authority to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state." N.D.C.C. § 54-12-01(2).

26.     Plaintiff Oklahoma is a sovereign State of the United States of America. It sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

27.     Oklahoma brings this suit through its attorney general, Gentner Drummond. He is the chief law officer of the State of Oklahoma and has the authority to represent Oklahoma in federal court. See 74 Okla. Stat. §§ 18 & 18b(A)(2).

28.     Plaintiff Tennessee is a sovereign State of the United States of America. It sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

29.     Tennessee brings this suit through its attorney general, Jonathan Skrmetti. He is the chief legal officer of the State of Tennessee and has the authority to represent Tennessee in "all civil litigated matters … in which the state … may be interested." Tenn. Code Ann. § 8-6-109(b)(1).

30.     Plaintiff Texas is a sovereign State of the United States of America. Texas sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests.

31.     Texas brings this suit through its attorney general Ken Paxton. He is the chief legal officer of the State of Texas and has the authority to represent Texas in civil litigation. *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2011).

32.     Plaintiff Virginia is a sovereign State of the United States of America.  Virginia sues to vindicate its sovereign, quasi-sovereign, and proprietary interests and brings this suit through its attorney general, Jason S. Miyares. He is the chief legal officer of the Commonwealth of Virginia and has the authority to represent Virginia in federal court. Va. Code §§ 2.2-507, 2.2-513.

33.     Plaintiff Miles Berry Farm is a 400-acre blueberry, strawberry, zucchini, razzmatazz grape, and cabbage farm with its principal place of business in Baxley, Georgia.

34.     Miles Berry Farm has employed H-2A workers since at least 2016.  It presently employs roughly 150 H-2A workers per year.  It provides housing and transportation for its H-2A workers.  It plans on filing an application between October and November of 2024 to participate in the H-2A program in 2025.

35.     Miles Berry Farm is not a member of the GFVGA.

36.     Plaintiff GFVGA is a trade organization for fruit and vegetable growers in Georgia. It is based in LaGrange, Georgia.

37.     The GFVGA has between 550 and 600 members across Georgia, which includes 175 to 200 member organizations.

38.    Members of the GFVGA rely upon the GFVGA to assist with a range of labor supply and labor cost matters, particularly matters surrounding the H-2A program.

39.    On behalf of its members, the GFVGA engages in lobbying efforts regarding attempts to reform and modify regulations governing the H-2A program.

40.    The GFVGA provides Georgia farms with educational resources, hosts farm and produce shows, hosts labor relations forums, and engages in legislative activities. A key part of the services GFVGA provides to its members centers on the H-2A program, including gathering information regarding changes to the program; assessing how the changes will impact members; and putting members in contact with congressional staff, agency personnel, and farm labor contractors to resolve operational challenges in the administration of the H-2A program.

41.

42.    GFVGA members participated in the H-2A program in the past to supply their workforce and will continue to do so in the future. GFVGA's membership includes at least one organization that has H-2A workers at present, at least one member organization that will file applications for new workers between August 2024 and January 2025, and at least one member organization that will be utilizing the work of H-2A visa holders between December 14, 2024, and December 31, 2024.

43.    Included among GFVGA's members are J.E.T. Farms Georgia, Inc.; Spring Hill Produce, LLC; Minor Brothers Farm; and Minor Produce, Inc. These

four businesses all currently use H-2A workers and provide housing and transportation for such workers.

44.     The United States Department of Labor (the "Department" or "DoL") is an executive department of the federal government of the United States. Its duties include administering federal law pertaining to occupational safety and health and wage and hour standards.

45.     The Final Rule was issued by two DoL sub-agencies: the Employment and Training Administration and DoL's Wage and Hour Division.

46.     The Employment and Training Administration, among other things, exercises the Secretary of Labor's authority to issue agricultural labor certifications. In exercising this authority, it cooperates with state workforce agencies.

47.     Defendant José Javier Rodríguez is the Assistant Secretary of Labor in charge of the Employment and Training Administration. In this capacity, he manages, directs, or is responsible for the Administration, including its temporary labor certifications such as the H-2A program.

48.     The Wage and Hour Division, among other things, exercises the Secretary of Labor's authority to assure employer compliance with the terms and conditions of employment under the H-2A program.

49.     Defendant Jessica Looman is the Administrator in charge of the Wage and Hour Division. In this capacity, she manages, directs, or is responsible for the Division, including its H-2A enforcement activities.

## JURISDICTION AND VENUE

50.     The Court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 702–03 (2018) and 28 U.S.C. § 1331 (2018).

51.     Under § 702, the federal government has waived immunity from suits under the Administrative Procedure Act.

52.     The Court is authorized to set aside the challenged agency actions, postpone their effective date pending judicial review, hold them unlawful, grant preliminary and permanent injunctive relief, and award the declaratory and injunctive relief requested below. 5 U.S.C. §§ 705–06 (2018); 28 U.S.C. §§ 1361, 2201–02 (2018).

53.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because Plaintiffs Georgia, and Miles Berry Farms reside in the district and no real property is involved in this action.

54.     Plaintiffs are challenging a final agency action pursuant to 5 U.S.C. §§ 551(13) and 704 (2018).

## BACKGROUND

### A.     The NLRA

55.     In 1935, Congress passed the NLRA which, among other things, established the right of certain employees to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concentrated activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (2018).

56.     For 89 years (i.e., since the NLRA's inception), the NLRA has explicitly

excluded agricultural workers from that statutory right. *See* 29 U.S.C. § 152(3) (2018).

**B.     The Immigration Reform and Control Act of 1986**

57.     The Immigration Reform and Control Act of 1986 (IRCA) amended the INA to create a special class of temporary, foreign-migrant agricultural workers. 8 U.S.C. § 1101(a)(15)(H)(ii)(a).[1] These workers receive H2-A visas.

58.     The INA is an immigration statute that is administered by the U.S. Department of Homeland Security (specifically, the U.S. Citizenship and Immigration Services).

59.     The INA expressly states who is given authority to issue regulations generally under the statute.  These include the Secretary of Homeland Security, the Attorney General of the United States, and the Secretary of State.  *See* 8 U.S.C. §§ 1103–04.

60.     Under IRCA, the Secretary of Labor performs a ministerial function to certify that (1) there are not sufficient American or lawful permanent resident workers to perform the necessary work and (2) foreign workers will not adversely affect the wages and working conditions of workers in the United States who are similarly employed. 8 U.S.C. § 1188(a)(1).

61.     The point of this certification authority is to make sure that farms use nonimmigrant (temporary visa) alien labor only when there is no other choice, so as

---

[1] Other aspects rule purports to rely on Wagner-Peyser Act, 29 USC 49 et seq. *See* 89 Fed. Reg. 33,899 but the challenged portions of the Final Rule do not rely on this authority.

to protect the welfare of American and lawful-resident workers.

62.    The INA does not give the Secretary of Labor (or her delegees) general authority to issue regulations under the statute.

63.    There are subsections of IRCA where Congress expressly gave the Secretary of Labor (or her delegees) authorization to issue a particular regulation. *See* 8 U.S.C. § 1188(c)(4) ("the Secretary of Labor shall issue regulations which address the specific requirements of housing for employees principally engaged in the range production of livestock"), § 1188(a)(2) ("The Secretary of Labor may require by regulation, as a condition of issuing the certification, the payment of a fee to recover the reasonable costs of processing applications for certification").

64.    8 U.S.C. § 1188(a)(1) provides no express authority for the Secretary of Labor (or her delegees) to issue regulations.

65.    In the 38 years since IRCA was enacted there was never a regulation that provided for the unionization of H-2A workers.

**E.    Final Rule**

66.    On April 29, 2024, Defendants published "*Improving Protections for Workers in Temporary Agricultural Employment in the United States,*" 89 Fed. Reg. 33,898 (Final Rule), with an effective date of June 28, 2024. The Finaly Rule applies to all applications to participate in the H-2A program filed on or after August 29, 2024.

67.    The Final Rule cites as its legal authority 8 U.S.C. § 1188(a)(1). *Id.* at 33,899; *see also id.* at 33,900 ("These revisions will help prevent exploitation and

abuse of agricultural workers and ensure that unscrupulous employers do not financially gain from their violations or contribute to economic and workforce instability by circumventing the law, both of which would adversely affect the wages and working conditions of workers in the United States similarly employed, and undermine the Department's ability to determine whether there are, in fact, insufficient U.S. workers for proposed H-2A jobs.").

68.     The Final Rule claims to provide protections for "'concerted activity for mutual aid and protection' which encompasses numerous ways that workers can engage, individually or collectively, to enforce their rights." 89 Fed. Reg. 34,005. The Final Rule accomplishes this task by mirroring provisions of the NLRA. *See* 29 U.S.C. §§ 157-58.

69.     For example, the Final Rule requires that "with respect to any person engaged in agriculture…the employer has not and will not…discharge, or in any manner discriminate against…any person who has engaged in activities related to self-organization" which includes, "any effort to form, join, or assist a labor organization." 89 Fed. Reg. at 34,062.

70.     It also includes the same prohibitions in relation to "other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions." *Id.*

71.     Employers must also refrain from discriminating in any manner against an employee who "refused to attend an employer sponsored meeting with the employer…if the primary purpose of the meeting is to communicate the

employer's opinion concerning any activity protected in this subpart; or has refused to listen to employer-sponsored speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart." *Id* at 34,063.

72.     The Final Rule requires employers to "permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview." *Id.* And it requires employers who provide housing to allow workers "to invite, or accept at their discretion, guests to their living quarters and/or the common areas or outdoor spaces near such housing." *Id.* These guests may include union organizers.

73.     The Final Rule also protects boycotts and pickets.  For example, the Final Rule states "a group of workers engaged in a labor dispute who meet with the management of a grocery store to explain their labor dispute and seek to persuade the store to stop carrying the products sold by the workers' employer until the labor dispute is resolved would be engaged in protected concerted activity" would be protected activity and that they intend "to interpret the terms 'concerted activity' broadly, to include concerted activities for the broad purpose of 'mutual aid or protection' as well as for the narrower purpose of 'self-organization,' as long as the object of the activity is related to the workers' own wages and working conditions." *Id.* at 34,007.

74.     The Final Rule pays lip service to the idea of implementing these rules to prevent adverse effects for similarly employed workers in the United States by stating, "Proposals to prohibit retaliation for self-advocacy and concerted activity… fall within the Department's authority to ensure that foreign labor certification of H-2A workers does not adversely affect similarly employed workers in the United States." *Id.* at 34,005.

75.     However, the Final Rule does not rationally explain how this will be accomplished when H-2A workers are given greater protections than their American counterparts, nor does it wrestle with the fact that American farmworkers are still ineligible for these protections under the NLRA.

76.      The Final Rule also alters the terms of payment due to H-2A workers by changing the effective date of the annual Adverse Effect Wage Rate (AEWR), one of the measures used to determine the wage owed to an H-2A worker. *Id.* at 34060. Whereas increases in the AEWR currently take effect every January 1, the Final Rule changes the effective date to the date of publication of the AEWR in the Federal Register, which usually occurs around December 14. *Id.* at 34048−49, 34060.

## IRREPARABLE HARM

77.     The H-2A program requires employers to begin the certification process through state workforce agencies such as those located in Plaintiff States.

78.     The Employment and Training Administration requires the state workforce agencies to review the job orders for deficiencies and give prospective H-

16

2A employers the ability to correct them.

79.   All of the Plaintiff States' workforce agencies will incur administrative costs with the implementation of this Final Rule and the Final Rule will result in state agencies having to change their preexisting approaches and behavior.

80.   The Final Rule acknowledges this by stating that the transition period between the Final Rule and its effective date was meant to "provide the Department with the necessary time to implement changes to Office of Management and Budget (OMB)-approved application forms within the Foreign Labor Application Gateway (FLAG) System and to its standard operating procedures and policies, and to provide training and technical assistance to...*State workforce agencies (SWAs),* employers, and other stakeholders in order to familiarize them with changes required by this final rule." *Id.* at 33,904 (emphasis added).

81.   Thus, the Final Rule acknowledges state workforce agencies including those in the Plaintiff States will require changes and incur administrative costs to comply with the Final Rule.

82.   Plaintiff States' workforce agencies also verify that there will be administrative costs.

83.   In South Carolina for instance, the state workforce agency will require an additional employee to comply with the Final Rule.

84.   Other Plaintiff States will also incur administrative costs such as Plaintiff Florida through the Florida Department of Commerce, Plaintiff Arkansas through its Department of Commerce and Department of Labor and Licensing, and

Virginia through its Employment Commission.

85.     Turning to the private plaintiffs, under the H-2A program, "employers may temporarily hire foreign workers 'when there are not enough qualified and available American workers to fill open jobs.'" *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 980 (D.C. Cir. 2001) (quoting *Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014)). As such, Miles Berry Farm and members of the GFVGA including J.E.T. Farms, Inc., Spring Hill Produce, Minor Brother Farm, and Minor Brothers Produce, are dependent on H-2A workers to operate their farms.

86.     Member organizations of GFVGA utilize the work of H-2A visa holders between December 14 and December 31 each year. Thus, member organizations relying upon the AEWR to calculate wages will experience increased labor costs from the Final Rule.

87.     Miles Berry Farm and members of GFVGA will need to familiarize themselves with the Final Rule and implement its provisions, resulting in either a time costs to these entities or a financial costs where the entity outsources these tasks to a specialist such as an attorney or human resources manager.

88.     Miles Berry Farm and members of GFVGA including J.E.T. Farms, Inc.; Spring Hill Produce, LLC; Minor Brother Farm, and Minor Produce, Inc. oppose allowing H-2A workers to engage in labor organizing activities, particularly while on the premises of their employer-provided housing units and would not permit them to do so absent the Final Rule.

89.     Miles Berry Farm and members of GFVGA further oppose H-2A

workers obtaining protections that mirror those created by the NLRA. They do not wish to hire H-2A workers with NLRA protection and would not do so if they had the choice. The ability of H-2A workers to self-organize and obtain rights that mirror those provided by the NLRA place requirements on Miles Berry Farm and members of GFVGA above and beyond the minimum pay, working conditions, and housing condition requirements of the H-2A program, as established by statute and regulation.

90.     Miles Berry Farm and members of GFVGA, including J.E.T. Farms, Inc.; Spring Hill Produce, LLC; Minor Brother Farm; and Minor Produce, Inc. would, absent the Final Rule, opt to employ H-2A workers who do not engage in self-organizing activities.

91.     Farms need the ability to investigate matters involving employees in a timely and efficient manner, sometimes while the employees are in the fields. Miles Berry Farm and members of GFVGA, including J.E.T. Farms, Inc.; Spring Hill Produce, LLC,; Minor Brother Farm; and Minor Produce, Inc. will face administrative challenges and delays in the management of employees if forced to permit an H-2A worker to have a designee present for any investigatory interview that the worker reasonably believes might result in disciplinary action. Waiting to investigate and address matters will also jeopardize workplace safety and crop quality.

92.     As a condition of participation in the H-2A program, the Final Rule requires Miles Berry Farm and members of GFVGA to agree to conditions contrary

to the efficient and cost-effective operation of their farms.  Thus, if the Final Rule is permitted to go into effect, they are left with the choice of not participating in the H-2A program (which they participate in specifically because there are not enough qualified and available American workers to fill the jobs) or agreeing to terms that will impair their ability to operate their farms.

## CLAIMS

### COUNT I
**Agency Action That Is Contrary to Statute – Contrary to NLRA**
**5 U.S.C. § 706**

93.     Plaintiffs incorporate by reference all preceding paragraphs.

94.     The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law."  5 U.S.C. § 706(2).

95.     The Final Rule is not in accordance with federal law.

96.     Congress has already clearly spoken on whether agricultural workers have collective bargaining rights and has concluded that they do not.

97.     IOnly Congress can rewrite the NLRA.  The Defendants cannot do it through the rulemaking process.

98.     The Defendants have attempted to use the Final Rule as a backdoor to accomplish what Congress has already told them they cannot do.

99.     Nothing in IRCA gives Defendants the authority to rewrite the NLRA.  IRCA is an amendment to an immigration statute that provides the Defendants a ministerial task of certifying H-2A employers.

20

100.    That ministerial task was designed to protect American workers from adverse effects.  It was not done with the intent to give H-2A workers more rights than their American counterparts.

101.    The Final Rule is contrary to the NLRA.  It should be set aside.

**COUNT II**
**Agency Action That Is in Excess of Statutory Authority - IRCA**
**5 U.S.C. § 706**

102.    Plaintiffs incorporate by reference all preceding paragraphs.

103.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be…in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

104.    IRCA requires the Defendants to certify that (1) there are not sufficient American or lawful permanent resident workers to perform the necessary work and (2) foreign workers will not adversely affect the wages and working conditions of workers in the United States who are similarly employed. 8 U.S.C. § 1188(a)(1).

105.    It does not give Defendants the authority to rewrite labor law for a subset of agricultural workers.

106.    Furthermore, the focus of this ministerial authority was to prevent adverse effects for *American* workers' wages and working conditions.  H-2A workers were not the intended beneficiaries of this provision.

107.    There is no authority under IRCA to grant H-2A workers better conditions than their American counterparts are statutorily allowed to have.

108.    To the extent that there is any ambiguity in IRCA, Defendants are not

entitled to any deference in their interpretation.  That is because the Defendants are not the ones tasked with administering this immigration statute.

109.   Notably, Defendants do not even have general rulemaking authority under the statute.  This is demonstrated by the fact that Congress granted the Secretary of Homeland Security, United States Attorney General, and Secretary of State authority to generally issue regulations and administer the statute but not the Secretary of Labor.  *See* 8 U.S.C. 1103–04.

110.   IRCA does have provisions that expressly grant the Secretary of Labor the authority to make rules in particular subsections.  *See* 8 U.S.C. 1108(a)(2) and (c)(4).  The supposed authority for the Final Rule, 8 U.S.C. 1108(a)(1), is not one of those subsections.  The affirmative grants of rulemaking authority in some subsections implies the absence of rulemaking authority in the other that lack any grant of authority.  *See, e.g., Bittner v. United States*, 143 S. Ct. 713, 720 (2023) (applying the *expression unius est exclusion alterius* canon).

111.   Finally, the word "certify" further demonstrates what the Defendants authority is vis-à-vis the statute.  "Certify" is defined "to attest authoritatively.[2]"

112.   The combination of the explicit language of certification demonstrating a ministerial task combined with the absence of any other language to give the agency authority to engage in rulemaking demonstrates that Congress did not grant the Defendants the authority to issue the Final Rule under IRCA.  As a

---

[2] *See* https://www.merriam-webster.com/dictionary/certify.

result, it is in excess of statutory authority and should be set aside.

## COUNT III
### Agency Action in Excess of Statutory Jurisdiction and in Violation of Major Questions Doctrine
### U.S. Const. art. I, § 1

113.   Plaintiffs incorporate by reference all preceding paragraphs.

114.   Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C) (2018).

115.   Separation-of-powers principles prohibit an executive agency from deciding on an issue of great economic or political significance, or issues traditionally governed by state or local law, absent clear authorization from Congress. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022).

116.   Departure from longstanding practice without new authorization from Congress is strong evidence the agency is acting without Congressional authorization. *See Nat'l Fed'n Indp. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022). Absent clear authorization from Congress, such major questions are reserved for Congress to answer.

117.   Unionization and the rights of American workers have been an issue of political significance in American history for over 100 years. The NLRA came after numerous disruptive and (sometimes) violent labor disputes occurred throughout the country.

118.   Despite that long and sometimes violent history, agricultural workers of all kinds were excluded from the NLRA. This exclusion has remained in place for

almost 90 years.

119.   Immigration and the circumstances under which alien workers are allowed into the country are also subject to debates across the country.

120.   Protecting American jobs and wages from being undercut by alien workers is also a question subject to intense debate across the country.

121.   The Final Rule closes off that debate with implications that reach far beyond any authority Defendants could conceivably possess.

122.   The Final Rule would create a situation where hundreds of thousands of nonimmigrant alien farmworkers would have the right to unionize while millions of American farmworkers do not.

123.   The Final Rule also implicates the major questions doctrine because it is of vast economic significance. *See N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296-97 (4th Cir. 2023).

124.   Finally, the Final Rule "intrudes into an area that is the particular domain of state law." *Ala. Ass'n of Realtors v. Dep't of Health and Human Services*, 594 U.S. 758, 764 (2021). When a regulation implicates "areas traditionally regulated by the States," "courts must be certain of Congress's intent" due to the federalism concerns present. *Gregory v. Ashcroft*, 501 U.S. 452, 469−60 (1991); *West Virginia*, 597 U.S. at 746-48 (Gorsuch, J., concurring) (internal quotations omitted).

125.   In the 38-year history of INA, the Defendants have never attempted to use their ministerial certification and enforcement authority to provide union protections for H-2A workers. Nothing in INA gives Defendants clear authorization

to rewrite a separate statute that has existed for 89 years.

126.   Because the Final Rule violates the major questions doctrine, it should be set aside.

## COUNT IV
### Arbitrary and Capricious Agency Action
### 5 U.S.C. § 706

127.   Plaintiffs incorporate by reference all preceding paragraphs.

128.   An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation or fails to consider either alternatives to its action or the affected communities' reliance on the prior rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

129.   In the 38 years since IRCA amended the INA there has never been an attempt by the Defendants to use their ministerial certification authority to create a right to unionize H-2A workers.

130.   In doing so, Defendants do not provide a reasonable explanation for this sharp deviation.

131.   Defendants claim that by allowing H-2A workers to unionize, they would limit the exploitation of such workers, which would in turn prevent American workers from having their wages adversely affected.

132.   This rationale is not a reasonable explanation for the Final Rule because American farmworkers are still not given the same protections for unionizing activity.

133.   If the Final Rule were to go into effect, H-2A farmworkers would have greater organizing and collective bargaining rights than their American counterparts.

134.   The Final Rule is a sharp deviation from prior practice.  Instead of acknowledging this and providing a reasonable explanation, Defendants pretend they are following the law with a justification that strains logic.

135.   In addition, the Final Rule is arbitrary and capricious because "the agency offered an explanation counter to the evidence before the agency, or if the agency action 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *State of Florida v. Department of Health and Human Services*, 19 F.4th 1271, 1290 (11th Cir, 2021) (internal citations omitted).

136.   The Final Rule effectively provides NLRA rights to H-2A workers. These are rights that American farmworkers explicitly do not have under federal law.

137.   Yet the Final Rule claims that providing these rights for H-2A workers—which similarly situated Americans lack—will somehow prevent adverse effects of American wages.

138.   This rationale is not only illogical, it is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*.

139.   Under the INA, a lack of qualified and available American citizen or resident workers is a threshold requirement for an employer obtaining H-2A visa authorizations.

140.   It is unreasonable to conclude that granting certain protections to the H-2A group will improve the wages of Americans when one of the requirements for H-2A visas to even exist is that there be insufficient Americans in the field.

141.   The more likely outcome of granting H-2A workers more rights than Americans will be to ensure that no American workers will *ever* make themselves available and qualified for the work.

142.   The Final Rule is simply a backdoor so that the agency can achieve a policy goal that requires legislation that it cannot convince Congress to pass.

143.   For all these reasons, the Final Rule is arbitrary and capricious and should be set aside.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs ask this Court to:

a.   Postpone the effective date of the Final Rule pending judicial review;

b.   Hold unlawful, vacate and set aside the Final Rule as contrary to law and unreasonable, arbitrary, and capricious.

c.   Issue orders preliminarily and permanently enjoining Defendants from implementing or enforcing the Final Rule;

d.   Award Plaintiffs their costs and reasonable attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, or other applicable law; and

e.   Award such other and further relief as this Court deems equitable and just.

27

**KRIS W. KOBACH**
**Attorney General of Kansas**

*/s/ James R. Rodriguez*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
James R. Rodriguez, Kan. SC No. 29172*
*Assistant Attorney General*
KANSAS OFFICE OF THE
 ATTORNEY GENERAL


Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
jay.rodriguez@ag.ks.gov

*Pro hac vice forthcoming

**ALAN WILSON**
**Attorney General of South Carolina**

*/s/ Joseph D. Spate*
Joseph D. Spate*
Assistant Deputy Solicitor General
Office of the Attorney General of South
Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*/s/ Thomas T. Hydrick*
Thomas T. Hydrick*
Assistant Deputy Solicitor General
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211
803-734-4127

*Pro hac vice forthcoming

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**

Stephen J. Petrany
*Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*/s/ G. Todd Carter*
G. Todd Carter, Esq.
   Georgia Bar No: 113601
Special Assistant Attorney General
OFFICE OF THE GEORGIA
ATTONEY GENERAL
BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue
P. O. Box 220
Brunswick, GA 31521-0220
Tel:  912-264-8544
Fax: 912-264-9667
tcarter@brbcsw.com

**TIM GRIFFIN**
**Arkansas Attorney General**

*/s/Michael Cantrell*
Michael Cantrell*
 *Assistant Solicitor General*
Nicholas J. Bronni
 *Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201
Telephone: (501) 682-2401
michael.cantrell@arkansasag.gov
*Counsel for Petitioner State of Arkansas*
*Pro hac vice forthcoming

**RAÚL R. LABRADOR**
**Attorney General of Idaho**

*/s/ Joshua Turner*
Joshua Turner, *pro hac vice*
*Chief of Constitutional Litigation &*
*Policy*
700 W. Jefferson St., Suite 210,
PO Box 83720,
Boise, Idaho 83720
(208) 334-2400
josh.turner@ag.idaho.gov
*Counsel for Plaintiff State of Idaho*

**KBRENNA BIRD**
**Attorney General of IOWA**

*/s/ Eric H. Wessan*
Eric H. Wessan, *pro hac vice*
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
*Counsel for Plaintiff State of Iowa*

**ASHLEY MOODY**
**Attorney General of Florida**

*/s/ Christine Pratt*
Christine Pratt (FBN 100351)*
COUNSELOR TO THE ATTORNEY GENERAL
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
(850) 410-2672 (fax)
christine.pratt@myfloridalegal.com
*Pro hac vice forthcoming

**THEODORE E. ROKITA**
**Attorney General of Indiana**

*/s/ James A. Barta*
JAMES A. BARTA*
*Solicitor General*
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
Phone: (317) 232-0709
Email: james.barta@atg.in.gov
*Counsel for the State of Indiana*
*Pro hac vice forthcoming

**LIZ MURRILL**
**Attorney General of Louisiana**

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
 *Solicitor General*
Louisiana Department of Justice
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 326-6766
aguinaga@ag.louisiana.gov
*Counsel for Plaintiff State of Louisiana*
*Pro hac vice forthcoming

**ANDREW BAILEY**
**Attorney General of Missouri**

/s/ Reed C. Dempsey
Reed C. Dempsey #1697941DC*
*Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
reed.dempsey@ago.mo.gov

*Pro hac vice forthcoming


**MIKE HILGERS**
**Attorney General of NEBRASKA**

/s/ Lincoln J. Korell
Lincoln J. Korell, *pro hac vice*
*Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
lincoln.korell@nebraska.gov
*Counsel for Plaintiff State of Nebraska*

**GENTNER DRUMMOND**
**Attorney General of Oklahoma**

/s/ Garry M. Gaskins
Garry M. Gaskins, II, OBA # 20212*
Solicitor General
Zach West, OBA # 30768*
Director of Special Litigation
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921

**AUSTIN KNUDSEN**
**Attorney General of Montana**

/s/ Christian B. Corrigan
Christian B. Corrigan*
*Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov
*Counsel for Plaintiff State of Montana*
*Pro hac vice forthcoming


**DREW H. WRIGLEY**
**North Dakota Attorney General**

/s/ Philip Axt
PHILIP AXT*
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov
*Counsel for the State of North Dakota*
*Pro hac vice forthcoming

**JONATHAN SKRMETTI**
**Attorney General and Reporter of Tennessee**

/s/ J. Matthew Rice
J. Matthew Rice*
  *Solicitor General*
Whitney Hermandorfer*
  *Director of Strategic Litigation*
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
Phone: (615) 741-7403
Email: Matt.Rice@ag.tn.gov

Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

*Pro hac vice forthcoming

**KEN PAXTON**
Attorney General of the State of Texas
**BRENT WEBSTER**
First Assistant Attorney General
**RALPH MOLINA**
Deputy Attorney General
for Legal Strategy
**RYAN D. WALTERS**
Chief, Special Litigation Division

*/s/ Kathleen T. Hunker*
**KATHLEEN T. HUNKER***
*Special Counsel*
Tex. State Bar No. 24118415
**GARRETT GREENE***
*Special Counsel*
Tex. State Bar No. 24096217
OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Kathleen.Hunker@oag.texas.gov
Garrett.Greene@oag.texas.gov

*Pro hac vice forthcoming

*/s/ Braden H. Boucek*
Braden H. Boucek*
Tenn. BPR No. 021399
Ga. Bar No. 396831

Whitney.Hermandorfer@ag.tn.gov
*Counsel for State of Tennessee*

*Pro hac vice forthcoming

**JASON S. MIYARES**
**Attorney General of Virginia**

*/s/ Kevin M. Gallagher*
Kevin M. Gallagher*
*Principal Deputy Solicitor General*
Brendan T. Chestnut*
*Deputy Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
*Counsel for Plaintiff Commonwealth of
Virginia*

*Pro hac vice forthcoming

*/s/ Jordan Miller*
Jordan Miller*
   Michigan Bar. No. P81467
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Tel.: (770) 977-2131
bboucek@southeasternlegal.org
jmiller@southeasternlegal.org

*Pro hac vice forthcoming