**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

| | |
|---|---|
| State of KANSAS,<br>State of GEORGIA,<br>State of SOUTH CAROLINA,<br>State of ARKANSAS,<br>State of FLORIDA,<br>State of IDAHO,<br>State of INDIANA,<br>State of IOWA,<br>State of LOUSIANA,<br>State of MISSOURI,<br>State of MONTANA,<br>State of NEBRASKA,<br>State of NORTH DAKOTA,<br>State of OKLAHOMA,<br>State of TENNESSEE,<br>State of TEXAS,<br>State of VIRGINIA,<br>MILES BERRY FARM, and<br>GEORGIA FRUIT AND VEGETABLE GROWERS ASSOCIATION,<br><div align="center">Plaintiffs,</div><br>v.<br><br>The UNITED STATES DEPARTMENT OF LABOR,<br><br>JOSÉ JAVIER RODRÍGUEZ, Assistant Secretary for Employment & Training, U.S. Department of Labor, *in his official capacity*, and<br><br>JESSICA LOOMAN, Administrator, Wage & Hour Division, U.S. Department of Labor, *in her official capacity*,<br><br><div align="center">Defendants.</div> | Civil Action No. 2:24-cv-76-LGW-BWC |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR STAY/PRELIMINARY INJUNCTION/TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

Contents

INTRODUCTION ...................................................................................................... 6

BACKGROUND ........................................................................................................ 6

   I.    The National Labor Relations Act ............................................................... 6

   II.   The H-2A Visa Program ............................................................................... 6

   III.  The Final Rule .............................................................................................. 7

LEGAL STANDARD ................................................................................................ 9

ARGUMENT ............................................................................................................. 10

   I.    Plaintiffs are Likely to Succeed on the Merits of their Claims .................. 10

      A.   The Final Rule is Not in Accordance with Law ...................................... 10

         1.   The Final Rule Violates the NLRA ................................................... 10

         2.   The Final Rule Exceeds the DOL's Statutory Authority Under the INA/IRCA ... 12

         3.   Defendants' Position Is Not Entitled to Deference ........................... 16

      B.   The Final Rule Violates the Major Questions Doctrine .......................... 17

         1.   This is a Major Questions Doctrine Case ......................................... 19

         2.   Defendants Lack Clear Statutory Authorization ............................... 23

      C.   The Final Rule is Arbitrary and Capricious. ........................................... 25

         1.   Reliance on Factors Congress Did Not Intend .................................. 25

         2.   Implausible Explanation ................................................................... 27

         3.   Sharp Departure ................................................................................ 28

   II.   The Remaining Requirements for Equitable Relief are Met Here .............. 29

      A.   Without Relief from this Court, Plaintiff States Will Suffer Irreparable Harm ...... 29

      B.   Without Relief from This Court, Miles Berry Farm and the GFVGA Will Suffer Irreparable Harm ...... 30

      C.   The Balance of Harms and Public Interest Favor Relief Here. .................. 32

   III.  The APA and Equity Principles Support Entry of Universal, Preliminary Relief. ... 33

CONCLUSION ........................................................................................................... 36

<u>**TABLE OF AUTHORITIES**</u>

Cases

*Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795 (D.C. Cir. 1983) ..................................... 41
*Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638 (1990) ..................................................................................... 20
*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136 (D.C. Cir. 2005) . 41
*Agri Processor Co. v. NLRB*, 514 F.3d 1 (D.C. Cir. 2008) ................................................................................ 12
*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758 (2021) ...................................... 25, 39
*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592 (1982) ............................................ 17
*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, No. 23-13138, 2024 U.S. App. LEXIS 13325 (11th Cir. June 3, 2024) ......................................................................................................................................... 11
*Arizona v. United States*, 567 U.S. 387 (2012) ................................................................................................. 42
*Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020) ......................................................... 40
*Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080 (11th Cir. 2013) ............................... passim
*BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964 (11th Cir. 2005) .. 37
*Bittner v. United States*, 143 S. Ct. 713 (2023) .................................................................................................. 15
*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) .................................................................................. 13
*Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500 (11th Cir. 1993) ........................................................ 12
*Data Mktg. P'ship, LP v. Dep't of Labor*, 45 F.4th 846 (5th Cir. 2022) ........................................................... 34
*Dep't of the Navy v. Fed. Labor Relations Auth.*, 836 F.2d 1409 (3d Cir. 1988) .............................................. 20
*FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) .............................................................................. 33, 34
*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................................................ 21, 27
*Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271 (11th Cir. 2021) ........................................................... 39
*Florida Sugar Cane League, Inc. v. Usery*, 531 F.2d 299 (1976) ..................................................................... 18
*Florida v. Becerra*, 544 F. Supp. 3d 1241 (M.D. Fla. 2021) ............................................................................ 34
*Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271 (11th Cir, 2021) ................................................... 30
*Florida v. HHS*, 19 F.4th 1271 (11th Cir. 2021) .......................................................................................... 42, 43
*Forest Serv. v. Cowpasture River Preservation Ass'n*, 590 U.S. 604 (2020) .................................................... 27
*Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022) ...................................................... 34
*Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) ................................................................................................ 25
*Gonzalez v. Governor of Ga.*, 978 F.3d 1266 (11th Cir. 2020) ................................................................... 11, 38
*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ........................................................................................................ 26
*Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377 (M.D.N.C. 2019) .............................................................. 41
*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454 (5th Cir. 2020) ................................... 24
*Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir.1989) ..................................................................................... 40
*In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239 (11th Cir. 2020). ................................................. 30
*In re GTE Serv. Corp.*, 762 F.2d 1024 (D.C. Cir. 1985) ................................................................................... 40
*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ............................................................................................... 37
*Jordan v. Pugh*, No. CIV.A. 02-CV-01239MS, 2007 WL 2908931 (D. Colo. Oct. 4, 2007) ......................... 41
*Koch Foods, Inc. v. Sec'y, U.S. Dep't of Lab.*, 712 F.3d 476 (11th Cir. 2013) ................................................. 19
*La. Pub. Serv. Comm'n v. FCC (LPSC)*, 476 U.S. 355 (1986) .................................................................... 13, 14

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ............................... 39

*Legal Envt'l Assistance Found., Inc. v. EPA*, 118 F.3d 1467 (11th Cir. 1997) ............................19

*Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023)...........................................................20

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022)........................................................................39

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ................................................................................. 14

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ...............................................................17, 18

*Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015) ..................................40

*Moore v. Brown*, 448 U.S. 1335 (1980)..........................................................................................39

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 29 (4th Cir. 2023).............. 21, 26, 27

*Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022)........................................................................43

*Nken v. Holder*, 556 U.S. 418 (2009)................................................................................38, 41, 42

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .............................................................38

*Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020)..........................................................................38

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016)..................................................................................40

*Texas v. Nuclear Regulatory Comm'n*, 78 F.4th 827 (5th Cir. 2023) ...........................................23

*Texas v. United States*, 497 F.3d 491 (5th Cir. 2007) ...................................................................14

*U.S. ex rel. Carson v. Kershner*, 228 F.2d 142 (6th Cir. 1955) .....................................................28

*United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) ......................... 41

*Utility Air Regulatory Grp. v. EPA (UARG)*, 573 U.S. 302 (2014)...............................................28

*Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021) ...................................40

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825)......................................................................21

*West Virginia v. EPA*, 597 U.S. 697 (2022)...........................................................................passim

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001) ..................................................................21

*Williams v. Usery*, 531 F.2d 305 (5th Cir. 1976).....................................................................17, 18

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .............................................................11

*Worthy v. City of Phenix City*, 930 F.2d 1206 (11th Cir. 2019) ...................................................38

Statutes

29 U.S.C. § 152...........................................................................................................................5, 10

29 U.S.C. § 157..................................................................................................................5, 6, 7, 11

29 U.S.C. § 158..................................................................................................................6, 7, 8, 11

29 U.S.C. § 159................................................................................................................................7

5 U.S.C. § 705 ............................................................................................................................4, 38

5 U.S.C. § 706 ............................................................................................................................9, 39

8 U.S.C 1188 ..................................................................................................................................29

8 U.S.C. § 1101 ......................................................................................................................5, 11, 12

8 U.S.C. § 1103 .........................................................................................................................12, 26

8 U.S.C. § 1188 ......................................................................................................................passim

Ariz. Stat. § 23-1381......................................................................................................................24

K.S.A. 44-828 ................................................................................................................................24

Pub. L. No. 74-198 ........................................................................................................................21

Wisc. Stat. 111.115.........................................................................................................................24

Law Review Articles

Kara E. Stockdale, *H-2A Migrant Agricultural Workers: Protected from Employer Exploitation on Paper, Not in Practice*, 46 CREIGHTON L. REV. 755 (2013) ............................................................................15

## Other Authorities

Library of Congress, *Colorado Coalfield War: Topics in Chronicling America* ......................................................20
Sandra Dallas, *"Killing for Coal" Mines History of Labor in West*, Denver Post, Feb. 15, 2009 ...........................20
Thomas G. Andrews, *Killing for Coal: America's Deadliest Labor War* (2009) ..................................................20

## INTRODUCTION

During the 89 years that the National Labor Relations Act of 1935 (NLRA) has provided federal protection for collective bargaining rights, it has prohibited all agricultural workers from receiving that protection. With the stroke of a pen, one executive branch agency—Defendant Department of Labor (DOL)—has tried to undo this enduring compromise and sneak in through the backdoor what Congress has explicitly prohibited. DOL uses a ministerial authority under the Immigration and Naturalization Act (INA) to illegally provide collective bargaining rights to temporary, foreign-migrant farmworkers through the H-2A visa program. Meanwhile, American farmworkers are still barred from such protections under the NLRA. This is not only wrong, but also unlawful. It must be stopped. This Court should therefore grant the Plaintiffs a preliminary injunction and stay the effective date of the challenged rule under 5 U.S.C. § 705.  In the alternative, Plaintiffs request a temporary restraining order until an injunction can be granted.

## BACKGROUND

### I.    The National Labor Relations Act

In 1935, Congress passed the NLRA, which, among other things, established the right of certain employees to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concentrated activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The NLRA was enacted as a compromise, in hopes to settle the divisive (sometimes violent) labor strife of previous decades. Since its inception, as part of that settlement, the NLRA has explicitly excluded agricultural workers from that statutory right. 29 U.S.C. § 152(3). That exception has stood for 89 years.

### II.    The H-2A Visa Program

The primary law governing immigration to and citizenship in the United States is the

INA. In 1986, Congress Amended the INA with the Immigration Reform and Control Act
(IRCA). Among the many things, IRCA created a special class of temporary, foreign-migrant
agricultural workers. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). These workers receive H-2A visas.

The INA (including the IRCA amendments) is, obviously, an immigration statute.
Naturally then, it is primarily administered by the Department of Homeland Security (DHS)
(specifically, U.S. Citizenship and Immigration Services (USCIS)). However, the Secretary of
Labor does have a minor, ministerial duty under the statute: before USCIS can issue H-2A visas,
she must certify that (1) there are not sufficient American or lawful permanent resident workers
to perform the necessary work and (2) foreign workers will not adversely affect the wages and
working conditions of workers in the United States who are similarly employed. 8 U.S.C. §
1188(a)(1). The purpose of this certification authority is to ensure that there is no other choice
but to use foreign workers to perform the jobs for which H-2A authorization is sought. This
ultimately protects the welfare of American workers by reserving H-2A visas only for situations
where there are no American workers to be had.

III.    The Final Rule

On April 29, 2024, Defendants published their Final Rule: *Improving Protections for Workers
in Temporary Agricultural Employment in the United States*, 89 Fed. Reg. 33,898 (Apr. 29, 2024).

Several of the provisions of the rule illegally mirror provisions of the NLRA that protect
collective bargaining rights. *See* 29 U.S.C. §§ 157-58. For example, the Final Rule requires that
"with respect to any person engaged in agriculture...the employer has not and will
not...discharge, or in any manner discriminate against...any person who has engaged in activities
related to self-organization," which includes "any effort to form, join, or assist a labor
organization." 89 Fed. Reg. 34,062.  This mirrors 29 U.S.C. § 158(a)(1) and (2) of the NLRA,
which prevent employers from interfering with, restraining or coercing employees in exercising

7

their rights to form, join or assist labor organizations.

The Final Rule also requires employers to refrain from discriminating in any manner against an employee who "refused to attend an employer sponsored meeting with the employer…if the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected in this subpart; or has refused to listen to employer-sponsored speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart."  89 Fed. Reg. 34,063.  This overlaps significantly with the provision of the NLRA which deems it an unfair labor practice by an employer if they, "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."  29 U.S.C. § 158(a)(3).

The Final Rule further requires employers to "permit workers to designate a representative" in certain disciplinary meetings. 89 Fed. Reg. 34,011. It further requires employers to "permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview." *Id*. at 34,063.  This overlaps with 29 U.S.C. § 159(a) of the NLRA, which requires employers to allow employee representatives to be present when dealing with issues such as "pay, wages, hours of employment, or other conditions of employment."

In addition, the Final Rule includes the same prohibitions that appear in the NLRA governing "other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions."  *See* 89 Fed. Reg. 34,063; 29 U.S.C. § 157.

The Final Rule purports to protect a range of concerted activities, including secondary

boycotts and pickets. 89 Fed. Reg. 33,997. For example, the Final Rule states "a group of workers engaged in a labor dispute who meet with the management of a grocery store to explain their labor dispute and seek to persuade the store to stop carrying the products sold by the workers' employer until the labor dispute is resolved would be engaged in protected concerted activity" and announces DOL's intention "to interpret the terms 'concerted activity' broadly, to include concerted activities for the broad purpose of 'mutual aid or protection' as well as for the narrower purpose of 'self-organization,' as long as the object of the activity is related to the workers' own wages and working conditions." *Id*. at 34,007. This arguably goes further than the NLRA in that it allows what would be an unfair labor practice by a *labor organization*. *See* 29 U.S.C. § 158(b)(4).

Also, unrelated to the NLRA but a major provision of the Final Rule nonetheless is its alteration of the terms of payment due to H-2A workers. Specifically it changes the effective date of the annual Adverse Effect Wage Rate (AEWR)—one of the measures used to determine the wage owed to an H-2A worker. 89 Fed. Reg. 34,060. Whereas increases in the AEWR used to take effect on January 1 of the upcoming year, the Final Rule put the changes into effect upon publication of the AEWR in the Federal Register, which usually occurs around December 14. *Id.* at 34,048-49, 34,060.

## LEGAL STANDARD

Generally, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits 'is generally the most important of the four factors.'" *Am. All. for Equal Rts. v. Fearless Fund*

*Mgmt., LLC*, No. 23-13138, 2024 U.S. App. LEXIS 13325 at *18 (11th Cir. June 3, 2024) (quoting *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 n.12 (11th Cir. 2020)). Here, each of the four preliminary injunction factors weighs in Plaintiffs' favor.

## ARGUMENT

### I.     Plaintiffs are Likely to Succeed on the Merits of their Claims

Plaintiffs satisfy the most important factor: likelihood of success. Under the Administrative Procedure Act (APA), a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law..." 5 U.S.C. § 706(2)(A), (C). And Plaintiffs can plainly show that Defendants acted both arbitrarily and in excess of their lawful authority in adopting the Final Rule.

### A.  The Final Rule is Not in Accordance with Law

The Final Rule is not accordance with law because (1) it violates the NLRA, (2) it exceeds DOL's limited authority under the IRCA amendment to the INA, and (3) to the extent there is any ambiguity in the statute, DOL's interpretation is not entitled to any deference.

#### 1.   The Final Rule Violates the NLRA

The Final Rule is not in accordance with law because it violates the NLRA. As explained above, the NLRA expressly excludes agricultural workers from its definition of employee. 29 U.S.C. § 152(3); *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1507 (11th Cir. 1993). By purporting to provide workers with various collective bargaining and organizations rights, the Final Rule thus violates the NLRA. Importantly, nothing in the text or history of IRCA suggests that Congress intended to repeal or modify the relevant provisions of the NLRA. *Agri Processor*

*Co. v. NLRB*, 514 F.3d 1, 7 (D.C. Cir. 2008) (noting "all available evidence" indicates that Congress did not intend for IRCA to amend or repeal the NLRA).

Defendants appear to understand this is a problem. But they seem to think they can avoid it simply by waving their hands and claiming that the Final Rule does not provide a right to unionize or collectively bargain. 89 Fed. Reg. 33,991. But if it looks like a duck and quacks like a duck, then it's probably a duck. Although Defendants studiously avoid explicitly saying that H-2A workers can unionize or collectively bargain, the Final Rule's protections are near copies of those in the NLRA.

For example, the overarching protection the Final Rule provides H-2A workers is protection for "'concerted activity for mutual aid and protection' which encompasses numerous ways that workers can engage, individually or collectively, to enforce their rights." 89 Fed. Reg. 34,005. The Final Rule also requires "*with respect to any person engaged in agriculture…*the employer has not and will not…discharge, or in any manner discriminate against…any person who has engaged in activities related to self-organization," which includes "any effort to form, join, or assist a labor organization." 89 Fed. Reg. at 34,062 (emphasis added).

These provisions mirror the NLRA, which protects a qualifying worker's "right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. In addition, 29 U.S.C. § 158(a)(1) says it's an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." Defendants cannot hide behind linguistic smoke and mirrors. They are doing what the NLRA clearly forbids:

including agriculture workers under the NLRA and also providing federal protections for (a certain subset of) agricultural workers[1] to unionize.

### 2. The Final Rule Exceeds the DOL's Statutory Authority Under the INA/IRCA.

Defendants also cannot claim the IRCA amendment to the INA authorizes the Final Rule because their authority under the INA is limited. It is axiomatic that "an agency literally has no power to act… unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC* (*LPSC*), 476 U.S. 355, 357 (1986); *see also Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1084 (11th Cir. 2013) ("[A]n agency's power to promulgate legislative regulations is limited to the authority delegated to it by Congress…" (citation omitted)) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). The best way to determine whether Congress conferred power upon an agency "is to examine the nature and scope of the authority granted by Congress to the agency." *LPSC*, 476 U.S. at 357. To do so, courts look to the relevant statutory text because "[t]he authority of administrative agencies is constrained by the language of the statute they administer." *Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007) (citing *Massachusetts v. EPA*, 549 U.S. 497 (2007)). If an agency issues a rule without statutory authority, then the rule is unlawful and should be vacated. *See Bayou Lawn*, 713 F.3d at 1080.[2]

Turning to the matter at hand, it is important to note that DOL lacks any general rulemaking authority under the INA. Other federal officers have such generalized authority,

---

[1] As noted above, H-2A visa holders are, by their very nature, agricultural workers; the visa is only available for that sort of worker. 8 U.S.C. § 1188(i)(2) (citing definition in 8 U.S.C. § 1101(a)(15)(H)(ii)(a)).

[2] Although the case held that Defendants have rulemaking authority for the H-2A program under 8 U.S.C. § 1101(a)(15)(H)(ii)(a) that provision is limited to defining "agricultural or labor services" and not a general grant of rulemaking over the entire program.

including the Attorney General and the Secretary of Homeland Security, *see* 8 U.S.C. § 1103. But the Secretary of Labor is conspicuously absent from this broad grant of authority. Rather, she has only limited, specific grants of authority within the statutory scheme.  Specifically, the INA gives the Secretary of Labor the regulatory authority to:

- define "agricultural labor services," 8 U.S.C. § 1101(a)(15)(H)(ii)(a);

- set fees for the processing of H-2A certification applications, *id.* § 1188(a)(2); and

- "issue regulations which address the specific requirements of housing for employees principally engaged in the range production of livestock," *id.* § 1188(c)(4).

Yet 8 U.S.C. § 1188(a)(1)—the supposed authority for the Final Rule[3]—lacks any statement regarding the Secretary of Labor issuing regulations. All that subsection does is allow the Secretary of Labor to issue the necessary certifications allowing an employer to hire workers on an H-2A visa. The affirmative grant of rulemaking authority in other parts of the INA thus imply the absence of rulemaking authority elsewhere—including under § 1188(a)(1).  *See Bittner v. United States*, 143 S. Ct. 713, 720 (2023); *see also Bayou Lawn*, 713 F.3d at 1085 ("[I]f congressional silence is a sufficient basis upon which an agency may build a rulemaking authority, the relationship

---

[3] *See* 89 Fed. Reg. 33,901 ("the Department believes that these protections are important to prevent adverse effect on the working conditions of workers in the United States similarly employed. 8 U.S.C. 1188(a)(1)"); 89 Fed. Reg. 33,970-1 (noting that DOL "has long maintained that regulating the employment decisions made by an employer using the H-2A program is necessary to achieve statutory objectives—specifically, to ensure that H-2A workers are employed only when there are insufficient qualified, able, and available U.S. workers to complete the work, and to ensure that the employment of H-2A workers does not adversely affect the wages and working conditions of workers in the United States similarly employed, *see* 8 U.S.C. 1188(a)(1)— and has a long history of regulating in this space."); 89 Fed. Reg. 33972 ("The Department therefore has a responsibility pursuant to 8 U.S.C. 1188(a)(1) to ensure that an employer is relieved of these obligations only in situations where the employer has sufficient justification to terminate a worker for cause.").

between the executive and legislative branches would undergo a fundamental change and agencies would enjoy virtually limitless hegemony...." (internal quotes omitted)).

Indeed, the Eleventh Circuit has already rejected a similar attempt to expand DOL's regulatory authority under the INA. In *Bayou Lawn*, the agency claimed that a provision requiring the DHS to "consult" with DOL gave DOL the authority to, essentially, regulate on any topic on which it was to be consulted, so as "to structure its consultation with DHS." 713 F.3d at 1084. Yet the Circuit Court called this "an absurd reading of the statute" and rejected it, holding that DOL had no authority to issue rules on the matters it had attempted to regulate in that case. *Id.*

The Secretary of Labor has only a narrow role under § 1188(a)(1); she must consider two questions: (1) whether "there are...sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition," and (2) whether "the employment of...alien[s] in such labor or services will...adversely affect the wages and working conditions of workers in the United States similarly employed." *Id.* Section 1188(a)(1) is not a grant of general rulemaking authority over the H-2A program as a whole.  Rather, DOL's role in the H-2A program is limited, straightforward, and clear. The explicit authority given is the authority of "certification."  To certify something means to attest authoritatively.[4]  Just as "consultation" could not be read to extend into rulemaking authority in *Bayou Lawn*, neither can "certification" provide such authority here. To hold otherwise would be "an absurd reading of the statute," 713 F.3d at 1084.

But even if there were a silent-but-somehow-implied authority for DOL to issue rules under § 1188(a)(1), such authority would have to be exceptionally limited. The statute focuses DOL on a single concern: prioritizing the needs of domestic workers. *See Alfred L. Snapp & Son, Inc.*

---

[4] *See* https://www.merriam-webster.com/dictionary/certifying.

*v. Puerto Rico, ex rel. Barez,* 458 U.S. 592, 596 (1982); *Mendoza v. Perez,* 754 F.3d 1002, 1017 (D.C. Cir. 2014). "H-2A workers are not the intended beneficiaries of substantive rights granted by the statute," and "courts have declined to imply a right of action to enforce the minimal conditions established by the H-2A visa program." Kara E. Stockdale, *H-2A Migrant Agricultural Workers: Protected from Employer Exploitation on Paper, Not in Practice*, 46 Creighton L. Rev. 755, 776 (2013) (citation omitted). Rather than prioritizing domestic workers, the Final Rule subordinates their interests to foreign workers.

The statute also requires DOL to certify that American domestic workers will not be "adversely affect[ed]" by alien labor. 8 U.S.C. § 1188(a)(1)(B). This requirement does not authorize DOL to seek to *expand* or *improve* the wages or working conditions of workers—domestic or foreign.

The pre-split Fifth Circuit outlined the scope of DOL's authority in this regard in *Williams v. Usery*, 531 F.2d 305 (5th Cir. 1976). In that case, the court rejected an argument that a similar provision of the pre-amendment INA authorized DOL to set wages sufficient to "attract domestic workers," concluding that the argument reflected a "misunderstanding of the nature of the regulatory scheme authorized under the [INA]." *Id.* The court acknowledged that while some may think it desirable for DOL to afford workers greater benefits, DOL lacks the legal authority to do so and has "no authority to set a wage rate on the basis of attractiveness to workers." *Id.* Instead, the Court held that DOL has only "limited" authority to make "an economic determination of what rate must be paid all workers to neutralize any 'adverse effect' resultant from the influx of temporary foreign workers."[5] *Id.* In summarizing the scope of DOL's

---

[5] Neither *Williams*—nor its companion case *Florida Sugar Cane League, Inc. v. Usery*, 531 F.2d 299 (1976)—challenged the DOL's authority to issue regulations at all. *Florida Sugar Cane*, however, notes that the DOL's regulatory authority was premised on a "consultation" provision. 531 F.2d

authority, the Court stated that the Secretary of Labor's "authority to insure against a lowering of wages is hardly synonymous with the affirmative power to raise wages." *Id.*

Similarly, DOL's authority to guard against the "adverse effect" of alien labor under § 1188(a)(1) does not include an affirmative power to raise wages or improve working conditions. On the contrary, insofar as the DOL has any regulatory authority under § 1188(a)(1), it is limited to neutralizing adverse effect from a potential influx of foreign workers. *Accord Williams*, 531 F.2d at 306.

And although this conclusion is apparent from the text of the statute itself, the legislative history of IRCA confirms that Congress was chiefly concerned about protecting domestic workers. *See generally Mendoza*, 754 F.2d at 1017 (discussing the text of IRCA and the legislative history of the INA). Thus, both the text and history of the statute indicate that Congress granted DOL only a limited role in the H-2A program. *Accord Bayou Lawn*, 713 F.3d at 1084–85 (rejecting argument that "text, structure and object" of INA granted DOL rulemaking powers). The Final Rule exceeds this limited role by providing attractive benefits to foreign workers (indeed, more attractive than what the NLRA requires for domestic workers).

In sum, nothing in the IRCA amendments to the INA gives Defendants the authority for the Final Rule.

### 3.   Defendants' Position Is Not Entitled to Deference

---

at 300. Thus, any implicit finding that DOL had regulatory authority is of questionable validity after *Bayou Lawn*—especially given the statutory changes that came to the INA with the IRCA amendments (the visa program that *Williams* and *Florida Sugar Cane* addressed does not even exist anymore). *Williams* is cited merely to show that, even if there is some silent, implied regulatory authority under § 1188(a)(1), it must be exercised with a much closer tie to the statutory language than what Defendants have proffered here.

To the extent DOL argues that its contrary view is entitled to some form of *Chevron* deference, this Court should reject that argument for multiple reasons. First, DOL is not entitled to deference because the intent of Congress in this case is clear. *See Koch Foods, Inc. v. Sec'y, U.S. Dep't of Lab.*, 712 F.3d 476, 480 (11th Cir. 2013) ("Where the court finds that the statute is clear, as it does here, no deference is accorded to the agency's interpretation."); *Legal Envt'l Assistance Found., Inc. v. EPA*, 118 F.3d 1467, 1474 (11th Cir. 1997) ("It is only after we have determined that words used by Congress are ambiguous, or that Congress left a gap in the statutory language, that we turn to the agency's interpretation of these words to ascertain whether it deserves any deference."). Congress has spoken directly on the question of whether agricultural workers fall under the NLRA. Congress clearly did not intend to provide foreign agricultural workers with these types of benefits through an IRCA back door.

Second, DOL is not entitled to deference because it does not administer immigration laws. *See Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 649 (1990) ("A precondition to deference under *Chevron* is a congressional delegation of administrative authority."); *see also Dep't of the Navy v. Fed. Labor Relations Auth.*, 836 F.2d 1409, 1410 (3d Cir. 1988) ("[A]n agency decision is not entitled to...deference when it interprets another agency's statute...").[6]

The Final Rule is contrary to law and the Plaintiffs are likely to succeed on the merits of this argument.

**B.  The Final Rule Violates the Major Questions Doctrine**

---

[6] Depending on how the Supreme Court answers the question presented in *Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023) (granting certiorari on "[w]hether the Court should overrule *Chevron* or at least clarify that statutory silence concerning controversial powers expressly but narrowly granted elsewhere in the statute does not constitute an ambiguity requiring deference to the agency"), there might not be any deference to agency interpretation at all.

The Final Rule triggers the major questions doctrine. Over the past several years, the Supreme Court has applied a new label to a doctrine that has developed over decades—the major questions doctrine. *Biden v. Nebraska*, 143 S.Ct. 2355, 2374 (2023)**Error! Bookmark not defined.** (quoting *West Virginia v. EPA*, 597 U.S. 697, 724 (2022)). This doctrine requires "clear congressional authorization" for agency action in cases where an agency invokes broad authority over matters of great economic and political significance. *See West Virginia*, 597 U.S at 724. A variety of circumstances may trigger the application of the doctrine, including the sheer economic or political impact of the agency action. *See, e.g., Nebraska*, 143 S.Ct. at 2375 (concluding doctrine applies to a "mass [student] debt cancellation program"); *West Virginia*, 597 U.S. at 724-25 (concluding doctrine applies to EPA regulation that would "substantially restructure the American energy market").

Although these considerations "need not be present in every major-questions case, they are among the things that cause [a court] to hesitate and look for clear congressional authorization before proceeding." *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 297 (4th Cir. 2023). It ultimately boils down to "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), and goes back to the fundamental idea that Congress legislates on "important subjects" while delegating to "fill up the details," *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825).

The major questions doctrine applies when an agency undertakes action in which "a decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to clear delegation from that representative body." *West Virginia*, 597 U.S. at 735. A "colorable" or "plausible" textual basis is not sufficient to clearly authorize the agency action. *Id.* at 722. This is because Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking*

*Ass'n*, 531 U.S. 457, 468 (2001). Although no precise formula exists to demonstrate clear authorization, the factors a court may look to include: (1) where the statutory provision the agency relies on fits within the broader statutory scheme, (2) "the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address," and (3) "the agency's past interpretations of the relevant statute." *West Virginia*, 597 U.S. at 746–48 (Gorsuch, J., concurring) (citation omitted). In reviewing factors like these, the burden is on the agency to demonstrate that it has clear authorization. *See Nebraska*, 143 S.Ct. at 2375. This requires viewing actions in their proper context and utilizing a certain degree of common sense. *Id.* at 2379 (Barrett, J., concurring).

### 1. This is a Major Questions Doctrine Case

The major questions doctrine applies here because the Final Rule is politically significant. This is so for three reasons. First, it seeks to answer a question "of vast... political significance." *West Virginia*, 597 U.S. at 716 (quotation marks omitted).  The United States has long—and often intensely—debated the conditions upon which workers can or should unionize. The right to collective bargaining in the United States came in 1935 through the NLRA after decades of contentious relationships between labor and management.[7] *Cf. Texas v. Nuclear Regulatory Comm'n*, 78 F.4th 827, 844 (5th Cir. 2023) (nuclear waste disposal is major question

---

[7] "The Labor-Management truce during World War I evaporated after the armistice in 1918. The following year, unions lost major strikes in the steel, coal, and rail industries. Union membership dropped from more than five million members in 1920 to three million members in 1933—just 300,000 more than in 1914. Hostility between labor and management ran high in the 1920s." Nat'l Lab. Relations Bd., Pre-Wagner Act Labor Relations, https://www.nlrb.gov/about-nlrb/who-we-are/our-history/pre-wagner-act-labor-relations (last visited June 13, 2024). "In the 1930s, workers had begun to organize militantly, and in 1933 and 1934, a great wave of strikes occurred across the nation in the form of citywide general strikes and factory takeovers. Violent confrontations occurred between workers trying to form unions and the police and private security forces defending the interests of anti-union employers." Nat'l Archives, Milestone Documents, *National Labor Relations Act (1935)*, https://www.archives.gov/milestone-documents/national-labor-relations-act (last visited June 13, 2024).

because it "has been hotly politically contested for over a half century"). This included violent uprisings such as the Colorado Coal Field Strike and War of 1913-1914 in which coalminers engaged in violent warfare against Rockefeller-owned Colorado Fuel and Iron, resulting in 75 to 100 deaths. Thomas G. Andrews, *Killing for Coal: America's Deadliest Labor War* 14 (2009); Sandra Dallas, *"Killing for Coal" Mines History of Labor in West*, Denver Post, Feb. 15, 2009, at E12, *available at* https://www.denverpost.com/2009/02/12/killing-for-coal-mines-history-of-labor-in-west/; Library of Congress, *Colorado Coalfield War: Topics in Chronicling America*, https://guides.loc.gov/chronicling-america-colorado-coalfield-war (last visited June 13, 2024).

The NLRA was designed to calm these tensions by codifying worker protections into federal law through a series of delicate compromises that may have fully satisfied no one but gave everyone enough to secure the peace. *See* Pub. L. No. 74-198, § 1, ¶ 3, 49 Stat. 449, 449 (1935) ("Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.").

The NLRA was not a minor portion of an appropriations bill. It was serious legislation aimed at combatting a national problem. The excision of agricultural workers from the NLRA represents an obvious and deliberate compromise that arose out of competing interests debated by Congress. That settlement has stood the test of time as it has been the law of the land for 89 years and any changes to it would certainly be an issue of vast political significance. In other words, Congress has long known of this issue, yet still taken no action to fold agricultural workers into the NLRA. *See generally Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454,

465 (5th Cir. 2020) (observing that congressional inaction, despite awareness of the issue, was "fundamental problem with the agency's position").

Making the topic hotter still, the Final Rule represents the intersection of labor rights and immigration, possibly the most politically significant topic in 2024. Polling data shows there is great debate among Americans about immigration (both legal and illegal) into this country and the conditions under which someone can enter the country.[8] Regulations that grant foreign workers more collective-bargaining protections than their American counterparts would settle a controversial issue with serious arguments on both sides. That is something only Congress can decide. Yet Defendants have circumvented that process, taking it upon themselves to decide an aspect of that contentious, complicated issue absent congressional input.

Also noteworthy here is that the proposed version of the Final Rule elicited thousands of impassioned comments from organizations and individuals across the country. "Improving Protections for Workers in Temporary Agricultural Employment in the United States," https://www.regulations.gov/docket/ETA-2023-0003/comments (last visited June 11, 2024), as well as the attention of members of Congress[9] and major media outlets, Adam Shaw, *Republicans*

---

[8] *See generally* Gallup, Immigration, https://news.gallup.com/poll/1660/immigration.aspx#:~:text=In%202023%2C%2041%25%20say%20they,least%2Dpopular%20view%20through%202017 (reviewing decades of polling on the topic).

[9] Press Release, Sen. Tim Scott, "Sen. Scott, Colleagues Slam DOL's New H-2A Rule Imposing Union Pressure on Temporary Farm Workers" (Dec. 8, 2023), *available at* https://www.scott.senate.gov/media-center/press-releases/sen-scott-colleagues-slam-dols-new-h-2a-rule-imposing-union-pressure-on-temporary-farm-workers/; Letter from Virginia Fox, Chairwoman, H. Comm. on Educ. & the Workforce, & Glenn Thompson, Chairman, H. Comm. on Ag., to Julie A. Su, Acting Sec'y of Labor (Nov. 14, 2023), *available at* https://www.scribd.com/document/684702853/GOP-Education-and-Workforce-Committee-on-H-2A; Letter from Rep. Pramila Jayapal to Julie Su, Acting Sec'y of Labor, and Alejandro Mayorkas, Sec'y of Homeland Sec. (Nov. 14, 2023), *available at* https://jayapal.house.gov/wp-content/uploads/2023/11/Quill-Letter-L13779-H2A-Reg-Letter-Version-2-11-14-2023-@-09-06-PM.pdf.

*Warn Biden Admin's Foreign Farm Worker Rule Is 'Giveaway to Big Labor,'* Fox News (Nov. 15, 2023),

https://www.foxnews.com/politics/republicans-warn-biden-admins-foreign-farm-worker-rule-is-giveaway-to-big-labor. Thus, whether or the extent to which H-2A workers should receive

unionization protections is plainly "the subject of an earnest and profound debate across the

country," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (internal quotation marks and citation

omitted).

In addition, this Final Rule "intrudes into an area that is the particular domain of state

law." *Ala. Ass'n of Realtors*, 594 U.S. at 764. When a regulation implicates "areas traditionally

regulated by the States," "courts must be certain of Congress's intent" due to the federalism

concerns present. *Gregory v. Ashcroft*, 501 U.S. 452, 469-60 (1991); *West Virginia*, 597 U.S. at 746–48

(Gorsuch, J., concurring) (internal quotations omitted) ("[C]ourts must be certain of Congress's

intent before finding that it legislate[d] in areas traditionally regulated by the States."). *Coastal

Fisheries*, 76 F.4th at 297 (requiring clear showing of authority when "the asserted power raises

federalism concerns").

And, indeed, the collective bargaining rights of agricultural workers have been

traditionally regulated by the States—Congress' express exclusion of agricultural workers from

the NLRA has necessarily made it so. Over the past 89 years, states have moved to fill that void

and regulated agricultural workers in a different manner than other workers when it comes to

collective bargaining rights. For example, in Kansas it is unlawful for agricultural workers to

"engage in a strike during periods of marketing of livestock or during a critical period of

production or harvesting of crops." K.S.A. 44-828(c)(6). Other states have similar statutes. *See,

e.g.* Ariz. Stat. § 23-1381; Wisc. Stat. 111.115. There are good reasons for states to have these laws.

For example, labor strikes during peak harvesting season for perishable crops threaten the

state's food supply. But these laws conflict with the Final Rule.  The Final Rule states that DOL

intends "to interpret the terms 'concerted activity' broadly, to include concerted activities for the broad purpose of 'mutual aid or protection' as well as for the narrower purpose of 'self-organization,' as long as the object of the activity is related to the workers' own wages and working conditions." 89 Fed. Reg. 34,007.  The Final Rule places no limitation on when this concerted activity can occur, and any H-2A employer risks liability if they follow state law on the matter.

Defendants seek to unilaterally override a domain that has been exclusively regulated by the states for at least the past 89 years. As the Supreme Court has observed, when Congress wishes to "significantly alter the balance between federal and state power," it must employ "exceedingly clear language." *Forest Serv. v. Cowpasture River Preservation Ass'n*, 590 U.S. 604, 622 (2020).

### 2.   Defendants Lack Clear Statutory Authorization

Because the Final Rule implicates a major question, Defendants must point to clear authorization from Congress. *See West Virginia*, 142 S. Ct at 2614 (quoting *UARG v. EPA*, 573 U.S. 302, 324 (2014)). A "plausible" or "colorable" textual basis is not enough. Defendants have the burden of demonstrating *clear* authorization. But, for several reasons, they cannot meet it.

An important reason relates to where the legislative provision the Department relies on fits within the broader statutory scheme. *See West Virginia*, 597 U.S. at 746 (Gorsuch, J., concurring) (noting that courts examine legislative provisions "with a view to their place in the overall statutory scheme" and cautioning against reliance on general and gap-filler language (quoting *Brown & Williamson*, 529 U.S. at 133)); *see also Coastal Fisheries*, 76 F.4th at 297 (noting "hallmark" of major questions cases is "when the Act's structure indicates that Congress did not mean to regulate the issue in the way claimed"). The Department relies on 8 U.S.C. § 1188(a)(1) as its authority to promulgate the Final Rule. 89 Fed. Reg. at 33,899; *accord* 88 Fed. Reg. at 63,751

(Sept. 15, 2023). But 8 U.S.C. § 1188(a)(1) is part of the IRCA amendments to the INA. The INA is "lengthy and complex." *U. S. ex rel. Carson v. Kershner*, 228 F.2d 142, 147 (6th Cir. 1955), *rev'd on other grounds sub nom. Lehmann v. U.S. ex rel. Carson*, 353 U.S. 685 (1957). And its administration is overseen by the Attorney General and the Secretary of Homeland Security. *See, e.g.*, 8 U.S.C. § 1103. In other words, § 1188(a)(1) is a small provision of a major statutory scheme administered or overseen by officials in different executive departments. And that small provision assigns to the DOL a mere ministerial function—issuing certifications to H-2A employers.[10] The Final Rule therefore represents a "transformative expansion in [the DOL's] regulatory authority." *Utility Air Regulatory Grp. v. EPA (UARG)*, 573 U.S. 302, 324 (2014). It is highly unlikely that Congress would have hidden authorization for such a consequential change within this ministerial function.

Turning to the age and focus of 8 U.S.C. § 1188(a)(1), it is a 37-year-old statute focused on protecting American workers, not foreign workers. It says that the Attorney General "may not" approve petitions to import H-2A workers "*unless* the petitioner has applied to the Secretary of Labor for a certification that... there are *not* sufficient workers [already available]... *and* [that] the employment of the alien... will *not* adversely affect the wages and working conditions of *workers in the United States* similarly employed." *Id.* (emphasis added). Notwithstanding the focus of § 1188(a)(1), the Final Rule focuses on conferring benefits on migrants, and only in a roundabout way considers the plight of American workers. *See* 89 Fed. Reg. at 33,987.

Finally, Defendants have never previously asserted authority under 1188(a)(1) to protect collective bargaining rights. Yet, 37 years later—and without reasonable explanation—the

---

[10] And even that authority is secondary to the Attorney General's overriding authority. The DOL can issue the required certifications, and the Attorney General cannot approve the importation of H-2A workers without that certification, but the ultimate approval still lies within the Attorney General's discretion. *See* § 1188(a)(1).

Department suddenly posits that § 1188(a)(1) gives them the authority to override almost 90 years of settled law.  Although past unchallenged practice does not in itself give rise to a presumption of illegality, the fact that no such practice exists is telling. *See West Virginia*, 597 U.S. at 748 (Gorsuch, J., concurring). It demonstrates that Defendants did not suddenly find authority that's been hiding for 37 years but instead are attempting to seize new power beyond the bounds of their limited statutory delegation.

In sum, the Final Rule deals with a subject of vast political and federalism significance. Because of that, Defendants have the burden of demonstrating that they have clear authorization from Congress to promulgate it. They can't. Therefore, the Final Rule violates the major questions doctrine.

### C.  The Final Rule is Arbitrary and Capricious.

A decision is arbitrary and capricious if:

> the factors the agency relied on were not what Congress would intend, if the agency entirely failed to consider an important aspect of the problem, if the agency offered an explanation counter to the evidence before the agency, or if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1290 (11th Cir, 2021) (internal citations omitted). Although this standard is deferential to the agency, courts "are not a rubber stamp." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1263 (11th Cir. 2020).

In this case, Defendants (1) relied on factors that were not what Congress would intend, (2) came up with an implausible explanation for its actions that could not be ascribed to difference in views or the product of agency expertise, and (3) took a sharp departure from past practice without reasonable explanation.

### 1.  Reliance on Factors Congress Did Not Intend

Defendants' explanation for the Final Rule relies on factors Congress did not intend for the agency to rely on—because it had already spoken on the issue of collective bargaining protections for agricultural workers. Yet the Final Rule strongly considers the importance of unionization within the agricultural workforce and the harm these workers have endured without union protections.[11] But given Congress' explicit statement on the issue, that could not have been something it intended Defendants to consider.

The Final Rule also focuses heavily on the protection of foreign workers.[12] However, prevention of foreign migrant laborer exploitation is not a factor that Congress intended DOL to consider under 8 U.S.C 1188(a)(1). Congress wanted the agency's focus to be on whether "the employment of the alien in such labor or services will not adversely affect the wages and working conditions *of workers in the United States* similarly employed." 8 U.S.C. § 1188(a)(1)(B) (emphasis added). And Congress wanted Defendants to ensure that before an H-2A worker is hired "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition." 8 U.S.C. § 1188(a)(1)(A).

---

[11] *See, e.g.,* 89 Fed. Reg. 33,992 ("the Department seeks to prevent adverse effect on similarly employed workers by ensuring that workers have the tools to ensure that their rights under the H-2A program are not violated and to advocate regarding the terms and conditions of their employment, on more equal footing with similarly employed workers in the United States. Though such similarly employed workers may be excluded from the NLRA's protections, they may be less likely to face the unique vulnerabilities and forms of retaliation experienced by H-2A workers described above.").

[12] *See, e.g.,* 89 Fed. Reg. 33,968 ("Failure to clearly and fully disclose any available overtime pay in the job order harms prospective workers who may be more interested in the job opportunity if they are aware of the availability of overtime pay."); 89 Fed. Reg. 33,934 ("the Department believes that its interest in protecting workers from the harmful, potentially dangerous situations giving rise to immediate discontinuation outweighs any burden employers may experience while services are discontinued."); 89 Fed. Reg. 33,040 ("delayed start dates are harmful to workers, who value predictability and certainty in employment start dates.").

The Final Rule addresses these considerations only in a roundabout way and places the primary focus on benefits to H-2A workers (and by extension the unions who increase their membership with H-2A workers).[13] In doing so, Defendants create a situation where foreign workers have better conditions than their American counterparts. No matter how many ways Defendants try to spin the collective bargaining rights for H-2A workers as a benefit to Americans, the reality is that American farmworkers are still prohibited by statute from receiving federal protection for collective bargaining.

Therefore, further unionization of H-2A workers cannot have the impact they say it does on American wages and working conditions because domestic farmworkers are denied that protection. Any benefit to American farmworkers would be speculative at best, and Defendants do not point to any data to support this speculative conclusion. This is not an explanation based on a difference in view or a product of agency expertise. It is simply an attempt to accomplish something Congress explicitly forbade through the rulemaking process.  As a result, the Final Rule considers factors Congress did not intend for it to rely on and provided an explanation so implausible that it cannot be ascribed to a difference in view or a product of agency expertise.

## 2.   Implausible Explanation

For similar reasons, Defendants explain their actions in a manner that is implausible, to say the least.  The Final Rule effectively provides NLRA rights to H-2A workers.  These are rights that American farmworkers explicitly do not have under federal law.  Instead of saying

---

[13] *See, e.g.*, 89 Fed. Reg. 33,991 ("The Department concludes that these provisions [including "safeguard collective action"], which safeguard worker voice and empowerment, will prevent adverse effect on similarly employed workers in the United States by alleviating some of the barriers H-2A workers face when raising complaints about violations of their rights under the program and advocating regarding working conditions.").

this, Defendants try to make it appear that this *benefits* American farmworkers through some odd, not-fully-explained transitive property.[14]

Defendants had to shoehorn their justification into a benefit for American farmworkers because the statute requires their certification to be based on prevention of adverse effects for American farmworkers. And that makes their purported explanation even more implausible. It is counterintuitive and irrational to believe that this Final Rule would somehow be a benefit for anyone other than H-2A workers. Quite to the contrary: it seems a more likely result would be to ensure that there are *never* sufficient qualified and available domestic workers. Why would Americans or permanent residents decide to work in a field where they get less benefits and protections than their foreign competition?

It is clear Defendants are simply using that as a pretext to do what they actually wanted to do—unionize H-2A farmworkers. But the law does not allow them to utilize an implausible pretext to accomplish this.

### 3. Sharp Departure

Arbitrary-and-capricious review requires that the agency provide "a reasoned explanation for its action." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). This is especially true when an agency action is a sharp departure from past practice. *See Data Mktg. P'ship, LP v. Dep't of Labor*, 45 F.4th 846, 857 (5th Cir. 2022). Here, Defendants are departing from 37 years of past practice by requiring employers to allow H-2A workers to unionize. Yet Defendants have

---

[14] *See, e.g.*, Fed. Reg. 33,992 ("The tools adopted in this final rule include the right for [H-2A] workers to engage in protected, concerted activity without fear of retaliation and additional worker protections to empower workers in order to engage in advocacy regarding the terms and conditions of employment. In adopting these provisions, the Department is exercising its long-recognized authority to establish the minimum terms and conditions of employment ( *i.e.*, the "baseline" of working conditions) necessary to "neutralize any 'adverse effect' [on domestic workers] resultant from the influx of temporary foreign workers.").

failed even to "display awareness that [they *are*] changing position," *Fox TV Stations*, 556 U.S. at 515, let alone provide a reasonable explanation therefor.

In summary, Defendants provide counterintuitive rationales, in a roundabout way, for how they are preventing adverse effects on American wages. They lack awareness of the limits on their statutory power, the Congressionally mandated relevant considerations, and the significant change that the Final Rule represents. That is not reasonable decision-making. Consequently, the Final Rule is arbitrary and capricious.

## II.     The Remaining Requirements for Equitable Relief are Met Here

### A.   Without Relief from this Court, Plaintiff States Will Suffer Irreparable Harm

Due to sovereign immunity, Plaintiff States cannot recover damages from the federal government. SO the unrecoverable costs the Final Rule inflicts on the Plaintiff States constitute irreparable harm. *See Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022) (citation omitted); *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1300 (M.D. Fla. 2021). Plaintiff States will thus be irreparably harmed by the Final Rule.

Plaintiff States' workforce agencies will incur administrative costs in the implementation of the Final Rule. The H-2A program requires employers to begin the certification process through state workforce agencies such as those located in Plaintiff States. *See, e.g.* Goldwater Decl. ¶ 4-5 (attached as Ex. 9) York Decl. ¶¶ 4 – 6 (attached as Ex. 12). And Defendants require state workforce agencies to review job orders for deficiencies and give prospective H-2A employers the ability to correct them. *Id.* This Final Rule will result in state agencies having to change their approach and behavior, which will result in additional administrative costs. *Id.* York Decl. ¶¶ 11 – 13. DOL does not provide extra funding to cover these costs, and Plaintiff States cannot otherwise recover these costs from the federal government. The Final Rule requires Plaintiff States to bear the cost of implementation.

**B.** **Without Relief from This Court, Miles Berry Farm and the GFVGA Will Suffer Irreparable Harm**

Like the States, Miles Berry Farm and the GFVGA will suffer irreparable harm. First, DOL acknowledges that employers such as Miles Berry Farm and the members of the GFVGA will experience at least two types of costs upon the Final Rule taking effect. One type is an increase in payments to H-2A workers, which stems from changes to the annual effective date of new Adverse Effect Wage Rates (AEWRs). The AEWR is one of the measures used to determine the minimum wage owed to H-2A workers. 89 Fed. Reg. at 34,060. The Final Rule eliminates a delay between the publication of the annual AEWR in the Federal Register and the effective date of the AEWR. *See id.* (amending 20 C.F.R. § 655.120 to make "updated AEWR… effective as of the date of publication of the notice in the Federal Register"). Absent the Final Rule, changes to the AEWR did not take effect until January 1; with the Final Rule, changes will take effect in mid-December. *Id.* at 34,048-49. Over a ten-year period, the DOL anticipates this change will cost farms across the country between $12 and $20 million. *Id.* at 34,049. And, where members of the GFVGA, including Minor Brothers Farm and Minor Produce, Inc., employ workers between December 14 and December 31, the change in the effective date of the AEWR will pose a direct financial impact to Plaintiffs. *See* Butts ¶ 18 (attached as Ex. 3). This direct financial impact will not be recoverable if the Final Rule is permitted to take effect.

The GFVGA identifies the second type of cost, explaining that the Final Rule would increase its costs and costs to its members by requiring compliance in administering a complex new rule that applies to farmworkers for the first time. *See* Butts Decl. ¶¶ 15-20. The DOL readily acknowledges the existence of these costs, as either a time cost to farmers needing to familiarize themselves with the Final Rule or a financial cost of around $300 to hire a Human Resource specialist to learn about the Final Rule and gather and enter additional information about H-2A

employees. *See* 89 Fed. Reg. at 34,047 (setting HR specialist hourly rate at $55.79 and estimating four hours for rule review[15] and two hours for gathering and entering of new employee information required by the Final Rule); *see also id.* at 34,044. Again, as with the first cost, this direct financial cost will not be recoverable if the Final Rule is permitted to take effect. This is irreparable *per se* because legal remedies are inadequate. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).

Miles Berry Farm and GFVGA members outlined a second irreparable injury. The efficient and effective operation of their farms often requires them to investigate personnel matters in a timely manner, especially when disputes impacting the performance of job functions, crop quality, or safety arise between workers in the fields or in a packaging warehouse. Thompson Decl. ¶ 20 (attached as Ex. 6); Brim Decl. ¶ 22 (attached as Ex. 5); Miles Decl. ¶ 20 (attached as Ex. 2); Minor Decl. ¶ 22. Yet, the Final Rule forces these farms to sit on their hands and wait for a designated representative of the H-2A workers to attend before commencing an investigatory interview.  89 Fed. Reg. at 34,063. And this requirement applies where an H-2A worker "reasonably believes" the investigation "might result in disciplinary action," even if the employer just wants to resolve the matter and get his or her team back to harvesting produce. *Id.*  As a pair of H-2A workers and a crew supervisor sit in an office trying to reach the designated representative, fragile berries are exposed to an extra day on the vine in ninety-degree heat or sit already picked in a warehouse losing their freshness while waiting to be packaged. And the delay means the fruit is also delivered to customers a day late. *See generally*

---

[15] This estimate seems low. The Final Rule and accompanying explanatory information is 172 pages, in three-column format. *See* 89 Fed. Reg. at 33,898–34,069. Thus, to meet the DOL's four-hour estimate, a farmer or HR specialist seeking to familiarize themselves with the ins and outs of the Final Rule would need to read and internalize the Final Rule's information at a rate of 43 pages an hour.

*BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("Although economic losses alone do not justify a preliminary injunction, the loss of customers and goodwill is an irreparable injury." (internal quotes omitted)).

Finally, the injury is imminent because it is "certainly impending." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *accord Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020). The explanatory preamble to the Final Rule notes that DOL will apply the Final Rule to "all H-2A applications submitted on or after 12:00 a.m. Eastern Daylight Time, August 29, 2024."  89 Fed. Reg. at 33904. This is but a few months away. The injuries are authorized by policy, making them certain to occur. *Worthy v. City of Phenix City*, 930 F.2d 1206, 1215 (11th Cir. 2019). And, as demonstrated in the declarations, Miles Berry Farm and at least one member of the GFVGA will be filing H-2A applications between September 2024 and November 2024—i.e., after the Final Rule will apply to their H-2A applications. *See* Butts Decl. ¶ 18; *see also* Thompson Decl. ¶ 14  2. Moreover, where farms are highly dependent on H-2A workers, farmers across America will be left with the choice of letting crops go unplanted and unharvested or complying with the Final Rule if the Rule is allowed to take effect. This is an obvious and imminent harm.

### C. The Balance of Harms and Public Interest Favor Relief Here.

Plaintiffs meet the remaining factors. "The third and fourth factors 'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (quotations and citations omitted); *accord Nken v. Holder*, 556 U.S. 418, 435 (2009) (same, considering a stay). A preliminary injunction would avoid harm to Plaintiffs.  Plaintiffs face imminent and irreversible harms in the form of administrative costs, costs for counselors/advisors, loss of tax revenue, as well as compliance costs for GFVGA and Miles Berry. Yet an injunction will cause "little or no harm" to Defendants. *Moore v. Brown*, 448 U.S. 1335, 1339 (1980). Having gone 37 years without asserting authority to effect the sea change the

Final Rule attempts, Defendants cannot credibly claim need to rush the Final Rule into effect prior to this Court's preliminary review. As such, the balance of harms favors Plaintiffs.

The public interest also weighs in Plaintiffs' favor. Agencies are not permitted to act unlawfully "even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 766 (2021). "[T]here is 'no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1315 (11th Cir. 2021) (Lagoa, J., dissenting) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). The public is harmed by "the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (quotation omitted).

Beyond the public's interest in ensuring that the federal government acts legally, the public will be harmed by this Rule because it presents an obstacle to food producers and those costs will be passed along to consumers who are already reeling from the effects of inflation at the grocery store. This factor is also satisfied.

### III.    The APA and Equity Principles Support Entry of Universal, Preliminary Relief.

This Court should stay or enjoin implementation of the Final Rule nationwide, not just in Plaintiff States, pending a decision on the merits. Under 5 U.S.C. § 705, "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review"). Section 705 "confer[s] upon every 'reviewing court' discretionary authority to stay agency action pending judicial review 'to the extent necessary to prevent irreparable injury.'" Clark, *Att'y Gen's Manual on the Administrative Procedure Act* 105 (1947); *see also In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985) (section 705 provides "statutory authority to stay agency orders pending review"); *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 562 (D.C. Cir. 2015)

(Kavanaugh, J., dissenting in part) ("Section 705 of the APA authorizes courts to stay agency rules pending judicial review without any time limit on the duration of the stay."). Courts may—and routinely do—stay effective agency actions, even after the effective date. *See, e.g., West Virginia v. EPA*, 136 S. Ct. 1000 (2016) (staying EPA's Clean Power Plan after 29 states moved for a stay under section 705); *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021); *Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016).

The APA authorizes nationwide relief even as an ultimate remedy. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C.Cir.1989); *see also Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2351 (2020) (explaining that when "a provision is declared invalid," it "cannot be lawfully enforced against others."). Indeed, the APA itself allows a reviewing court to "hold unlawful and set aside agency action," 5 U.S.C. § 706(2), a power that is consistent with a nationwide injunction. "[U]nsupported agency action normally warrants vacatur." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005). The "ordinary practice" is to "vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). Vacatur removes the source of the defendant's authority. Indeed, "[w]hen a court holds on the merits that a rule is unlawful and should be 'set aside,' the rule is vacated, and thereafter cannot be applied to anyone." Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1131 (2020) (citing *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) ("To 'vacate,' as the parties should well know, means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'")). "Courts have, thus, found a nationwide

injunction appropriate in such cases" Involving federal rules of nationwide scope. *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 397 (M.D.N.C. 2019) (collecting cases); *accord Jordan v. Pugh*, No. CIV.A. 02-CV-01239MS, 2007 WL 2908931, at *4 (D. Colo. Oct. 4, 2007).

The particular facts of this case make it appropriate for a universal injunction. Stays and preliminary injunctions are not "one and the same." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Indeed, they differ in a crucial way: stays act on the *proceeding* while preliminary injunctions act on the *parties. See Nken*, 556 U.S. at 428 ("[A]n injunction is a judicial process or mandate operating *in personam*" (quoting 1 H. Joyce, *A Treatise on the Law Relating to Inunctions* §1 (1909)); *id.* at 428 (2009) (an injunction "tells someone what to do or not to do ... [,] directs the conduct of a party, and does so with the backing of [the court's] full coercive powers"); *id.* at 428 (2009) (a stay "halt[s] or postpone[s] some portion of the proceeding" or "temporarily divest[s] an order of enforceability" (citing *Stay*, Black's Law Dictionary 1413 (6th ed. 1990)). So while both an injunction and a stay can prevent "some action before the legality of that action has been conclusively determined[,]" an injunction "direct[s] an actor's conduct" but a stay "temporarily suspend[s] the source of authority to act." *Nken*, 556 U.S. at 428-29.

This case is appropriate for a universal injunction. First, this rule implicates federal immigration policy, and "courts have frequently found that a nationwide injunction can be warranted in the immigration context." *Florida v. HHS*, 19 F.4th 1271, 1282 (11th Cir. 2021). Furthermore, a limited injunction in such circumstances goes against the notion that federal immigration policy is supposed to be "a comprehensive and *unified* system." *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)). And because Plaintiffs include 17 states, an injunction limited to those states would result in inconsistent application of federal immigration law.

Also, independent of context, a universal injunction would "protect similarly situated nonparties [and] avoid the chaos and confusion of a patchwork of injunctions"—considerations

that the Eleventh Circuit has found justify universal relief under the APA. *Florida v. HHS*, 19 F.4th at 1282.

There are other practical reasons for extending the injunction nationwide as well. "[T]ailoring an injunction to address the alleged harms to the remaining States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022). And allowing union-like rights for H-2A workers in non-Plaintiff states but not in Plaintiff States would create an incentive for such labor in non-Plaintiff States, which would funnel foreign migrant agricultural labor away from Plaintiff States—creating more harm to companies like the GFVGA's members (the exact opposite of what an injunction is intended to do). This Court should not permit such an inequitable outcome.

Given the magnitude of harms that will occur if the Final Rule is permitted to go into effect in Plaintiff States, it should not be permitted to go into effect in any states while this Court examines the legality of the Final Rule.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Preliminary Injunction and stay the effective date of the Final Rule. Alternatively, this Court should grant a temporary restraining order until an injunction can be granted. [16]

> KRIS W. KOBACH
> **Attorney General of Kansas**
> */s/ Abhishek S. Kambli*
> Abhishek S. Kambli
> *Deputy Attorney General*

---

[16] The Plaintiffs filed a motion to exceed page limits that is currently pending with the court. However, due to the effective date of the Final Rule being June 28, 2024, Plaintiffs needed to submit this memorandum as soon as they could.

James R. Rodriguez
*Assistant Attorney General*
KANSAS OFFICE OF THE
 ATTORNEY GENERAL
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
jay.rodriguez@ag.ks.gov
*Pro hac vice pending


**CHRISTOPHER M. CARR**
**Attorney General of Georgia**
Stephen J. Petrany *
*Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Pro hac vice pending

*/s/ G. Todd Carter*
G. Todd Carter, Esq.
   Georgia Bar No: 113601
Special Assistant Attorney General
OFFICE OF THE GEORGIA ATTORNEY
GENERAL
BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue
P. O. Box 220
Brunswick, GA 31521-0220
Tel:  912-264-8544
Fax: 912-264-9667
tcarter@brbcsw.com


**ALAN WILSON**
**Attorney General of South Carolina**
*/s/ Joseph D. Spate*
Joseph D. Spate*
Assistant Deputy Solicitor General
Office of the Attorney General of South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

37

*/s/ Thomas T. Hydrick*
Thomas T. Hydrick**
Assistant Deputy Solicitor General
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211
803-734-4127
**Pro hac vice forthcoming

**TIM GRIFFIN**
**Arkansas Attorney General**
*/s/Michael Cantrell*
Michael Cantrell**
 *Assistant Solicitor General*
Nicholas J. Bronni
 *Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201
Telephone: (501) 682-2401
michael.cantrell@arkansasag.gov
*Counsel for Petitioner State of Arkansas*
**Pro hac vice forthcoming

**ASHLEY MOODY**
**Attorney General of Florida**
*/s/ Christine Pratt*
Christine Pratt (FBN 100351)**
Counselor to the Attorney General
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
(850) 410-2672 (fax)
christine.pratt@myfloridalegal.com
**Pro hac vice forthcoming

**RAÚL R. LABRADOR**
**Attorney General of Idaho**
*/s/ Joshua Turner*
Joshua Turner, **
*Chief of Constitutional Litigation & Policy*
700 W. Jefferson St., Suite 210,
PO Box 83720,
Boise, Idaho 83720
(208) 334-2400

josh.turner@ag.idaho.gov
*Counsel for Plaintiff State of Idaho*
*Pro hac vice forthcoming

**THEODORE E. ROKITA**
**Attorney General of Indiana**
/s/ *James A. Barta*
JAMES A. BARTA*
*Solicitor General*
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
Phone: (317) 232-0709
Email: james.barta@atg.in.gov
*Counsel for the State of Indiana*
*Pro hac vice pending

**BRENNA BIRD**
**Attorney General of IOWA**
/s/ *Eric H. Wessan*
Eric H. Wessan, *pro hac vice*
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
*Counsel for Plaintiff State of Iowa*
*Pro hac vice forthcoming

**LIZ MURRILL**
**Attorney General of Louisiana**
/s/ *J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
*Solicitor General*
Louisiana Department of Justice
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 326-6766
aguinaga@ag.louisiana.gov
*Counsel for Plaintiff State of Louisiana*
*Pro hac vice forthcoming

**ANDREW BAILEY**
**Attorney General of Missouri**
/s/ *Reed C. Dempsey*
Reed C. Dempsey #1697941DC*

*Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
reed.dempsey@ago.mo.gov
*Pro hac vice forthcoming

AUSTIN KNUDSEN
**Attorney General of Montana**
*/s/ Christian B. Corrigan*
Christian B. Corrigan*
   *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov
*Counsel for Plaintiff State of Montana*
*Pro hac vice forthcoming

MICHAEL T. HILGERS
**Attorney General of NEBRASKA**
*/s/ Lincoln J. Korell*
Lincoln J. Korell*
   *Assistant Solicitor General*
ATTORNEY GENERAL OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
Zachary.pohlman@nebraska.gov
*Counsel for Plaintiff State of Nebraska*
* Pro hac vice pending

DREW H. WRIGLEY
**North Dakota Attorney General**
*/s/ Philip Axt*
PHILIP AXT*
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck ND 58505

Phone: (701) 328-2210
Email: pjaxt@nd.gov
*Counsel for the State of North Dakota*
*Pro hac vice pending

GENTNER DRUMMOND
**Attorney General of Oklahoma**
*/s/ Garry M. Gaskins*
Garry M. Gaskins, II, OBA # 20212*
Solicitor General
Zach West, OBA # 30768*
Director of Special Litigation
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
*Pro hac vice forthcoming

JONATHAN SKRMETTI
**Attorney General and Reporter of Tennessee**
*/s/ J. Matthew Rice*
J. Matthew Rice*
 *Solicitor General*
Whitney Hermandorfer*
 *Director of Strategic Litigation*
Office of the Attorney General and Reporter of
Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
Phone: (615) 741-7403
Email: Matt.Rice@ag.tn.gov
Whitney.Hermandorfer@ag.tn.gov
*Counsel for State of Tennessee*
*Pro hac vice pending

KEN PAXTON
Attorney General of the State of Texas

41

BRENT WEBSTER
First Assistant Attorney General
RALPH MOLINA
Deputy Attorney General for Legal Strategy
RYAN D. WALTERS
Chief, Special Litigation Division
*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER*
*Special Counsel*
Tex. State Bar No. 24118415
GARRETT GREENE*
*Special Counsel*
Tex. State Bar No. 24096217
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Kathleen.Hunker@oag.texas.gov
Garrett.Greene@oag.texas.gov
*Pro hac vice forthcoming

**JASON S. MIYARES**
**Attorney General of Virginia**
*/s/ Kevin M. Gallagher*
Kevin M. Gallagher*
*Principal Deputy Solicitor General*
Brendan T. Chestnut*
*Deputy Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
*Counsel for Plaintiff Commonwealth of Virginia*
*Pro hac vice forthcoming

*/s/ Braden H. Boucek*
Braden H. Boucek
   Tenn. BPR No. 021399
   Ga. Bar No. 396831
*/s/ Jordan Miller*
Jordan Miller*
   Michigan Bar. No. P81467
SOUTHEASTERN LEGAL FOUNDATION

560 W. Crossville Road, Suite 104
Roswell, GA  30075
Tel.: (770) 977-2131
bboucek@southeasternlegal.org
jmiller@southeasternlegal.org
*Pro hac vice pending