**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

STATE OF KANSAS, *et al.*

              Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
LABOR, *et al.*,

              Defendants.

Civil Action No. 2:24-cv-76-LGW-BWC

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR**
**STAY/PRELIMINARY INJUNCTION/TEMPORARY RESTRAINING ORDER**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

I.      DOL's Authority to Grant Temporary Labor Certifications Is Pivotal to Operation of the H-2A Program Overall. .......................................................................... 3

II.      The Final Rule Empowers Workers to Ensure Compliance with the H-2A Program's Minimum Requirements to Prevent Adverse Effects to Workers in the United States. ......................................................................................................... 6

III.      Procedural Background ........................................................................................ 10

LEGAL STANDARD ....................................................................................................... 11

ARGUMENT .................................................................................................................... 12

I.      Plaintiffs Failed to Establish Likelihood of Succeed on the Merits ................... 12

     A.      The Final Rule Does Not Violate the NLRA. ......................................... 12

     B.      The Final Rule Is a Proper Exercise of DOL's Statutory Obligation to Ensure That the Use of H-2A Workers Does Not Adversely Affect Workers in the United States. .................................................................. 15

     C.      The Final Rule Is Not Arbitrary and Capricious. .................................. 29

II.      The States Have Not Established Injury, Let Alone Irreparable Harm. ............. 33

III.      The Public Interest Weighs Against a Preliminary Injunction. ......................... 37

IV.      Any Relief Should Be Limited to the Plaintiffs that Have Established Standing and Irreparable Harm. ......................................................................................... 38

CONCLUSION ................................................................................................................. 41

i

## <u>INTRODUCTION</u>

Nearly 40 years ago, Congress delegated authority to the Department of Labor ("DOL") to ensure that the hiring of temporary nonimmigrant farmworkers pursuant to the H-2A program did not "adversely affect the wages and working conditions of workers in the United States similarly employed." *See* 8 U.S.C. § 1188(a)(1).  Beginning in 1987 and over the last four decades, DOL has promulgated regulations to implement that clear and broad statutory command.  The challenged provisions of the rule at issue here continue that effort by affording workers employed under the H-2A program—both H-2A workers and their domestic non-H-2A co-workers—with the tools necessary to advocate for themselves in response to H-2A employers who fail to provide the baseline wages and working conditions that DOL has previously determined are necessary to prevent adverse effects on workers in the United States.  *See* Final Rule, *Improving Protections for Workers in Temporary Agricultural Employment in the United States*, 89 Fed. Reg. 33,898 (Apr. 29, 2024) ("Final Rule" or "Rule").  "Empowering workers in this way thus can improve compliance with the various terms and conditions of H-2A employment that the Department has separately determined are necessary to prevent adverse effect on similarly employed workers." *Id.* at 33,991.  Further, these provisions also seek to place workers employed under the H-2A program "on more equal footing with similarly employed workers and thus reduce the potential for this workforce's vulnerability to undermine the advocacy efforts of similarly employed workers." *Id.*

Notwithstanding the Rule's fealty to Congress's direction, Plaintiffs—17 states, a private employer, and a trade organization—allege that the Final Rule violates the National Labor Relations Act ("NLRA"), the Immigration and Nationality Act ("INA"), as amended by the Immigration Reform and Control Act of 1986 ("IRCA"), and the Administrative Procedure Act ("APA").  Plaintiffs seek the extraordinary relief of a temporary restraining order, a preliminary injunction, and/or a stay pursuant to 5 U.S.C. § 705.  The Court should reject Plaintiffs' effort.

At the outset, Plaintiff States lack standing to bring any of their claims because they have not suffered an injury in fact.  As relevant here, the states' role in the H-2A program is to review the terms and conditions of employment submitted by prospective employers and check that

prospective employers have provided the proper assurances that they will comply with the law and regulations.  That role preceded the Final Rule, which accordingly does no harm to the states.  Moreover, the federal government provides funding for these administrative duties, and Plaintiff States have not shown that their budgets are affected.

On the merits, Plaintiffs are not likely to succeed on any of their claims.  Count One fails because the NLRA does not prohibit DOL from issuing labor regulations that reach employees not covered by the NLRA.  Agricultural employees—the only employees covered by the Rule's concerted action provisions—fall outside the NLRA's reach, as Plaintiffs acknowledge.  But, contrary to Plaintiffs' assertion, that fact permits—rather than forecloses—issuance of the Rule.

Plaintiffs are similarly unlikely to prevail on their other two statutory claims.  Count Two fails because the Final Rule is authorized by IRCA, which numerous courts have held represents a broad delegation of authority to DOL to administer the H-2A program.  That delegation includes the power to promulgate regulations to effectuate DOL's statutory command to prevent adverse effects to workers in the United States.  The Final Rule does just that by barring retaliation and discrimination against H-2A workers and workers in corresponding employment[1] who engage in concerted activity related to the minimum wages and working conditions that H-2A employers are required to provide, and by providing workers with the tools to advocate regarding working conditions.  These provisions prevent adverse effects to workers in the United States by ensuring that H-2A employers meet their statutory and regulatory obligations under the H-2A program; failure to provide these baseline wages and conditions risks downward pressure on pay and other benefits for workers in the United States.  Moreover, these provisions will help place the H-2A workforce on more equal footing with similarly employed workers, who may be less likely to face the unique vulnerabilities faced by the H-2A workforce, and thus reduce the potential for the H-2A workforce's vulnerability to undermine the advocacy efforts of similarly employed workers.

---

[1]   "Corresponding employment" refers to the employment of non-H-2A workers by an employer who has an approved *Application for Temporary Employment Certification* in any work included in the job order, or in any agricultural work performed by the H-2A workers. 20 C.F.R. § 655.103.

Count Three similarly falls short. This is not a major questions doctrine case because the Rule is not an attempt to exert extravagant power over the national economy nor does it rest on an ancillary provision that has been understood previously to provide only a narrow grant of regulatory authority.

Plaintiffs' APA claim fares no better. DOL reasonably explained the challenged provisions and relied on the factors that Congress expected it to consider. As DOL explained throughout the Final Rule, the challenged provisions better ensure that use of the H-2A program does not adversely affect workers in the United States, as required under IRCA, including by providing H-2A workers and workers in corresponding employment with the tools necessary to receive the wages and benefits that DOL has separately determined are necessary to prevent adverse effect. And the determination that these provisions are needed now flows from DOL's enforcement experience, through which DOL has determined that the current regulatory framework is insufficient on its own to guarantee adequate compliance with the H-2A program's requirements.

For the same reasons the Plaintiff States lack standing, they cannot establish irreparable harm. Any de minimis increase in administrative cost cannot justify a preliminary injunction. Any injunctive relief found to be warranted should be limited to those parties who have established irreparable harm and to the challenged provisions as to which all four factors are met. Finally, the public interest, and specifically the need to protect agricultural workers' rights consistent with Congress's intent, weigh against preliminary relief. The Court should deny Plaintiffs' motion.

## **BACKGROUND**

### I.   **DOL's Authority to Grant Temporary Labor Certifications Is Pivotal to Operation of the H-2A Program Overall.**

The Immigration and Nationality Act ("INA"), as amended by IRCA, establishes an "H-2A" nonimmigrant visa classification for a worker "having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services . . . of a temporary or seasonal nature." 8 U.S.C. § 1101(a)(15)(H)(ii)(a); *see also* 8 U.S.C. §§ 1184(c)(1), 1188. The statute requires multiple

3

federal agencies to take several steps before foreign workers may be admitted to the United States under the H-2A classification.

First, a prospective H-2A employer must apply to DOL for a temporary employment certification ("TEC"). Congress authorized DOL to issue a TEC only if certain statutory requirements are met. First, DOL must certify that:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
>
> (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1). Unless both conditions (A) and (B) are established, DOL may not issue a TEC. *Id.* § 1188(b) ("The Secretary of Labor may not issue a certification under subsection (a) with respect to an employer if the conditions described in that subsection are not met . . . ."). Second, DOL may not issue a TEC "if any" of the additional conditions listed in 8 U.S.C. § 1188(b) exist. These conditions include if: (1) "[t]here is a strike or lockout in the course of a labor dispute which, under the regulations, precludes such certification," *id.* § 1188(b)(1); (2) in the previous two years, the employer employed H-2A workers and "substantially violated a material term or condition" of a TEC, *id.* § 1188(b)(2)(A); (3) the employer does not provide adequate workers' compensation assurances, *id.* § 1188(b)(3); or (4) the employer fails to make "positive recruitment efforts within a multi-state region of traditional or expected labor supply," *id.* § 1188(b)(4).

To apply for a TEC, employers must first complete and submit a job order to DOL's National Processing Center ("NPC") between 60-75 days "before the employer's first date of need." 20 C.F.R. § 655.121(b). After the NPC receives the job order, it transmits a copy to the State Workforce Agency ("SWA") in the relevant state. 20 C.F.R. § 655.121(e)(1). After the SWA receives the job order, it then must confirm that the job order complies with various requirements, including that the employer has agreed to "abide by the requirements of [20 C.F.R. part 655, subpart B]." 20 C.F.R. § 655.121(e)(2); *see also id.* § 655.121(a)(4) (a "job order must

satisfy the requirements for agricultural clearance orders set forth in 20 CFR part 653, subpart F, and the requirements set forth in § 655.122"). One of the longstanding requirements of 20 C.F.R. part 655, subpart B is that employers make a number of "assurances," including that the employer will not engage in discriminatory hiring practices, is not seeking H-2A workers among an ongoing strike or lockout, and has not or will not treat unfairly any person who has engaged in a host of protected activities. *See* 20 C.F.R. § 655.135.

After reviewing the job order, the SWA works with the employer to address any noted deficiencies. *Id.* § 655.121(e)(2). When the SWA accepts the job order as fully compliant, the SWA will "place the job order in intrastate clearance and commence recruitment of U.S. workers." *Id.* § 655.121(f). If the "area of intended employment" spans multiple states, the SWA that initially reviewed and approved the job order informs the NPC that the job order covers multiple states, and then the NPC transmits the approved job order to the SWAs in the other states where recruitment must occur. *Id.* § 655.121(f). A SWA must keep an approved job order on active file until the recruitment period ends, generally after 50 percent of the work contract has elapsed. *Id.* §§ 655.121(g), 655.135(d). The SWA must refer to the employer each U.S. worker who applies to an active job order. *Id.* § 655.121(g).[2]

---

[2] Under the Wagner-Peyser Act, the federal government funds SWAs' job order processing and recruitment activities as part of the Employment Service, a national system of employment offices operated by the states and overseen by DOL. *See* 29 U.S.C. § 49 (establishing the Employment Service); 29 U.S.C. § 49d(a) (authorizing the appropriation of money in such amounts as Congress "may deem necessary to carry out" the program); *see also* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Division D, Title I, 138 Stat. 460, 633 (appropriating funds for grants to the states under the Wagner-Peyser Act for Fiscal Year 2024). Funds are allocated amongst the states according to a statutory formula. 29 U.S.C. § 49e(b); *see* 20 C.F.R. § 652.203 ("The SWA retains responsibility for all funds authorized under the Wagner-Peyser Act . . . "). States, through the SWAs, may use these funds for, among other things, "job search and placement services to job seekers," "appropriate recruitment services," and "clearing labor among the States." 29 U.S.C. §§ 49b(a), 49f(a); 20 C.F.R. § 652.3; *see also* Training and Employment Guidance Letter (TEGL) No. 12-23, https://perma.cc/HY26-55W8 (providing guidance for fund allotments for Program Year 2024, beginning July 1, 2024). Allowable grant-funded activities explicitly include recruitment and related services to agricultural employers in connection with applications for TECs. *See* 20 C.F.R. part 653, subpart F (Employment Service Agricultural Recruitment System

After a job order has been approved and posted by a SWA, the employer must apply for a TEC from DOL. *Id.* § 655.130. The application must be made no less than 45 days before the first date of need. *Id.* § 655.130(b); *see also* 8 U.S.C. § 1188(c)(1) (DOL may not require application be filed more than 45 days prior to need for H-2A workers).

Once an employer obtains a TEC from DOL, it may then file a petition for a nonimmigrant worker with the United States Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security ("DHS"). *See* 8 U.S.C. § 1184(c). If the petition is approved, the foreign workers whom the employer seeks to employ must generally apply for a nonimmigrant H-2A visa at a U.S. embassy or consulate abroad, and seek admission to the United States with U.S. Customs and Border Protection, another component of DHS.

## II.   The Final Rule Empowers Workers to Ensure Compliance with the H-2A Program's Minimum Requirements to Prevent Adverse Effects to Workers in the United States.

Since 1987, the H-2A statutory and regulatory scheme provided numerous wage and working condition protections for H-2A visa workers and workers in corresponding employment. These pre-existing protections provide that H-2A employers cannot "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" an employee who has "filed a complaint," "instituted" a "proceeding," "testified" "in any proceeding," "consulted with an employee of a legal assistance program or an attorney," or "exercised or asserted on behalf of themselves or others any right or protection afforded by 8 U.S.C. § 1188" or DOL regulations. 20 C.F.R. § 655.135(h) (effective Nov. 14, 2022); *see also* 8 U.S.C. § 1188; 29 C.F.R. part 501.

---

for U.S. Workers); *see also* 8 U.S.C. § 1188(b)(4) (interstate circulation of H-2A-related job offers through the Employment Service).

In addition to grant funding provided under the Wagner-Peyser Act, the INA also authorizes, and Congress appropriates, federal funding specifically for SWAs to provide services to employers in connection with applications for TECs. *See* 8 U.S.C. § 1188(g)(1); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Division D, Title I, 138 Stat. 460, 633 (appropriating funds to DOL for state grants to administer foreign labor certification activities under the INA); *see also* Training and Employment Guidance Letter (TEGL) No. 12-21, Change 2, https://perma.cc/UE5B-A5BN (providing guidance for foreign labor certification grant fund allotments for Fiscal Year 2024).

Despite these protections, DOL found that "violations of the H-2A program requirements remain pervasive."  89 Fed. Reg. at 33,989.  "[W]hen [Wage and Hour Division ("WHD")] investigates H-2A employers, it typically does not find full compliance with the law, with back wages averaging several hundred dollars owed per worker.  But WHD cannot investigate every farm on which H-2A workers are employed."  *Id.*; *see id.* 33,988 (explaining that, "in the previous 5 fiscal years, in 88 percent of WHD's H-2A investigations, WHD found employers in violation of the law, and citing a report finding that "70 percent of WHD investigations of farms found violations and that a farm employer's probability of being investigated in any year is 1.1 percent").  DOL further found that H-2A visa workers represent a population especially vulnerable to exploitation because of "the temporary nature of the work, frequent geographic isolation of the workers, and dependency on a single employer."  *Id.* at 33,987.  It also found that retaliation against H-2A workers for asserting or advocating for their rights remains common.  *Id.* at 33,993.  In some instances, DOL has "debarred and assessed penalties against H-2A employers that instructed workers to lie about their pay to investigators and threatened to kill, harm, punish, fire, blacklist, or deport workers for talking to authorities."  *Id.* at 33,998.  Based on this experience, DOL determined in the Final Rule that the existing H-2A program regulations did not provide sufficient protections for H-2A workers to advocate for themselves regarding working conditions.  *Id.* at 33,987.

The agency further found that similarly employed domestic workers "may be less likely to face unique vulnerabilities and forms of retaliation experienced by H-2A workers."  *Id.* at 33,992. Because H-2A workers are easier to exploit, some employers are more likely to fill jobs through the H-2A program and less likely to hire U.S. workers.  *See id.* at 33,991.  "[U]se of the H-2A program has grown dramatically over the past decade while overall agricultural employment in the United States has remained stable, meaning that fewer workers in the United States are employed as farmworkers."  *Id.* at 33,990.  Thus, DOL determined that the "exploitation and abuse" of H-2A workers by "unscrupulous employers" risks "contribut[ing] to economic and workforce instability" and potentially worse conditions for workers in the United States as a result.  *Id.* at

34,405.  Because DOL is required to certify that H-2A visas will not adversely affect workers in the United States, *see id.* at 33,993 (citing 8 U.S.C. § 1188(a)(1)), the agency determined that additional protections for H-2A workers were necessary in order to "place the H-2A workforce on more equal footing with similarly employed workers [in the United States] and thus reduce the potential for this workforce's vulnerability to undermine the advocacy efforts of similarly employed workers." *Id.* at 33,991.

After a notice-and-comment rulemaking, DOL issued the Final Rule to "establish the minimum terms and conditions of employment (*i.e.*, the 'baseline' or working conditions) necessary to 'neutralize any adverse effect resultant from the influx of temporary foreign workers.'" *See id.* at 33,987 (quoting *Williams v. Usery*, 531 F.2d 305, 306–07 (5th Cir. 1976)). Specifically, the Final Rule expands the list of protected activities to safeguard "collective action," *id.* at 33,990, and imposes "new employer obligations" that "ensure H-2A employers do not interfere with workers' efforts to advocate regarding their working conditions" and allow workers to "invite or accept guests to worker housing." *Id.* at 33,991.  As relevant here, the Final Rule adds the following new provisions:

- 20 C.F.R. § 655.135(h)(1) (effective June 28, 2024)[3]: H-2A employers cannot "intimidate, threaten, restrain, coerce, blacklist, discharge or in any manner discriminate against" an employee who has:

  - § 655.135(h)(1)(v): "Consulted with a key service provider . . ."

  - § 655.135(h)(1)(vii): "Filed a complaint, instituted, or caused to be instituted any proceeding; or testified, assisted, or participated (or is about to testify, assist, or participate) in any investigation, proceeding, or hearing under or related to any applicable Federal, State, or local laws or regulations, including safety and health, employment, and labor laws"

  - § 655.135(h)(2)(i)[4]: "Has engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or

---

[3] Parallel provisions appear at 29 C.F.R. § 501.4.
[4] 20 C.F.R. § 655.135(h)(2) & (m) apply only to persons engaged in agriculture as defined and applied in 29 U.S.C. § 203(f), *i.e.*, persons exempt from the NLRA.  *See* 89 Fed. Reg. at 33,991.

protection relating to wages or working conditions; or has refused to engage in any or all of such activities"

- o § 655.135(h)(2)(ii): "Has refused to attend an employer-sponsored meeting with the employer or its agent, representative or designee, if the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected by this subpart; or has refused to listen to employer-sponsored speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart"

- 20 C.F.R. § 655.135(m): "With respect to any H–2A worker or worker in corresponding employment engaged in agriculture as defined and applied in 29 U.S.C. 203(f), employed at the place(s) of employment included in the Application for Temporary Employment Certification, the employer must permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview. Where the designated representative is present at the worksite at the time of the investigatory interview, the employer must permit the representative to attend the investigatory interview in person. Where the designated representative is not present at the time and place of the investigatory interview, the employer must permit the representative to attend the investigatory interview remotely, including by telephone, videoconference, or other means."

- 20 C.F.R. § 655.135(n): "Workers residing in employer-furnished housing must be permitted to invite, or accept at their discretion, guests to their living quarters and/or the common areas or outdoor spaces near such housing during time that is outside of the workers' workday subject only to reasonable restrictions designed to protect worker safety or prevent interference with other workers' enjoyment of these areas. Because workers' ability to accept guests at their discretion depends on the ability of potential guests to contact and seek an invitation from those workers, restrictions impeding this ability to contact and seek an invitation will be evaluated as restrictions on the workers' ability to accept guests."

The Final Rule does not compel employees to form or join a union or to engage in any union-related activity; it "does not provide for collective bargaining rights," nor does it "grant any rights to labor organizations." 89 Fed. Reg. at 33,991. It does permit H-2A workers *and* corresponding workers in the United States, to advocate for themselves and to engage with their employers regarding wages and working conditions without retaliation. However, the Final Rule clearly states that such "concerted activity . . . need not include any formal organization of workers," and that "it includes employee activity engaged in with or on the authority of other

9

employees, and not solely by and on behalf of the employee himself, and can consist of two or more workers presenting joint requests or grievances to their employer, among other activities." *Id.* at 33,992 (alteration and internal quotation marks omitted).  In other words, to the extent that workers in the United States wish to seek better wages or working conditions in agricultural employment, the rule helps ensure that employers cannot simply turn to the relatively captive and vulnerable H-2A workforce to undermine the requests or expectations of workers in the United States.  In addition, the Final Rule gives workers employed under the H-2A program the tools necessary to self-advocate to ensure employers comply with the longstanding minimum terms and conditions of employment required under the H-2A program, which protections themselves are designed to prevent adverse effect.  Consequently, the Rule helps DOL more effectively ensure that the H-2A program does not adversely affect the wages or working conditions of workers in the United States.

## III.   Procedural Background

Plaintiffs—17 states, one farm, and one trade organization that purports to represent agricultural employers in Georgia—filed this suit on June 10, 2024.  ECF No. 1 ("Compl.").  Plaintiffs' complaint alleges four claims.  Plaintiffs allege that the Final Rule is unlawful because it (1) violates the National Labor Relations Act ("NLRA"), *see* Compl. ¶¶ 93–101; (2) violates IRCA, *see id.* ¶¶ 102–112; (3) violates the major questions doctrine, *see id.* ¶¶ 113–126; and (4) constitutes arbitrary-and-capricious agency action, *see id.* ¶¶ 127–143.

On June 13, 2024, Plaintiffs filed the instant motion for a temporary restraining order, preliminary injunction, and stay of the Final Rule's effective date pursuant to 5 U.S.C. § 705.  ECF No. 19.  The Court set a hearing on Plaintiffs' motion for June 20, 2024.  June 14, 2024 Minute Order.  On June 17, 2024, the parties jointly moved to vacate that hearing and to set a briefing schedule on Plaintiffs' motion.  ECF No. 28.  Defendants explained that DOL had posted on its public website a notice stating that "to better align the implementation of the [Final] Rule's revisions to 29 CFR § 501.4(a) with parallel revisions in 20 CFR 655.135(h)," the Rule's revisions to 29 C.F.R. § 501.4(a) will not be enforced until August 29, 2024.  Wage and Hour Division,

*Final Rule, Improving Protections for Workers in Temporary Agricultural Employment in the United States*, https://www.dol.gov/agencies/whd/agriculture/h2a/final-rule.  Specifically, DOL explained that "through August 28, 2024, it will continue to enforce the requirements of 29 CFR 501.4(a) in effect as of June 27, 2024" and that it "will begin to enforce the requirements of 29 CFR 501.4(a) as revised by the [Final Rule] only with respect to conduct or actions occurring on or after August 29, 2024."  *Id.*

On June 18, 2024, the Court granted the parties' joint motion, entered a briefing schedule, and set a hearing on Plaintiffs' motion for August 2, 2024.  ECF No. 29.

## <u>LEGAL STANDARD</u>

"A preliminary injunction is an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up).  A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff seeking a preliminary injunction "must clearly establish the following requirements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018).  A preliminary injunction must "not be granted unless the movant clearly establishes the burden of persuasion as to the four requisites."  *Id.* (cleaned up).  "If [a plaintiff] is unable to demonstrate a substantial likelihood of success on the merits, [the Court] do[es] not need to address the remaining preliminary injunction requirements."  *Id.*  "Plausibly alleg[ing] claims such that they survive dismissal at the motion to dismiss stage" is insufficient; a plaintiff must establish a substantial likelihood of success on the merits.  *Smith v. Hamm*, No. 2:23-CV-656-RAH, 2024 WL 116303, at *16 (M.D. Ala. Jan. 10, 2024), *aff'd sub nom. Smith v. Comm'r, Alabama Dep't of Corr.*, No. 24-10095, 2024 WL 266027 (11th Cir. Jan. 24, 2024).

The "test to be applied as to whether a stay [under section 705] should be entered is the

11

same as that which applies to requests for preliminary injunctions." *Corning Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 562 F. Supp. 279, 280 (E.D. Ark. 1983).

## ARGUMENT

## I.    Plaintiffs Failed to Establish Likelihood of Succeed on the Merits.

### A.  The Final Rule Does Not Violate the NLRA.

The Final Rule comports with the NLRA.  Plaintiffs point to no provision of the NLRA that prohibits affording agricultural workers employed under the H-2A program the protections found in the Final Rule.  Instead, Plaintiffs assert that the Rule violates the NLRA simply because the NLRA itself does not reach agricultural workers.  *See* 29 U.S.C. § 152(3).[5]  But that provision does not preclude regulating the labor relations of agricultural employees, and courts have consistently held that those individuals that fall outside of the NLRA's "employee" definition may still be subject to—and protected by—other labor statutes and regulations.  Plaintiffs are therefore unlikely to succeed on Count One.

Section 7 of the NLRA protects a covered employee's right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  Section 8 bars certain "unfair labor practice[s]," including employer interference in the exercise of a covered employee's § 7 rights.  *Id.* § 158(a).

As a preliminary matter, Plaintiffs mischaracterize the Final Rule as "purporting to provide workers with various collective bargaining" rights, and "including agriculture workers under the

---

[5] The "NLRA's protections extend only to workers who qualify as 'employee[s]' under [29 U.S.C. § 152(3)]."  *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 397 (1996).  That section, which defines "employee" for NLRA purposes, does "not include any individual employed as an agricultural laborer."  29 U.S.C. § 152(3).  While "[n]o definition of 'agricultural laborer' appears in the NLRA," the term "derive[s] its meaning from the definition of 'agriculture' supplied by" the Fair Labor Standards Act ("FLSA").  *Holly Farms*, 517 U.S. at 397; *see also* 29 U.S.C. § 203(f) (defining "agriculture" for FLSA purposes).  "In construing the agricultural laborer exemption," the National Labor Relations Board looks to DOL, the agency "charged with the responsibility for and has the experience of administering the [FLSA]."  *Holly Farms*, 517 U.S. at 405.

NLRA and also providing federal protections for (a certain subset of) agricultural workers to unionize." ECF No. 19-1 ("PI Mot.") at 10, 12. Plaintiffs are flatly wrong. The Final Rule does not purport to bring *any* workers within the ambit of the NLRA, does not include any collective bargaining rights, and does not "compel a worker to join a union." 89 Fed. Reg. at 33,991; *see also id.* at 33,994 ("the Department's final rule does not require collective bargaining, employer recognition, or any other action by the employer in response to worker organizing."); *id.* at 34,006 (similar); *id.* at 34,005 (similar). Unlike the NLRA, the Rule "does not require H-2A employers to recognize labor organizations or to engage in any collective bargaining activities." *Id.* at 33,901. Nor does the Rule provide for certification or representation elections, regulate unfair labor practices, or create any kind of labor relations board or process for handling representation cases or unfair labor practice complaints as does the NLRA. "Instead, th[e] final rule [merely] requires employers to provide assurances that they will not intimidate, threaten, or otherwise discriminate against certain workers or others for engaging in 'activities related to self-organization,' including concerted activities for the purpose of mutual aid or protection relating to wages or working conditions,'" *id.*, and it "prohibits discrimination or retaliation against farmworkers who seek to self-organize or engage in other concerted activity for mutual aid or protection," *id.* at 34,006.

Contrary to Plaintiffs' assertions, then, the Final Rule's concerted activity provisions do not "mirror the NLRA." PI Mot. at 11 (quoting 29 U.S.C. § 157, which provides covered employees with the right "to bargain collectively through representatives of their choosing").[6] Instead, the Final Rule simply expands the existing anti-discrimination provisions of the H-2A

---

[6] Plaintiffs' assertions that certain provisions of the Final Rule "illegally mirror provisions of the NLRA that protect collective bargaining rights" are simply wrong. PI Mot. at 7–9. None of the challenged provisions define or seek to prohibit unfair labor practices as do 29 U.S.C. § 158(a)(1), (2), and (3) of the NLRA. By the same token, the designation of representative provision bears no resemblance to 29 U.S.C. § 159(a), which provides that certified representatives have exclusive rights to represent employees in collective bargaining over conditions of employment. And DOL did not adopt its initial proposal to protect secondary boycotts and pickets, explaining that such activities were regulated under NLRA §§ 158(b)(4)(i) and (ii). 89 Fed. Reg. at 34,006. Finally, contrary to Plaintiffs' assertions, PI Mot. at 22–23, the Final Rule expressly states that its provisions would only protect "otherwise lawful" concerted activity, *id.* at 34,007.

program, enforced by WHD, to expressly protect from employer retaliation workers who engage in self-advocacy and self-organization.  Similarly, the provision which permits workers to designate a representative for certain meetings with their employer does not establish rights for unions or collective bargaining but instead, as explained, prevents adverse effect to workers in the United States because it bolsters workers' ability to advocate for themselves respecting the terms and conditions of employment, thereby mitigating downward risks respecting terms and conditions for workers in the United States.  And the Final Rule's reach is much narrower: Unlike the NLRA, which applies to all employees covered by 29 U.S.C. § 152(3), the Final Rule applies only to agricultural workers employed by H-2A employers, including H-2A workers and workers in corresponding employment.

In any event, Plaintiffs point to no provision of the NLRA that prohibits the issuance of— or conflicts with—the Final Rule.  Rather, Plaintiffs' entire argument rests on a single, flawed premise: that the Final Rule violates the NLRA because that act defines "employee" to "not include" "an agricultural laborer." 29 U.S.C. § 152(3).  But this definitional provision only speaks to the reach of the NLRA; it does not set the outer bounds of labor regulation by other means. "The Supreme Court has never found that Congress intended for the NLRA to occupy the 'field' with respect to the regulation of labor concerns."  *Nat'l Ass'n of Mfrs.* v. *Perez,* 103 F. Supp. 3d 7, 25 (D.D.C. 2015); *see also id.* ("Congress did not intend for the NLRA to wholly occupy the field with respect to labor regulation and thereby foreclose all other regulation of that area."). Indeed, courts have repeatedly upheld labor regulations of the categories of individuals excluded from the NLRA's definition of "employee."  *See United Farm Workers of Am. v. Ariz. Agric. Emp't Rels. Bd.,* 669 F.2d 1249, 1257 (9th Cir. 1982) (agricultural laborers); *Willmar Poultry Co. v. Jones,* 430 F. Supp. 573, 577-78 (D. Minn. 1977) (same); *see also Davenport v. Wash. Educ. Ass'n,* 551 U.S. 177, 181 (2007) (public employees); *Chamber of Commerce v. City of Seattle,* 890

14

F.3d 769, 793 (9th Cir. 2018) (independent contractors); *Greene v. Dayton,* 806 F.3d 1146, 1149 (8th Cir. 2015) (domestic service workers).[7]

Finally, Plaintiffs note that IRCA did not "repeal or modify" the NLRA.  PI Mot. at 10 (citing *Agri Processor Co. v. NLRB*, 514 F.3d 1, 7 (D.C. Cir. 2008)).  On this point, the parties agree.  But IRCA need not repeal or modify the NLRA for the NLRA and the Final Rule to coexist.  As the D.C. Circuit in *Agri Processor* explains, where two provisions "are 'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'"  *Agri Processor*, 514 F.3d at 4 (quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018 (1984)).  And here the NLRA and the Rule, implemented pursuant to IRCA, are compatible, with the NLRA affording a broad range of labor protections to nearly every employee while the Rule grants a narrower set of protections to a subset of employees not covered by the NLRA.

Accordingly, Plaintiffs are not likely to succeed on Count One.

### B.  The Final Rule Is a Proper Exercise of DOL's Statutory Obligation to Ensure That the Use of H-2A Workers Does Not Adversely Affect Workers in the United States.

Congress delegated to DOL the authority to issue regulations to effectuate the agency's statutory obligations under the H-2A program.  That includes the power to issue regulations to ensure that the use of H-2A workers does not adversely affect similarly employed workers in the United States.  DOL properly exercised that authority in issuing the challenged provisions of the Final Rule.  Accordingly, Plaintiffs are unlikely to succeed on the merits of Count Two.

**1.**      Congress delegated broad authority to DOL to ensure that an employer's use of H-2A workers would not harm similarly employed workers in the United States.  Courts have characterized IRCA, which established the H-2A program, as a "broad congressional delegation" to DOL.  *AFL-CIO v. Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991).  Far from assigning a "minor,

---

[7] In addition, courts have long applied the same analyses to determine whether the NLRA precludes labor regulations by either state or federal actors.  *See, e.g.,*, *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 111 (1989); *UAW-Labor Emp. & Training Corp. v. Chao,* 325 F.3d 360, 363 (D.C. Cir. 2003); *Chamber of Commerce v. Reich,* 74 F.3d 1322 (D.C. Cir. 1996).

ministerial" task to the agency, *see* PI Mot. at 7, "Congress entrusted to [DOL]" a significant role: "strik[ing] the balance" between the "competing goals" of "providing an adequate labor supply and protecting the jobs of domestic workers"—interests "which are often in tension." *Dole*, 923 F.2d at 187. Pursuant to IRCA, DOL is the federal agency charged by Congress with ensuring that a particular employer's use of H-2A workers does not adversely affect workers in the United States. While various components of DHS approve visa petitions and issue visas, those agencies do not separately assess whether the granting of such visas will harm the U.S. workforce. DOL has made that determination since prior to IRCA's enactment in 1987, including by setting minimum standards and protections for H-2A workers and those in corresponding employment. *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,496 ("IRCA codif[ies] DOL's role in the temporary alien agricultural labor certification process" to ensure that the use of H-2A workers does not adversely affect workers in the United States similarly employed).[8]

Congress therefore vested DOL with "discretion" to determine "how to ensure that the importation of farmworkers met the statutory requirements." *Dole*, 923 F.2d at 184; *see also AFL-CIO v. Brock*, 835 F.2d 912, 915 (D.C. Cir. 1987) (Congress left § 1188(a) implementation questions "entirely to [DOL's] discretion"); *United Farm Workers v. Solis*, 697 F. Supp. 2d 5, 6 (D.D.C. 2010) ("Congress delegated the certification of H–2A [applications] to the Secretary of Labor."); *Fla. Growers Ass'n, Inc. v. Su*, No. 8:23-CV-889-CEH-CPT, 2024 WL 670464, at *22

---

[8] In fact, when it passed IRCA, Congress was clearly aware of DOL's then-current regulations, issued in 1978, which set forth the labor certification process for the temporary employment of agricultural occupations under the H-2 program. *See Temporary Employment of Alien Agricultural and Logging Workers in the United States*, 43 Fed. Reg. 10306 (Mar. 10, 1978). Those regulations required DOL to advise the Immigration and Naturalization Service as to "(1) Whether there are sufficient qualified U.S. workers who are available to do the work proposed to be done by the [foreign workers], and (2) Whether the employment of the [foreign workers] will adversely affect the wages and working conditions of similarly employed U.S. workers." *Id.* By codifying the standard set forth in DOL's regulations, Congress evidenced its intent to give DOL the discretion to continue its historical practice via rulemaking. *Cf. Outdoor Amusements Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671, 687 (4th Cir. 2020) (concluding that Congress granted DHS discretion to consult with DOL based on its historical role promulgating rules in the H-2 nonagricultural program).

(M.D. Fla. Jan. 5, 2024) (describing broad delegation to DOL), *report and recommendation adopted,* No. 8:23-CV-889-CEH-CPT, 2024 WL 1343021 (M.D. Fla. Mar. 29, 2024); *cf. Williams v. Usery*, 531 F.2d 305, 307 (5th Cir. 1976) (pre-IRCA decision describing "latitude of discretion" granted to DOL "to achieve the statutory purpose of guarding against a general wage deflation from the employment of foreign workers").

    **2.**    "Section 1188(a)(1) [thus] establishes the INA's general mission," but "Congress left it to [DOL] to implement that mission through the creation of specific substantive provisions." *Mendoza v. Perez*, 754 F.3d 1002, 1021–22 (D.C. Cir. 2014).   As the Eleventh Circuit has explained, IRCA "expressly *grants* DOL rulemaking authority over the agricultural worker *H–2A* program."   *Bayou Lawn & Landscape Servs. V. Sec'y of Labor*, 713 F.3d 1080, 1084 (11th Cir. 2013) (emphasis in original).   "Congress knew what it was doing when it crafted" IRCA: providing "a specific delegation to [DOL] of rulemaking authority over the . . . H-2A program."   *Id.*; *see also Overdevest Nurseries v. Walsh*, 2 F.4th 977, 980 (D.C. Cir. 2021) (Congress "directed [DOL] to promulgate regulations that would set the parameters . . . for temporary workers coming 'to perform agricultural labor or services.'" (quoting 8 U.S.C. § 1101(a)(15)(H))); *Nat'l Council of Agric. Emps. v. DOL*, No. CV 22-3569 (RC), 2024 WL 324235, at *2 (D.D.C. Jan. 29, 2024) ("Congress has delegated authority to promulgate regulations governing the parameters of the H-2A program to the Secretary of Labor.").

    That delegation of regulatory authority is found throughout § 1188.   *See* 8 U.S.C. § 1188(c)(3)(B)(i) ("the employer will offer to provide benefits, wages and working conditions required *pursuant to this section and regulations*" (emphasis added)); 8 U.S.C. § 1188(c)(3)(B)(iii) (Secretary shall issue findings regarding statutory mandate to ensure use of H-2A workers does not adversely affect workers in the United States and "shall promulgate, on an interim or final basis, *regulations* based on his findings which shall be effective no later than three years from the effective date of this section" (emphasis added)); 8 U.S.C. § 1188 note (referring to "*regulations* to be issued implementing sections 101(a)(15)(H)(ii)(a) and 218 of the Immigration and Nationality Act [8 U.S.C. 1101(a)(15)(H)(ii)(a), 1188]," which Congress required "first be issued"

17

"not later than [IRCA's] effective date" (emphasis added)).[9]

 "Pursuant to this authority," DOL has "promulgated regulations to protect American workers." *Overdevest Nurseries*, 2 F.4th at 980. Shortly after IRCA's enactment in 1986, DOL began issuing regulations to effectuate its statutory responsibility under what is now § 1188(a).[10] *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,507 ("Under the authority of the INA, the Secretary of Labor has promulgated the regulations . . . set[ting] forth the requirements and procedures applicable to requests for certification by employers seeking the services of temporary foreign workers in agriculture."); *id.* ("This subpart provides the Secretary's methodology for the twofold determination of availability of domestic workers and of any adverse effect which would be occasioned by the use of foreign workers, for particular temporary and seasonal agricultural jobs in the United States.").

 For example, a TEC application must contain the terms and conditions of employment, 20 C.F.R. § 655.122(b), (c), and the employer must agree to abide by all H-2A regulations, *id.* § 655.135. In addition, DOL's offered wage provision requires employers to offer, advertise in their recruitment, and pay a wage that is the highest of various wages, including the Adverse Effect Wage Rate ("AWER"), the prevailing wage, the agreed-upon collective bargaining wage, the federal minimum wage, and the state minimum wage. *See* 20 C.F.R. §§ 655.120(a), 655.122(*l*). These wage requirements prevent the employment of foreign temporary agricultural workers from adversely affecting the wages and working conditions of workers in the United States. The applicable wage must be offered to U.S. workers who are interested in performing the work sought by the employer, and then—to the extent an insufficient number of U.S. workers are willing to

---

[9] The Secretary's authority to "carry out" the "statutory responsibilities required by 8 U.S.C. § 1188" has been delegated to "the Assistant Secretary for the Employment and Training Administration (ETA), who in turn has delegated that authority to the Office of Foreign Labor Certification (OFLC)," which is tasked with issuing TECs, as well as "the Wage and Hour Division (WHD)," which is tasked with "conduct[ing] certain investigatory and enforcement functions with respect to terms and conditions of employment under 8 U.S.C. 1188, 29 CFR part 501, and this subpart ('the H-2A program')." 20 C.F.R. § 655.101(a), (b).

[10] The 1987 regulations retained the minimum terms and conditions of employment set forth in the 1978 pre-IRCA regulations. *See* 1978 H-2A Rule, 43 Fed. Reg. 10306, 10312.

perform the requested labor—to both H-2A workers and workers in corresponding employment. *Id.* § 655.122(a).[11]

Other regulations setting forth minimum terms and conditions of employment similarly prevent adverse effects to workers in the United States. *See, e.g.*, 20 C.F.R. § 655.122(f) (employer provided items); *id.* § 655.122(g) (meals); *id.* §655.122(h) (inbound and outbound transportation); *id.* § 655.122(i) (guarantee to offer the worker employment for at least three-fourths of the work contract); *id.* § 655.122(j) (earnings records); *id.* § 655.122(k) (hours and earnings statements); *id.* § 655.122(m) (frequency of pay); *id.* § 655.122(n) (termination for cause); *id.* § 655.122(o) (protections in the event of contract impossibility); *id.* § 655.122(p) (deductions); *id.* § 655.122(q) (provision of work contract). The regulations require that these minimum wages and conditions be provided to both H-2A workers and workers in corresponding employment—including U.S. workers—which also furthers DOL's statutory mandate to prevent adverse effects. *See* 20 CFR § 655.103(b) (definition of "corresponding employment"), *id.* § 655.122(d)-(q) (requirements of work contract to be included in and provided to workers in corresponding employment).

So too does the regulatory requirement—issued in 1987 shortly after IRCA's enactment—that employers provide assurances that they will not retaliate against workers for taking various steps to ensure employer compliance with the requirements of IRCA and its implementing regulations. *See Labor Certification Process for the Temporary Employment of Aliens in*

---

[11] Two of the wages described in the offered wage provision at 20 C.F.R. §§ 655.120(a) and 655.122(l) are specific to the H-2A program; these wages are not statutorily required to be offered and paid to applicable agricultural workers employed by non-H-2A employers. However, they are intended to prevent adverse effects to workers in the United States generally. The prevailing wage rate is the wage paid to domestic workers performing a particular agricultural activity in the same region in which H-2A temporary workers will be employed. *Id.* §§ 653.501(c)(2)(i), 655.103(b). Likewise, the AEWR "is designed to prevent the potential wage-depressive impact of foreign workers on the domestic agricultural workforce," 75 Fed. Reg. 6,884, 6,891 (Feb. 12, 2010) ("2010 H-2A Final Rule"), by setting a "rate [that] will neither ratchet wages upward, driving growers out of business nor perpetuate wage depression," *Dole*, 923 F.2d at 187. DOL's "AEWR regulations are . . . promulgated under [the] statutory authority" found in 8 U.S.C. § 1188(a)(1). *Id.* at 184 n.3. The requirement to pay the highest applicable wage rate ensures that H-2A employers cannot use the H-2A program to pay wages that would not be competitive for workers in the United States.

*Agriculture and Logging in the United States,* 52 Fed. Reg. 20,496, 20,501, 20,517 (June 1, 1987) ("1987 H-2A IFR") (describing required anti-retaliation assurances originally promulgated at 20 C.F.R. § 655.103(g), which stated that an "employer shall not . . . in any manner discriminate against . . . any person who has with just cause" filed a complaint, instituted or testified in a proceeding, consulted with an employee of a legal assistance program or an attorney, or exercised any right or protection related to then-§ 1186 or any regulation promulgated thereunder).[12]

In issuing these implementing regulations, DOL "has historically understood the INA's adverse effect requirement" as (1) "establishing a baseline 'acceptable' standard for working conditions below which workers in the United States would be adversely affected" and (2) "requiring parity between the terms and conditions of employment provided to H-2A workers and other workers employed by an H-2A employer."  89 Fed. Reg. at 33,987.

As to the first purpose, from the inception of the H-2A program, DOL has established the minimum terms and conditions discussed above to prevent adverse effect on workers in the United States.  1987 H-2A IFR, 52 Fed. Reg. at 20,508 ("The regulations in this subpart establish" the "minimum level of wages, terms, benefits, and conditions for the particular job opportunities below which similarly employed" workers in the United States " would be adversely affected.").

---

[12] To ensure that the H-2A program did not, in its implementation, adversely affect workers in the United States, Congress also delegated broad authority to DOL to ensure that these baseline protections are actually provided by employers.  *See* 8 U.S.C. § 1188(g)(2) ("The Secretary of Labor is authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment under this section.").  As DOL explained in 1987, "[i]t is clear from the enactment of IRCA and the legislative history that the Congress intended that DOL would increase its effort regarding the enforcement of labor standards with respect to the H-2A programs." *Enforcement of Contractual Obligations for Temporary Alien Agricultural Workers Admitted Under Section 216 of the Immigration and Nationality Act,* 52 Fed. Reg. 20,524, 20,524 (June 1, 1987) ("1987 WHD IFR"); *see also id.* ("The interim final regulation in this document adopts procedures deemed necessary by DOL to carry out its statutory responsibilities regarding enforcement of an H-2A employer's contractual obligations to H-2A workers and other workers engaged in corresponding employment.").  These regulations included a version of the anti-discrimination provision now found at 29 C.F.R. § 501.4. *See* 29 C.F.R. § 501.3 (1988) ("[n]o person shall . . . in any manner discriminate against any person" who has engaged in one of the enumerated activities).

As the Eleventh Circuit has explained, "[t]he H-2A regulations . . . require an 'employer' to provide certain minimum benefits to H-2A temporary workers," thereby "ensur[ing] that foreign workers will not appear more attractive to the 'employer' than domestic workers[ and] avoiding any adverse effects for domestic workers." *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1285 (11th Cir. 2016).

As to the second purpose (*i.e.*, parity), DOL has required employers to offer to U.S. workers "the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers."  20 C.F.R. § 655.122(a).  This affords U.S. workers the opportunity to fill the roles H-2A employers are seeking under the same terms and conditions offered to H-2A workers.  In addition, the regulations require an employer to in fact provide at least the same minimum terms and conditions of employment to all non-H-2A workers engaged in corresponding employment, including the obligations regarding pay, meals, the three-fourths guarantee, and disclosure of the work contract.  20 C.F.R. § 655.122(g), (i), (l), (q).  These provisions also prevent adverse effects to workers in the United States. *See Overdevest*, 2 F.4th at 984 (finding DOL's corresponding employment regulations requiring H–2A employers "to pay non-H–2A workers the same amount that they pay the H–2A workers when they are doing the same work" to be an "eminently reasonable" interpretation of the adverse effect mandate).

**3.**     DOL properly promulgated the challenged provisions in the Final Rule in exercise of this broad rulemaking authority.  The premise of the Final Rule is straightforward: DOL has established a baseline level of wages and working conditions for H-2A workers below which it has determined that workers in the United States would be adversely affected, but because H-2A workers are a uniquely vulnerable worker population, H-2A employers often fail to actually provide the baseline conditions that DOL has determined are necessary to prevent adverse effects to workers in the United States.  The result is that DOL cannot assure itself that the use of H-2A workers is not adversely affecting workers in the United States without additional tools to ensure compliance with the statutory and regulatory requirements of the H-2A program.  Based on DOL's experience, and the observations of commenters, DOL's own enforcement efforts are insufficient.

Accordingly, DOL promulgated the challenged provisions in the Final Rule to empower H-2A workers and workers in corresponding employment to advocate for themselves to ensure that the baseline wages and working conditions that H-2A employers have committed to providing are, in fact, provided to workers, and to allow workers employed under the H-2A program to advocate regarding the terms and conditions of their employment on more equal footing with similarly employed workers in the United States, and thus reduce the potential for the vulnerability of the H-2A workforce to undermine the advocacy efforts of similarly employed workers.

DOL explained the statutory basis for the challenged provisions in the Final Rule itself. *See* 89 Fed. Reg. at 33,995 (the Final Rule "seek[s] to expand and improve the tools available to workers protected under the H-2A program to prevent exploitation and to ensure compliance with the law," based on DOL's "experience and evidence . . . demonstrating that the current framework of protections are insufficient to satisfy the Department's statutory mandate" to prevent adverse effects); *id.* at 33,990 (DOL's "H-2A regulations already include numerous and substantial protections for workers, including various minimum terms and conditions of employment under the H-2A program that are necessary to prevent adverse effects on similarly employed workers," but, as DOL's "enforcement experience and [many] comments, data, and studies reflect, greater protections are needed to empower workers to speak up on their own behalf to enforce these terms and conditions of employment"); *id.* at 33,987 ("[I]n light of the barriers they face, H-2A workers are less able and less likely to advocate on behalf of themselves or their coworkers to seek compliance with the terms and conditions of employment set forth in the Department's regulations, employment below which will adversely affect workers in the United States"); *id.* at 33,991 ("Empowering workers in this way thus can improve compliance with the various terms and conditions of H-2A employment that the Department has separately determined are necessary to prevent adverse effect on similarly employed workers."); *see also id.* at 33,987 (explaining "the characteristics of the H-2A program, including the temporary nature of the work, frequent geographic isolation of the workers, and dependency on a single employer" that "create a

vulnerable population of workers for whom it is uniquely difficult to advocate or organize regarding the terms and conditions of employment or to seek access to certain service providers").

Plaintiffs object to these provisions on a number of grounds, all of which lack merit.

First, Plaintiffs challenge the breadth of DOL's statutory authority, describing § 1188(a) as a "small provision" that "assigns [to] DOL a mere ministerial function." PI Mot. at 24. But § 1188(a) represents a "broad congressional delegation," *Dole*, 923 F.2d at 187, that "expressly grants DOL rulemaking authority over the agricultural worker H–2A program" to ensure that the use of H-2A workers does not adversely affect workers in the United States, *Bayou Lawn*, 713 F.3d at 1084 (emphasis omitted); *see also supra* at 15–18.[13] Rather than establish a "ministerial" system of rubberstamping applications for H-2A workers, DOL has set forth a baseline set of working conditions necessary to prevent adverse effects to workers in the United States and, in the Rule, augmented workers' capacity to ensure employers deliver on providing those baseline conditions.

In Plaintiffs' view, by contrast, DOL has statutory authority to promulgate H-2A regulations only in three narrowly circumscribed instances: (1) to "define" "agricultural labor services," (2) to "set fees for the processing of H-2A certification applications," and (3) to establish certain housing requirements. PI Mot. at 13. But DOL's rulemaking authority is not so narrow,

---

[13] As the Supreme Court recently explained, "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright Enters. v. Raimondo*, No. 22-451, slip op. at 17–18 (June 28, 2024). A court "fulfills that role by recognizing constitutional delegations" to agencies. *Id.* at 18. The best reading of IRCA is that it contains such a delegation of discretionary authority to DOL. That delegation flows not from a statutory ambiguity, but from the fact that, in enacting § 1188, "Congress entrusted to [DOL]" a significant role: "[s]triking th[e] balance" between "the interests of both farmworkers and growers." *Dole*, 923 F.2d at 187 (holding, without citation to or reliance on *Chevron* doctrine, that the text of IRCA represents a significant delegation to DOL). Accordingly, DOL does not seek deference to its interpretation of § 1188, *see* PI Mot. at 16–17 (asserting that no deference is due), but rather argues that this Court should hold—as the many other courts to address the question have done—that IRCA represents a "broad congressional delegation" to DOL, *see Dole*, 923 F.2d at 187, and that such delegation authorizes the Final Rule at issue here.

23

as made clear by the various other IRCA provisions that expressly reference DOL regulations that Plaintiffs omit, *see, e.g.*, 8 U.S.C. § 1188(c)(3)(B)(i) ("the employer will offer to provide benefits, wages and working conditions required pursuant to this section and regulations"); 8 U.S.C. § 1188(c)(3)(B)(iii) (Secretary shall issue findings regarding statutory mandate to ensure use of H-2A workers does not adversely affect workers in the United States and "shall promulgate, on an interim or final basis, regulations based on his findings which shall be effective no later than three years from the effective date of this section"); 8 U.S.C. § 1188 note (referring to "regulations to be issued implementing sections 101(a)(15)(H)(ii)(a) and 218 of the Immigration and Nationality Act [8 U.S.C. 1101(a)(15)(H)(ii)(a), 1188]," which Congress required "first be issued" "not later than [IRCA's] effective date"), and by the foregoing cases, *see supra* at 15–18.

Second and relatedly, Plaintiffs assert that the Final Rule violates § 1188(a)'s command to prevent adverse effects to workers in the United States because the Rule "focuses on conferring benefits on migrants, and only in a roundabout way considers the plight of American workers." PI Mot. at 24. But this argument misunderstands the Final Rule in three key ways. First, the "benefits" provided by the Final Rule—tools to ensure that workers can advocate for themselves, including prohibitions on employer retaliation for concerted action—first must be offered to U.S. farmworkers before H-2A employers can fill the open positions with H-2A workers. *See* 20 C.F.R. § 655.122(a) (employers must first "offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers"). That includes the challenged provisions of the Final Rule. Second, any workers in corresponding employment—including U.S. workers—must receive the same "benefits, wages, and working conditions" provided by H-2A employers to H-2A employees. *See Overdevest,* 2 F.4th at 984 (describing corresponding employment requirements). That also applies to the challenged provisions of the Final Rule. Finally, that the challenged requirements of the Final Rule protect only workers employed under the H-2A program (both H-2A and corresponding workers) is not unique. Rather, DOL's regulations have always required that participating employers offer and provide certain minimum terms and conditions of employment, not otherwise

required of non-H-2A employers, as a means of preventing adverse effects to workers in the United States.  The AEWR provides a simple example.  DOL has required that H-2A employers offer and pay at least the AEWR since the 1987 regulations.  *See, e.g.*, 52 Fed. Reg. at 10502.  The AEWR is often higher than the minimum wage available to agricultural workers employed by non-H-2A employers.  But that does not mean that DOL's AEWR requirement violates § 1188 because it must be offered and paid only to workers employed under the H-2A program, but not to workers in the United States employed by non-H-2A employers.  Rather, as the Eleventh Circuit has explained, "[b]y requiring that the 'employer' provide these baseline benefits, the regulations ensure that foreign workers will not appear more attractive to the 'employer' than domestic workers, thus avoiding any adverse effects *for domestic workers*."  *Garcia-Celestino*, 843 F.3d at 1285 (emphasis added).  Moreover, in this Final Rule, as discussed in more detail above, DOL explained that in order to ensure that both H-2A workers and corresponding workers can report violations, and in order to ensure that agricultural employers cannot use the H-2A workforce to undermine workers in the United States who seek better wages and working conditions, the H-2A program must protect H-2A workers and corresponding workers from employer discrimination when they engage in self-advocacy.

Third, Plaintiffs rely heavily on *Bayou Lawn*, and mischaracterize the Eleventh Circuit's holding as having "rejected a similar attempt to expand DOL's regulatory authority under the INA."  *See* PI Mot. at 14.  But *Bayou Lawn*'s holding addressed whether Congress granted "any rulemaking authority [to] DOL over the *H-2B* program."  713 F.3d at 1084 (emphasis added).  By contrast, the Eleventh Circuit explained that, through IRCA, Congress "expressly *grant*[*ed*] DOL rulemaking authority over the agricultural worker *H-2A* program."  *Id.* (emphasis in original).  As that court explained, the "absence of a delegation of rulemaking authority to DOL over the non-agricultural H–2B program in the presence of a specific delegation to it of rulemaking authority

over the agricultural worker H–2A program persuades us that Congress knew what it was doing when it crafted these sections." *Id.*[14]

Plaintiffs are therefore unlikely to succeed on the merits of Count Two.

**4.**     The major questions doctrine does not suggest a different result.  That doctrine— which is reserved for "extraordinary cases," involving assertions of "extravagant statutory power over the national economy" or "highly consequential power beyond what Congress could reasonably be understood to have granted," *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (citations omitted)—does not apply here, for several reasons.

First, this is not a case where the "sheer scope" of the agency's claimed authority provides a "reason to hesitate." *Id.* at 721.  "[T]his is not a rule that asserts 'extravagant statutory power over the national economy.'"  89 Fed. Reg. at 33,995 (quoting *West Virginia*, 597 U.S. at 724). Through this Rule, DOL "does not seek to regulate employers generally," or "even agricultural employers at large." *Id.*  Rather, the Rule "applies only to those agricultural employers that have opted to participate in the H-2A program," and thus "the labor standards and protections in [the Rule] do not apply to agricultural workers beyond the scope of the H-2A program." *Id.*  "While an increasing number of employers have chosen to participate in the H-2A program, the program still makes up only a small fraction of the agricultural workforce." *Id.*; *id.* at 33,995 n.79 (noting that, in 2022, "direct on-farm employment amounted to 2.6 million jobs," but DOL only "certified H-2A temporary labor certifications for around 370,000 jobs").  And former or current H-2A employers are free to operate without participating in the H-2A program in the future.

DOL's promulgation of the challenged provisions of the Final Rule therefore is unlike the assertions of regulatory authority to which the Supreme Court has applied the doctrine, such as when: OSHA sought to adopt "a broad public health regulation" that would have required 84 million Americans to either get vaccinated or take other COVID-19 precautions in all workplaces

---

[14] *But see Outdoor Amusements Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671 (4th Cir. 2020), cert. denied, 142 S. Ct. 425 (2021) (holding Congress granted DOL rulemaking authority as to the H-2B program).

with more than 100 employees, *NFIB v. OSHA*, 595 U.S. 109, 119 (2022); the CDC sought to regulate "the landlord-tenant relationship" through a nationwide eviction moratorium, *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021); the EPA contemplated regulation of power plants that would have resulted in a nationwide cap on carbon dioxide emissions and required restructuring the country's mix of electricity generation, *West Virginia*, 597 U.S. at 721; or the Department of Education sought to implement a student-loan forgiveness plan that was estimated to "cost taxpayers between $469 billion and $519 billion"—"nearly one-third of the Government's $1.7 trillion in annual discretionary spending." *Biden v. Nebraska*, 600 U.S. 482, 483, 502–03 (2023) (quotation marks omitted).

Second, as discussed above, *see supra* at 15–18, the grant of statutory authority here constitutes a "broad congressional delegation" to DOL to ensure that the use of H-2A workers does not adversely affect workers in the United States. *Dole*, 923 F.2d at 187. That expansive delegation looks nothing like the grants of authority at issue in major questions cases. *See West Virginia*, 597 U.S. at 723 ("modest words," "vague terms," "subtle devices," and "oblique or elliptical language" are insufficient "in certain extraordinary cases" involving "[e]xtravagant grants of regulatory authority") (cleaned up). In *Biden v. Nebraska*, for example, the Court explained that "statutory permission to 'modify' does not authorize 'basic and fundamental changes in the scheme' designed by Congress." *See* 600 U.S. at 494–95 ("modify" is a "term [that] carries 'a connotation of increment or limitation,'" and must be read to mean "to change moderately or in minor fashion"). Here, IRCA provides DOL with significant discretion to ensure that the H-2A program provides a sufficient number of workers for agricultural employers without adversely affecting the wages and working conditions of workers in the United States. The Rule effectuates that goal, in part, by, for example, preventing employers from retaliating against workers who seek to protect the minimum terms and conditions DOL has already determined necessary to prevent adverse effects, and by specifying that workers may designate a representative to advocate for employers respecting the terms and conditions of the workers' employment. Accordingly, the Rule would not "effec[t] a 'fundamental revision of the statute, changing it from

27

[one sort of] scheme of . . . regulation' into an entirely different kind." *West Virginia*, 597 U.S. at 728.  Instead, the Rule is necessary to ensure that DOL meets its statutory obligations.

Pursuant to that broad grant of authority, DOL has consistently promulgated regulations to prevent adverse effects, including to ensure that the minimum terms and conditions of the H-2A program are provided by employers. *See supra* at 17–21.  Indeed, from the inception of the H-2A program, DOL has promulgated anti-retaliation and anti-discrimination provisions that served to facilitate a worker's rights to seek compliance with the baseline wages and working conditions required of H-2A employers.  *See* 1987 H-2A IFR, 52 Fed. Reg. at 20,501, 20,517 (describing required anti-retaliation assurances originally promulgated at 20 C.F.R. § 655.103(g)); 1987 WHD IFR, 52 Fed. Reg. at 20,524–25 (describing anti-discrimination enforcement "deemed necessary by DOL to carry out its statutory responsibilities regarding enforcement of an H-2A employer's contractual obligations to H-2A workers and other workers engaged in corresponding employment").  Thus, the Final Rule does not represent a novel exercise of agency authority or rely on an "ancillary" statutory provision.  *See West Virginia*, 597 U.S. at 724.  "To the contrary . . . the relevant grant of authority at issue here at 8 U.S.C. 1188(a) is one that the Department has long relied on to establish program requirements that ensure that the employment of H-2A workers does not adversely affect the wages and working conditions of workers in the United States similarly employed, and is an area where the Department has significant expertise." 89 Fed Reg. at 33,995; *see also* 2010 H-2A Final Rule, 75 Fed. Reg. at 6948 (discussing the need to "prevent[] the exploitation of foreign workers, with its concomitant adverse effect on U.S. workers"); 2008 H-2A Final Rule, 73 Fed. Reg. 77,110, 77,159 (Dec. 18, 2008) (noting that foreign workers "may be subject to exploitation in ways that would adversely affect the wages and working conditions of U.S. workers by creating conditions resembling those akin to indentured servitude, driving down wages and working conditions for all workers, foreign and domestic"); 1987 H-2A IFR, 52 Fed. Reg. at 20,508, 20,513 (describing the "minimum" terms and conditions of employment necessary to prevent adverse effect).

Accordingly, Plaintiffs are unlikely to succeed on the merits of Count Three.

### C. The Final Rule Is Not Arbitrary and Capricious.

Plaintiffs' arbitrary-and-capricious claim fares no better.  Agency action must be upheld in the face of an arbitrary-and-capricious challenge so long as the agency "articulate[s] a satisfactory explanation for [the] action including a rational connection between the facts found and the choice made." *Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020) (citation omitted).  A court's review is "narrow" and it "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Plaintiffs argue that DOL (1) relied on factors that Congress did not intend the agency to consider, (2) gave an "implausible explanation" for issuing the Final Rule, and (3) departed from past practice without a reasonable explanation.  PI Mot. at 25.  Each argument is meritless.

### 1. DOL Did Not Rely on Factors that Congress Did Not Intend the Agency to Consider

Plaintiffs assert that DOL's explanation for the Final Rule "relies on factors Congress did not intend for the agency to consider." *Id.* at 26.  First, they say that DOL improperly considered "the importance of unionization within the agricultural workforce and the harm these workers have endured without union protections" because Congress "had already spoken on the issue of collective bargaining protections for agricultural workers." *Id.*  This argument largely duplicates Plaintiffs' argument that the Final Rule violates the NLRA.  For the same reasons, *see supra* at 12–15, that argument fails.  "The final rule does not require H-2A employers to recognize labor organizations or to engage in any collective bargaining activities such as those that may be required by the NLRA itself . . . ." 89 Fed. Reg. at 33,901.  "Instead, th[e] final rule requires employers to provide assurances that they will not intimidate, threaten, or otherwise discriminate against certain workers or others for engaging in 'activities related to self-organization,' including 'concerted

activities for the purpose of mutual aid or protection relating to wages or working conditions' . . . ."
*Id.*

Plaintiffs also contend that DOL improperly considered "protection of foreign workers" and that "prevention of foreign migrant laborer exploitation is not a factor that Congress intended DOL to consider." PI Mot. at 26.  As explained above, *see supra* at 15–21, Congress has granted DOL statutory authority to establish conditions under which employers must operate as a prerequisite for participation in the H-2A visa program; in this regard, Congress has expressly charged DOL with "consider[ing]" protection of foreign workers in promulgating rules under the program.  *See* 8 U.S.C. § 1188(c)(3)(B)(i) ("the employer will offer to provide benefits, wages and working conditions required pursuant to this section and regulations").  And, as the Final Rule explains, the whole point of the protections for foreign workers under the H-2A program is to prevent adverse effects on the wages and working conditions of similarly employed workers in the United States—as *required* by statute, *see* 8 U.S.C. § 1188(a)(1)(B)—by making it more difficult for employers to exploit foreign agricultural workers and contribute to economic and workforce instability.  *See* 89 Fed. Reg. at 33,900.[15]  Moreover, Plaintiffs point to no provision of law that prohibits DOL from considering foreign worker protections as a factor in promulgating a rule.  Had Congress intended to prohibit DOL from considering foreign worker protections, it readily could have said so.  *Cf. Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 509 (1981) (finding arbitrary and capricious an agency's regulation that balanced costs and benefits of a rule on worker health where the statute stated that the "benefit" of worker health should be placed above any other consideration if the benefit was achievable); 42 U.S.C. § 1320f-3(e)(2)(D) (prohibiting the Centers for Medicare & Medicaid Services from considering evidence from any clinical trial that placed lower value on extending the life of elderly, disabled, and terminally ill individuals as compared to other individuals).

---

[15] If anything, one would expect Plaintiffs—who repeatedly describe IRCA as "focused on protecting American workers, not foreign workers," PI Mot. at 24—to commend DOL for taking seriously its statutory obligation to prevent adverse effects to workers in the United States.

Finally, and as addressed below, *see infra* at 31–32, Plaintiffs are wrong when they say that the Final Rule "create[s] a situation where foreign workers have better conditions than their American counterparts."  PI Mot. at 27.   DOL "has historically understood the INA's adverse effect requirement" as (1) "requiring parity between the terms and conditions of employment provided to H-2A workers and other workers employed by an H-2A employer," and (2) "as establishing a baseline 'acceptable' standard for working conditions below which workers in the United States would be adversely affected," 89 Fed. Reg. at 33,987; *see Garcia-Celestino*, 843 F.3d at 1285, and promulgated regulations to those ends, *see* 43 Fed. Reg. at 10,312; 52 Fed Reg. at 20,508, 20,513.  In other words, non-H-2A workers employed by an H-2A employer will get the same benefits from the Final Rule as the H-2A workers.  And other workers in the United States will not be adversely affected by the aggregate impact on the workforce from use of the H-2A program.

### 2.  DOL Provided a Reasoned Explanation for the Final Rule

Plaintiffs next argue that DOL's explanation for the Final Rule is "implausible" because it "effectively provides NLRA rights to H-2A workers," even though "American farmworkers explicitly do not have" those rights under federal law.  PI Mot. at 27–28.  But DOL specifically and reasonably explained that the Final Rule does not provide such rights.  *See supra* at 9–10, 13–14.  So long as the agency "reasonably explained" its decision—which DOL did here—the regulation is not arbitrary and capricious.  *Prometheus Radio Project*, 592 U.S. at 423.

Plaintiffs' argument also ignores the fact that the H-2A program and the Final Rule "require parity between the terms and conditions of employment provided to H-2A workers and other workers employed by an H-2A employer."  89 Fed. Reg. at 33,987.  Thus, "American farmworkers" employed by an H-2A employer to work alongside H-2A workers must be afforded the same protections as the H-2A workers, including those provided under the Final Rule.  *Contra* PI Mot. at 28 (incorrectly asserting that some "Americans or permanent residents [would] work in a field where they get less benefits and protections than their foreign competition").  Thus, the Final Rule "establish[es] a baseline 'acceptable' standard for working conditions below which

workers in the United States would be adversely affected."  89 Fed. Reg. at 33,987.  In turn, the Final Rule "neutralizes any 'adverse effect'" on domestic workers from the hiring of H-2A visa workers.  *Id.* at 33,992 (citation omitted); *see also id.* at 33,900 (noting that the protections granted to H-2A visa workers are meant to disincentivize employers from exploiting the H-2A program for cheap foreign labor).  Ultimately, the anti-discrimination protections in this Final Rule are no different from the other baseline protections that the H-2A program has long enforced for H-2A workers and corresponding employment, such as meal and housing requirements, which agricultural workers also generally do not have.  The Final Rule in this case articulates why the Department concluded that expanding the H-2A program's existing anti-discrimination protections was necessary to avoid adverse effect.  *See supra* at 7–8.

Thus, DOL "reasonably explained" its decisionmaking with respect to the contested provisions.  *Prometheus Radio Project*, 592 U.S. at 423.  The APA requires nothing more, and Plaintiffs' disagreement with DOL's policy judgment is not a basis for finding the Rule arbitrary and capricious.  *See Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 380 (D.C. Cir. 2013) (rejecting argument that "amounts to nothing more than [a] policy disagreement").

### 3.  DOL Reasonably Explained Its Policy Change

Plaintiffs' argument that the agency did not adequately explain its "sharp departure from past practice," *see* PI Mot. at 28, is misplaced.  "[A]n agency is certainly entitled to change course." *Am. Petrol. Inst. v. EPA*, 906 F.2d 729, 738 n.11 (D.C. Cir. 1990).  "[A]gencies are expected to reevaluate the wisdom of their policies in response to changing factual circumstances." *COMPTEL v. FCC*, 978 F.3d 1325, 1335 (D.C. Cir. 2020).  No heightened standard applies when an agency changes its policy so long as the agency "display[s] awareness that it *is* changing position," and shows that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Plaintiffs claim that DOL needed to "display awareness" that it is "changing position" by requiring new protections for H-2A workers that it had not previously required for 37 years.  PI Mot. at 28–29 (quoting *Fox Television Stations*, 556 U.S. at 515).  It did so: the Final Rule recognizes that it adds new requirements for H-2A employers that have not previously existed as part of the program.  *See generally* 89 Fed. Reg. at 33,901–03 (summarizing the new provisions and the reasons for adopting them).  Moreover, DOL "reasonably considered the relevant issues and reasonably explained the decision" to adopt these new policies.  *Prometheus Radio Project*, 592 U.S. at 423.  The Final Rule is unlike agency actions in cases where an agency "chang[ed] position" by issuing new regulations or otherwise acting to repeal and replace an existing regulation or policy.  *See, e.g.*, *Ohio v. Becerra*, 87 F.4th 759, 772 (6th Cir. 2023) (applying *Rust v. Sullivan*, 500 U.S. 173, 186 (1991), in upholding a regulation that replaced a contrary regulation issued two years prior).  In those instances, an agency must recognize that the new rule supersedes the previous, contrary one.  *See, e.g.*, *Fox Television Stations*, 556 U.S. at 515 ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").  But here, Plaintiffs do not claim that the Final Rule *replaces* an existing policy, rather than adding new requirements to the existing scheme.  In that regard, DOL's explanation—that it was adding new requirements, and why—suffices.

## II.    The States Have Not Established Injury, Let Alone Irreparable Harm.

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24.  Among other things, a movant must show that it is "likely to suffer irreparable harm in the absence of preliminary relief."  *Id.* at 20, 22.  Here, the State Plaintiffs have not even demonstrated that they suffer an injury-in-fact from the Final Rule to afford them standing to sue, let alone an irreparable harm justifying a preliminary injunction.

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy."  *City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983).  For the Court to have subject-matter jurisdiction over a challenge to agency action, the plaintiff must demonstrate standing.  *See Ga.*

*Republican Party v. Sec. & Exch. Comm'n*, 888 F.3d 1198, 1201 (11th Cir. 2018).  Standing first requires that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Second, "there must be a causal connection between the injury and the conduct complained of" such that the injury is fairly traceable to the defendant and not the result of the independent action of some third party not before the court.  *Id.*  Third, it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision from the court.  *Id.* at 561.  Plaintiffs have the burden of establishing standing.  *Ga. Republican Party*, 888 F.3d at 1201; *see also Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003) (noting that plaintiffs bear the burden of persuasion as the prerequisites for a preliminary injunction, including irreparable harm).  These elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561.  Thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

Moreover, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).  Rather, plaintiffs "must demonstrate standing for each claim [they] seek[] to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  "[A] litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)); *see also California v. Texas*, 593 U.S. 659, 672 (2021) ("Remedies . . . 'operate with respect to specific parties,'" not "on legal rules in the abstract." (citation omitted)).

The Plaintiff States assert that the Final Rule imposes "administrative costs" on the SWAs, PI Mot. at 29, and that because sovereign immunity prevents Plaintiff States from recovering damages from the federal government, these costs constitute an irreparable harm, *id.*  As explained above, *see supra* at 4–6, DOL transmits an employer's job order to the appropriate SWA, who then reviews it to confirm that it complies with various requirements, including assurances that the

employer will abide by the applicable laws and regulations.  If the job order meets this criteria, the SWA places it in clearance and commences recruitment.  *See id.*  Because the Rule changes some of the requirements imposed on employers, Plaintiff States claim that it imposes additional costs on a SWA's review of new job orders for compliance with the regulations.

Plaintiff States' theory of harm fails for two reasons.  First, Plaintiff States' description of administrative costs fails to adequately explain how the Rule will require the States to expend their own funds on SWAs' H-2A-related activities, which are funded by the federal government.  *See supra* at 5 n.2.  The Wagner-Peyser Act requires DOL to provide congressionally appropriated grant funds to SWAs, and these funds are used to review H-2A job orders, among other things. *See* 29 U.S.C. §§ 49d(a), 49e(b); 20 C.F.R. § 653.501.  The INA also authorizes funding that DOL provides to SWAs for activities related to foreign labor certification.  8 U.S.C. § 1188(g)(1). Neither the Wagner-Peyser Act nor the INA requires, as a condition of accepting federal grant funds, that States expend any of their own funds to cover program costs.  Sovereign immunity or not, Plaintiff States have no basis to recover administrative costs where the administrative costs are already funded by the federal government.  Because the Plaintiff States have not demonstrated that the Final Rule will impose any costs on the States, and because the States have not asserted any other injury, the Plaintiff States lack standing.

Second, Plaintiff States' theory of harm fails because the SWAs are already required to review job orders to check that employers provide assurances that they will comply with the applicable laws and regulations.  *See* 20 C.F.R. § 655.121(e)(2); *see also id.* § 655.135 (employers' assurances).  The Final Rule does not change the SWAs' obligation to check for these assurances, it merely alters some of the assurances that the employers must provide.  And the SWAs' obligation to put approved job orders into interstate clearance for recruitment is unchanged by the Final Rule.  In other words, the only change that SWAs experience from the challenged provisions of the Final Rule is that they will use a different form for job orders post-dating the effective date

of the rule in order to check for the employers' assurances.[16]  The States cannot claim that they suffer harm merely from DOL's updated paperwork.

Even if the Plaintiff States could establish some de minimis administrative costs imposed on them by the Final Rule, such an injury would still not satisfy the irreparable harm requirement for a preliminary injunction.  Plaintiffs' burden to show irreparable harm is higher than what is required to establish standing.  *See, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  "For an injury to be irreparable it 'must be both certain and great,' not 'merely serious or substantial.'" *Ga. ex rel. Ga. Vocational Rehab. Agency v. United States ex rel. Shanahan*, 398 F. Supp. 3d 1330, 1344 (S.D. Ga. 2019) (Wood, J.) (quoting *Kan. ex rel. Kan. Dep't for Children & Families v. SourceAmerica*, 874 F.3d 1226, 1250 (10th Cir. 2017)).

"[E]conomic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1527 (11th Cir. 1994) ("[C]ases in which the remedy sought is the recovery of money damages do not fall within the jurisdiction of equity."); *Hobson v. Fischbeck*, 758 F.2d 579, 581 (11th Cir. 1985) (holding equitable relief unavailable because plaintiff "has an adequate remedy at law—he could pay the disputed tax and then sue for a refund").  And while a plaintiff generally "suffers irreparable harm where 'monetary relief might not be available . . . because of the [government's] sovereign immunity," *Ga. ex rel. Ga. Vocational Rehab Agency*, 398 F. Supp. 3d at 1344 (quoting *Kan. ex rel. Kan. Dep't for Children & Families*, 874 F.3d at 1251), courts have recognized that "a party asserting such a loss is not relieved of its obligation to demonstrate that its harm will be 'great,'" *Ohio v. Becerra*, 577 F. Supp. 3d 678, 699 (S.D. Ohio 2021), *aff'd in part, rev'd in part and remanded*, 87 F.4th 759 (6th Cir. 2023) (quoting *N. Air Cargo v. U.S. Postal Serv.*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010)); *see also, e.g.*, *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 67–68 (D.D.C. 2010) (collecting cases); *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015) (similar).  "Otherwise, a litigant seeking

---

[16] Drafts of these updated forms can be found at https://www.dol.gov/agencies/eta/foreign-labor/farmworker-protection-final-rule, under "OFLC forms."

injunctive relief against the government would always satisfy the irreparable injury prong, nullifying that requirement in such cases." *CoverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014).  The Plaintiff States do not quantify the alleged costs to them associated with the Final Rule.  But because, as explained above, the only impact the challenged provisions will have on the SWAs is the need to review updated paperwork for checking employers' assurances, any costs would likely represent a tiny fraction of the state's total annual budget.  As such, the Plaintiff States have not met their burden of showing that any costs would be so great as to constitute irreparable harm.

### III.    The Public Interest Weighs Against a Preliminary Injunction.

The balance of hardships and the public interest weigh against issuing an injunction here. When the government is a party, these two inquiries merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Plaintiffs say that an injunction would cause "little or no harm" to Defendants, PI Mot. at 32 (quoting *Moore v. Brown*, 448 U.S. 1335, 1339 (1980)), but that argument ignores that "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop," *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008); *see Seaside Civic League, Inc. v. U.S. Dep't of Housing & Urb. Dev.*, No. 14-1823-RMW, 2014 WL 2192052, at *3 (N.D. Cal. May 23, 2014).  DOL determined that the Rule was in the public interest, and an injunction frustrating the enforcement of that rule would therefore harm the agency and the public interest.  Specifically, DOL found that new protections for workers employed under the H-2A program would "help prevent exploitation and abuse of agricultural workers and ensure that unscrupulous employers do not financially gain from their violations or contribute to economic and workforce instability by circumventing the law," and that a lack of these protections "would adversely affect the wages and working conditions of workers in the United States similarly employed." 89 Fed. Reg. at 33,900.  Because the statute expressly elevates consideration of "the wages and working conditions of workers in the United States," 8

U.S.C. § 1188(a)(1)(B), without consideration for the economic interests of the employers, DOL's Final Rule aligns with Congress's stated policy goals and is therefore in the public interest.

## IV.  Any Relief Should Be Limited to the Plaintiffs that Have Established Standing and Irreparable Harm.

In the event that the Court finds that some Plaintiffs are entitled to relief, such relief should be limited to the Plaintiffs that have demonstrated an injury-in-fact for standing purposes and satisfied the irreparable harm requirement.  Relief should be no broader than necessary to remedy any harm demonstrated by plaintiffs in a given case.  *See Gill v. Whitford*, 585 U.S. 48, 73 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  "[N]ationwide injunctions or universal remedies . . . seem to take the judicial power beyond its traditionally understood uses, permitting district courts to order the government to act or refrain from acting toward nonparties in the case. . . . Nationwide injunctions sometimes give States victories they did not earn . . . ." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (questioning propriety of nationwide injunctions)); *see also Trump v. Hawaii*, 585 U.S. 667, 720 (2018) (Thomas, J., concurring) (suggesting universal injunctions are inconsistent with "limits on equity and judicial power"); *Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) (staying nationwide injunction of COVID-19 vaccination mandates as "an issue of great significance" that "will benefit from the airing of competing views in our sister circuits" (citation omitted)). As Justice Gorsuch, joined by Justice Thomas, has explained, "[b]ecause plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *Dep't of Homeland Sec*, 140 S. Ct. at 601 (Gorsuch, J., concurring). This creates risks of "conflicting nationwide injunctions," with "asymmetric" stakes where "a single successful challenge is enough to stay the challenged rule across the country." *Id.*; *see also Trump*, 585 U.S. at 713 (Thomas, J., concurring) (Universal relief "take[s] a toll on the federal court system—preventing legal questions from percolating through

the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.").

The fact that Plaintiffs bring an APA claim does not compel a nationwide remedy. *See, e.g.*, *California v. Azar*, 911 F.3d 558, 582–84 (9th Cir. 2018) (vacating nationwide scope of injunction in facial challenge under the APA).  A court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), and the APA's general instruction that unlawful agency action "shall" be "set aside," 5 U.S.C. § 706(2), is insufficient to mandate such a departure. The Supreme Court therefore has confirmed that, even in an APA case, "equitable defenses may be interposed." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967).  Significantly, no federal court had issued a nationwide injunction before Congress's enactment of the APA in 1946, nor would any court do so for more than fifteen years thereafter.  *See Trump*, 585 U.S. at 716 (Thomas, J., concurring); *see also United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring in the judgment) (joined by Justices Thomas and Barrett) (indicating that the APA does not require, or perhaps even permit, universal vacatur of agency actions).

As explained above, *see supra* at 33–36, the Plaintiff States have not established standing or irreparable harm.  So any equitable relief should extend no further than the remaining Plaintiffs (*i.e.*, Miles Berry Farm and the members of GFVGA).  Should the court find that the private Plaintiffs have demonstrated actual injuries, and that the remaining preliminary injunction factors are met, an injunction preventing enforcement of the Final Rule against those parties would provide complete relief to redress the parties' demonstrated actual injuries, and any broader relief would be inappropriate.  *See Gill*, 585 U.S. at 73.[17]

---

[17] Additionally, any injunctive relief should apply at most to those provisions of the Final Rule that Plaintiffs have (a) challenged and (b) demonstrated all four preliminary injunction factors, including irreparable harm.  Enjoining or staying any part of the Final Rule other than the worker voice and empowerment provisions and the automatic AEWR updates would be unwarranted because the Plaintiffs have not even argued that any other provision is unlawful or would cause irreparable harm.

Plaintiffs offer three reasons why the Court should enter nationwide relief, none of which is persuasive. First, Plaintiffs say that "a universal injunction would 'protect similarly situated nonparties.'" PI Mot. at 35 (quoting *Florida v. HHS*, 19 F.4th 1271, 1282 (11th Cir. 2021)). But "[r]eviewing courts should . . . be skeptical of nationwide injunctions premised on the need to protect nonparties." *Georgia v. President of the United States*, 46 F.4th 1283, 1306 (11th Cir. 2022). Nonparties can seek protection of injunctive relief through "class certification under Rule 23, joinder and intervention in an existing lawsuit, or even filing a new lawsuit of their own," and "[a] district court cannot circumvent these mechanisms in the name of providing injunctive relief only for nonparties' benefit." *Id.* This is especially true "in cases challenging federal administrative actions," where "similarly situated parties may well have extremely *dissimilar* views on whether they are helped or harmed by a federal policy." *Id.* at 1306–07.

Second, Plaintiffs say that universal relief would "avoid the chaos and confusion of a patchwork of injunctions." PI Mot. at 35 (quoting *Florida*, 19 F.4th at 1282). In particular, Plaintiffs say that if the Final Rule's protections for H-2A workers go into effect for some employers (nonparties) and not others (Plaintiffs), the result would "funnel foreign migrant agricultural labor" away from the Plaintiffs and toward nonparties, which they say would hurt Plaintiffs. *Id.* at 36. "[A] district court [should not] enter a nationwide injunction to serve the general interest of national uniformity." *Georgia*, 46 F.4th at 1307. "[N]onuniformity is a deliberate feature of our federal court system, and Congress—not one of the 94 federal district courts or 12 regional circuit courts—is best positioned to choose when to depart from that norm." *Id.* Where a "regulatory challenge involves important and difficult questions of law, it is especially vital that various courts be allowed to weigh in so that the issues can percolate among the courts." *Id.* (citation omitted). Moreover, Plaintiffs' economic argument make little sense. If non-party employers are constrained by the Final Rule, they will be less likely to decide to participate in the H-2A program; foreign migrant agricultural workers will not be "funnel[ed]" towards them. Conversely, if Plaintiffs, by virtue of an injunction, are free to employ H-2A workers without the additional requirements of the Final Rule, Plaintiffs would be more likely, relative to their Final

Rule-constrained competitors, to participate in the H-2A visa program and to hire non-U.S. workers to fill those jobs.

Third, Plaintiffs argue that a universal injunction is appropriate because the Final Rule "implicates federal immigration policy," for which there should be "a comprehensive and *unified* system." PI Mot. at 35 (quoting *Florida*, 19 F.4th at 1282). This argument is merely a variation on the previous point, but "national uniformity" does not justify a universal injunction. *Georgia*, 46 F.4th at 1307. And none of the cases finding a special need for uniformity in the immigration context are binding authority. *See Florida*, 19 F.4th at 1282 (citing decisions of the Fourth and Fifth Circuit); *see also New York*, 140 S. Ct. at 600 (Gorsuch, J., concurring) (questioning propriety of nationwide injunctions in an immigration case). In any event, the Final Rule does not itself impose immigration policy. The Final Rule establishes certain threshold requirements that agricultural employers must meet prior to obtaining a TEC for H-2A visa workers. The ultimate decision on whether to grant a visa rests with USCIS. Even if the Final Rule is enjoined as to certain employers, there will not be any inconsistent application of the immigration laws because USCIS will process visas all the same so long as DOL has issued the employer a TEC.

## **CONCLUSION**

The Court should deny Plaintiffs' motion. In the event the Court finds emergency relief warranted, any such relief should be limited to the Plaintiffs that have established irreparable harm and to the challenged provisions causing such harm.

Dated: July 8, 2024             Respectfully submitted,

JILL E. STEINBERG
United States Attorney

/s/ *O. Woelke Leithart*
O. Woelke Leithart
Idaho Bar No. 9257
Assistant United States Attorney
U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia 31412
Telephone: (912) 652-4422
E-mail: Woelke.Leithart@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JULIE STRAUS HARRIS
Assistant Branch Director

*/s/ Michael J. Gaffney*
MICHAEL J. GAFFNEY (D.C. Bar No. 1048531)
MICHAEL P. CLENDENEN
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington, D.C. 20005
Telephone:      (202) 514-2356
Facsimile:      (202) 616-8470
E-mail:          Michael.J.Gaffney@usdoj.gov

*Attorneys for Defendants*