# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

State of KANSAS, State of
GEORGIA, State of SOUTH
CAROLINA, State of
ARKANSAS, State of FLORIDA,
State of IDAHO, State of
INDIANA, State of IOWA,
State of LOUISIANA, State
of MISSOURI, State of
MONTANA, State of NEBRASKA,
State of NORTH DAKOTA,
State of OKLAHOMA, State of
TENNESSEE, State of TEXAS,
State of VIRGINIA, MILES
BERRY FARM, and GEORGIA
FRUIT AND VEGETABLE GROWERS
ASSOCIATION,

    Plaintiffs,

    v.

THE UNITED STATES
DEPARTMENT OF LABOR, JOSE
JAVIER RODRIGUEZ, in his
official capacity, and
JESSICA LOOMAN, in her
official capacity,

    Defendants.

CASE NO. 2:24-cv-76

## ORDER

Before the Court is Plaintiffs' combined motion for a stay, preliminary injunction, or temporary restraining order. Dkt. No. 19. Plaintiffs seek preliminary relief halting the effective date of a rule issued by Defendant Department of Labor. After

considering the briefs and hearing oral argument on the motion, the Court **GRANTS** Plaintiffs' motion for a preliminary injunction for the reasons discussed herein.

BACKGROUND

Seventeen states—Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, Tennessee, Texas, and Virgina—seek preliminary injunctive relief against: the United States Department of Labor ("DOL"); Jose Javier Rodriguez, Assistant Secretary for Employment and Training at the DOL; and Jessica Looman, Administrator of the DOL Wage and Hour Division. See generally Dkt. No. 1. Plaintiffs claim that a recently-enacted DOL regulation, see Improving Protections for Workers in Temporary Agricultural Employment in the United States, 89 Fed. Reg. 33,898 (Apr. 29, 2024) (to be codified at 29 C.F.R. pt. 501) (hereinafter "the Final Rule"), illegally provides collective bargaining rights to agricultural migrant workers employed in the United States under the H-2A visa program. Dkt. No. 19-1 at 6. Accordingly, Plaintiffs ask the Court to issue preliminary relief delaying implementation of the Final Rule nationwide. Id. at 33. The states argue that, if the Final Rule were enacted, alien agricultural workers would receive rights that American citizens working agricultural jobs do not enjoy.

Analyzing Plaintiffs' arguments requires a brief outline of the legal backdrop against which the decision must be made. The Court begins by providing an overview of the H-2A visa program, which Defendants argue gives them authority to issue the Final Rule.

## I.   The H-2A Visa Program

In 1986, Congress amended the Immigration and Nationality Act (INA) with passage of the Immigration Reform and Control Act (IRCA). Through IRCA, Congress created a special class of migrant workers that "com[e] temporarily to the United States to perform agricultural labor or services." 8 U.S.C. § 1101(a)(15)(H)(ii)(a); see also 8 U.S.C. §§ 1184(c)(1), 1188. Under IRCA, several federal agencies—e.g., the DOL, the U.S. Department of Justice ("DOJ"), and the Department of Homeland Security ("DHS")—have certain duties to fulfill, and rulemaking authority to use, in relation to issuing these "H-2A visas."

The first step for an employer seeking workers through the H-2A visa program is to apply for a temporary employment certification ("TEC"). To apply for this TEC, it is mandatory that employers submit a job order to the DOL between sixty and seventy-five days prior to the employer's initial date of need. The State Workforce Agency ("SWA") is in charge of reviewing the job order, and upon its completion of the review, the SWA will "place the job order in intrastate clearance and commence recruitment of U.S.

3

workers." <u>See</u> 20 C.F.R. § 655.121(f). The SWA must then refer to the employer each U.S. (non-migrant) worker who applies for the active job order.

An employer's next step is to apply for ultimate certification from the DOJ. But before the DOJ can issue such a certification, the DOL must issue its own certification, confirming two things: (1) "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition" and (2) "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a). In § 1188(c), Congress expounds upon the DOL's role in the certification process by providing "rules [that] apply in the case of the filing and consideration of an application for a labor certification." § 1188(c). Within that section, Congress grants the DOL the power to issue regulations[1] to ensure that the certification requirements of § 1188(a)—specifically, the requirement that American agricultural workers not be adversely

---

[1] To be clear, this is not the *only* rulemaking authority that Congress confers upon the DOL. For example, Congress provides the DOL authority to "require by regulation, as a condition of issuing the certification, the payment of a fee to recover the reasonable costs of processing applications for certification." 8 U.S.C. § 1188(a)(2). The parties' arguments, however, are focused on to the DOL's rulemaking authority under § 1188(c)(3)(A).

affected—are met before the DOL issues such a certification. § 1188(c)(3)(A) (requiring that employers seeking H-2A visas comply with "the criteria for certification," "including criteria for the recruitment of eligible individuals *as prescribed by the Secretary*" (emphasis added)). It is under this authority that the DOL claims it issued the Final Rule, which the Court turns to now.

## II. **The Final Rule**

Following the required notice and comment period, the DOL issued the Final Rule on April 29, 2024. See generally 89 Fed. Reg. 33,898. According to DOL, the Final Rule "establish[es] the minimum terms and conditions of employment (*i.e.*, the 'baseline' or working conditions) necessary to 'neutralize any adverse effect resultant from the influx of temporary foreign workers.'" See id. at 33,987 (quoting Williams v. Usery, 531 F.2d 305, 306-07 (5th Cir. 1976)). Generally, the Final Rule establishes the right for H-2A workers to participate in "concerted activity" to ensure that H-2A employers are not violating the minimum standards as set forth by the DOL.

Specifically, the Final Rule provides that H-2A employers cannot retaliate against an H-2A visa-holder who "[h]as engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization; or has engaged in other concerted activities for the purpose of mutual aid or protection relating to wages or working conditions; or has refused to engage

5

in any or all of such activities." 20 C.F.R. § 655.135(h)(2)(i).
Under that same subsection, H-2A employers may not retaliate
against any visa-holder that "[h]as refused to attend an employer-
sponsored meeting with the employer or its agent, representative
or designee, if the primary purpose of the meeting is to
communicate the employer's opinion concerning any activity
protected by this subpart; or has refused to listen to employer-
sponsored speech or view employer-sponsored communications, the
primary purpose of which is to communicate the employer's opinion
concerning any activity protected by this subpart." Id.
§ 655.135(h)(2)(ii). Finally, an H-2A "employer must permit a
worker to designate a representative to attend any investigatory
interview that the worker reasonably believes might result in
disciplinary action and must permit the worker to receive advice
and active assistance from the designated representative during
any such investigatory interview." Id. § 655.135(m).[2]

---

[2] The three subsections discussed here apply only to persons
engaged in agriculture as defined by 29 U.S.C. § 203(f). See 29
U.S.C. § 203(f) ("'Agriculture' includes farming in all its
branches and among other things includes the cultivation and
tillage of the soil, dairying, the production, cultivation,
growing, and harvesting of any agricultural or horticultural
commodities (including commodities defined as agricultural
commodities in [section 15(g) of the Agricultural Marketing Act,
as amended]), the raising of livestock, bees, fur-bearing animals,
or poultry, and any practices (including any forestry or lumbering
operations) performed by a farmer or on a farm as incident to or
in conjunction with such farming operations, including preparation
for market, delivery to storage or to market or to carriers for
transportation to market.").

The DOL maintains that it promulgated this rule to alleviate the "pervasive" violations of the H-2A visa program. 89 Fed. Reg. 33,989. As support for that reasoning, the DOL presents data based on investigations completed by the DOL Wage and Hour Division ("WHD"). It is true that the WHD "cannot investigate every farm [at which] H-2A workers are employed," but in the investigations it did complete, the WHD found violations eighty-eight percent of the time. Id. at 33,988-89. Too, the DOL found that H-2A workers are uniquely vulnerable to their employers' exploitations because of "the temporary nature of the work, frequent geographic isolation of the workers, and dependency on a single employer." Id. at 33,987. The DOL noted that H-2A employers often "retaliate[ed] against H-2A workers for asserting or advocating for their rights." Dkt. No. 69 at 9 (citing 89 Fed. Reg. 33,993). On that note, the DOL found that *domestic* agriculture workers "may be less likely to face unique vulnerabilities and forms of retaliation experienced by H-2A workers." 89 Fed. Reg. 33,992.

Because of those vulnerabilities, the DOL determined the Final Rule was necessary to ensure the protection of H-2A workers. The DOL also asserts that the Final Rule is necessary to ensure that the vulnerabilities of H-2A workers do not encroach upon, or adversely affect, domestic workers that are similarly employed. Plaintiffs disagree with this characterization of the Final Rule and therefore argue that the DOL acted outside of the authority

granted to it by Congress in publishing the Final Rule. Plaintiffs also argue that the Final Rule directly contravenes federal law because it violates the National Labor Relations Act of 1935 ("NLRA").

## III. The NLRA

With passage of the NLRA in 1935, Congress established statutorily-protected rights to collective bargaining to certain employees.[3] There are two portions of the NLRA relevant to the Court's analysis today: (a) the rights provided by the NLRA and (b) the employees who enjoy those rights.

As to the rights afforded by Congress, the NLRA provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157; see also Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174, 598 U.S. 771 (2023). The NLRA also makes it an "unfair

---

[3] Congress enacted the NLRA in response to the contentious, and often times violent, national debate on workers' rights. See Edward Silver & Joan McAvoy, The National Labor Relations Act at the Crossroads, 56 FORDHAM L. REV. 181, 181–82 (1987). Congress itself struggled with passage of the NLRA, and the NLRA in its current form represents extensive compromises by Congressional leaders, employers, and disgruntled employees. See Pub. L. No. 74-198, § 1, 49 Stat. 449, 449 (1935) (noting the "disputes" that gave rise to the NLRA).

labor practice" for any employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." § 158(a)(2). Moreover, "it shall be an unfair labor practice for an employer to discriminate in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." § 158(a)(3).

In terms of which employees enjoy the protections above, the NLRA defines the term "employee." Congress provides: "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment." § 152(a)(3). This definition is ostensibly broad, but Congress explicitly excludes certain laborers from its definition of "employee," including agricultural workers. Id. ("The term 'employee' . . . shall not include any individual employed as an agricultural laborer."). Put plainly, the NLRA establishes the right to collectively bargain for employees, but specifically excludes agricultural laborers from the group of employees entitled to such rights.

**IV.  Procedural History**

On or around April 29, 2024, the DOL published the Final Rule in the Federal Register, and on June 10, 2024, Plaintiffs filed the present action. Dkt. No. 1. Then, on June 13, 2024, Plaintiffs moved the Court for preliminary relief.  Thereafter, Defendants filed a response brief, dkt. no. 69, and Plaintiffs filed a reply, dkt. no. 84. The Court heard oral argument on the motion on August 2, 2024. See generally Dkt. No. 94. Plaintiffs' motion is thus ripe for review.[4]

DISCUSSION

Plaintiffs ask the Court to issue a temporary restraining order ("TRO"), a preliminary injunction, or a stay of the Final Rule's effective date pursuant to 5 U.S.C. § 705. Under either form of relief, Plaintiffs request that the Court's decision apply nationwide. The Court's decision in this case is thus two-fold. First, the Court must determine whether this case warrants issuance of a preliminary injunction or stay under the Administrative Procedure Act ("APA"). And if either is warranted, then the Court must also determine whether such relief should apply nationwide.

---

[4] Originally, the Final Rule had an effective date of June 28, 2024, and would be applicable to "all applications to participate in the H-2A program filed on or after August 29, 2024." Id. ¶ 66. But after Plaintiffs filed the motion presently before the Court, the DOL opted to extend the effective date of the Final Rule to August 29, 2024. Dkt. No. 28 ¶ 4.

I.   **Plaintiffs have met their burden to show they are entitled to preliminary relief.**

   A. **Legal Standard**

   "To receive a preliminary injunction, [Plaintiffs] must clearly establish the following requirements: '(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to [Plaintiffs] outweighs the potential harm to [Defendants]; and (4) that the injunction will not disserve the public interest.'" Keister v. Bell, 879 F.3d 1282, 1287 (11th Cir. 2018) (quoting Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002)). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." Id. (quotations omitted).

   The requirements for a stay mirror those for a preliminary injunction. Under the APA, the Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The Court considers the following factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the

11

public interest lies." Hilton v. Braunskill, 481 U.S. 770, 776 (1987) (citations omitted). The Court thus evaluates a request for a stay under a nearly identical standard as a request for a preliminary injunction. Nken v. Holder, 556 U.S. 418, 434 (2009); see also, e.g., Callahan v. U.S. Dep't of Health & Human Servs., 434 F. Supp. 3d 1319, 1336 (N.D. Ga. 2020) ("The 'test to be applied as to whether a stay should be entered is the same as that which applies to requests for preliminary injunctions.'" (quoting Corning Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd., 562 F. Supp. 279, 280 (E.D. Ark. 1983))). The Court will, therefore, consider together the factors for a preliminary injunction and a stay.

**B. Plaintiffs are likely to succeed on the merits of their case.**

According to Plaintiffs, the Final Rule is not in accordance with law because it exceeds the DOL's authority under the IRCA's H-2A visa program, violates the NLRA, and violates the Major Questions Doctrine.[5] Dkt. No. 19-1 at 10–23. The Court begins its analysis with Plaintiffs' first argument.

---

[5] Plaintiffs also argue that the DOL's interpretation of the IRCA is not entitled to any deference. At the time this case was filed, Chevron deference was still in effect. See generally Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984). But during the pendency of this case, the Supreme Court overturned Chevron. See Loper Bright Enters. v. Raimondo, 144 S. Ct. 2244, 2273 (2024) ("Chevron is overruled."). The Court owes no Chevron deference to the DOL's interpretation of the IRCA. Instead, the Court "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority." Id.

**1. The Final Rule does not exceed the DOL's authority under the H-2A visa program.**

Generally, "an agency literally has no power to act . . . unless and until Congress confers power upon it." La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n (LPSC), 476 U.S. 355, 357 (1986); see also Bayou Lawn & Landscape Servs. v. Sec'y of Labor, 713 F.3d 1080, 1084 (11th Cir. 2013) ("[A]n agency's power to promulgate legislative regulations is limited to the authority delegated to it by Congress." (citations omitted)). But "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." Loper Bright, 144 S. Ct. at 2273. Put another way, "[w]hen the *best reading* of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." Id. at 2263 (emphasis added).

To determine the extent of rulemaking authority granted to the DOL under the H-2A program, the Court looks to the INA, as amended by the IRCA. Congress provided quite general rulemaking authority, but not to the DOL. Indeed, Congress conferred general rulemaking authority to carry out the H-2A visa program upon two executive agencies: the DHS, 8 U.S.C. § 1103(a)(3), and the

13

Attorney General ("AG"), id. § 1103(g)(2). Plaintiffs accurately point out that the DOL is "conspicuously absent" from this grant of general rulemaking authority. Dkt. No. 19-1 at 13. But while the DOL does not enjoy a grant of *general* rulemaking authority, the IRCA does reflect congressional intent to confer some rulemaking authority upon DOL. See, e.g., Bayou Lawn, 713 F.3d at 1084 (Congress has "expressly grant[ed] DOL rulemaking authority over the agricultural worker H-2A program."). It is thus the Court's duty to identify the Final Rulemaking authority conferred upon the DOL and determine whether the Final Rule is a valid exercise of that authority.

The Final Rulemaking authority Congress conferred upon the DOL can be found in § 1188 of the IRCA. Specifically, § 1188(a) provides that the AG may not issue any H-2A visas until the DOL has issued a "certification" that: (A) there are not enough American workers to perform the relevant labor and (B) the issuance of such visas will not "adversely affect" similarly-employed American laborers. 8 U.S.C. § 1188(a)(1). Section 1188(c) expounds upon the DOL's role in the certification process by providing "rules [that] apply in the case of the filing and consideration of an application for a labor certification." § 1188(c). Within that section, Congress grants the DOL the power to issue regulations to ensure that the certification requirements of § 1188(a)—specifically, the requirement that American agricultural workers

14

not be adversely affected—are met before the DOL issues such a
certification. § 1188(c)(3)(A) (requiring that employers seeking
H-2A visas comply with "the criteria for certification,"
"including criteria for the recruitment of eligible individuals *as
prescribed by the Secretary*" (emphasis added)). Put plainly, the
"best reading" of § 1188, in its entirety, is that Congress granted
the DOL the authority to issue regulations to ensure that any
certifications it issues for H-2A visas do not "adversely affect"
American agricultural workers.

This reading is supported by the D.C. Circuit's
interpretation of the same language in AFL-CIO v. Dole, 923 F.2d
182 (D.C. Cir. 1991). In Dole, the D.C. Circuit was asked to decide
whether the DOL's "new methodology for computing the adverse effect
wage rate ('AEWR'), which is the minimum wage that employers who
wish to hire aliens as temporary agricultural workers must offer
American and foreign workers," was a valid exercise of the DOL's
rulemaking authority under § 1188. Id. at 183. The court held that
the DOL's "choice of methodology is really a policy decision taken
within the bounds of a *rather broad congressional delegation*." Id.
at 187 (emphasis added). The court further explained that this
"rather broad congressional delegation" was couched by the DOL's
obligation "to balance the competing goals of the statute—
providing an adequate labor supply and protecting the jobs of
domestic workers." Id. (citing Rogers v. Larson, 563 F.2d 617, 626

15

(3rd Cir. 1977), <u>cert. denied</u>, 439 U.S. 803 (1978)). At bottom, though, the D.C. Circuit found that "[s]triking that balance is a judgment call which Congress entrusted to [DOL]." <u>Id.</u> (citations omitted). Put plainly, Judge Silberman, then-Judge Ginsburg, and Judge Sentelle—each well respected for their administrative law jurisprudence—agreed that § 1188 affords the DOL considerable latitude to promulgate regulations that protect American workers from being adversely affected by the issuance of H-2A visas. The Court sees no reason to depart from the D.C. Circuit's well-reasoned interpretation.

The Court next turns to whether the Final Rule is a valid exercise of the Final Rulemaking authority outlined above. <u>See Loper Bright</u>, 144 S. Ct. at 2273. That is, the Court must determine whether the Final Rule is a valid method by which the DOL can ensure that American workers are not adversely affected by H-2A visaholders. To make this determination, the Court finds the Final Rule itself particularly instructive. Therein, the DOL explains that, despite previously-enacted protections, "violations of the H-2A program requirements remain pervasive." 89 Fed. Reg. 33,989. But even though the DOL is aware of widespread violations, the DOL asserts that it is unequipped to "investigate every farm on which H-2A workers are employed," and thus, the DOL cannot take sufficient action to rectify H-2A employers' violations of the program's requirements. <u>Id.</u>; <u>see also</u> 8 U.S.C. § 1188(c)(3)(A)(i)

(requiring the DOL to ensure that an employer has complied with "the criteria for certification" before issuing a certification). The DOL also notes its finding that, based on "the temporary nature of [H-2A visaholder's] work, frequent geographic isolation of the [H-2A] workers, and [their] dependency on a single employer," H-2A workers are especially vulnerable to an employer's exploitation. 89 Fed. Reg. 33,987. Additionally, because of the aforementioned vulnerabilities, H-2A employers not only exploit H-2A workers but commonly retaliate against H-2A workers who advocate for their own rights. See id. 33,993.

On the other hand, the DOL found that American agricultural workers "may be less likely to face unique vulnerabilities and forms of retaliation experienced by H-2A workers." Id. 33,992. Accordingly, the DOL asserts that employers are more likely to employ H-2A workers, who are more easily exploited, than similarly situated American workers. See id. 33,990 ("[T]he ability of employers to hire this uniquely vulnerable workforce may suppress the ability of agricultural workers in the United States to negotiate with employers and advocate on their own behalf regarding their terms and conditions of employment."). The DOL specifically notes that "use of the H-2A program has grown dramatically over the past decade while overall agricultural employment in the United States has remained stable, meaning that fewer workers in the United States are employed as farmworkers." Id. And the DOL posits

17

that "increasing reliance upon the H-2A program makes the entire agricultural workforce as a whole more vulnerable to abuse and exploitation," thus adversely affecting the American agricultural workers who are similarly situated to H-2A workers. Id. The DOL "concludes that [the Final Rule], which safeguard[s] worker voice and empowerment, will prevent adverse effect on similarly employed workers in the United States by alleviating some of the barriers H-2A workers face when raising complaints about violations of their rights under the program and advocating regarding working conditions." Id. 33,991. The Court finds that the Final Rule falls within the DOL's rulemaking authority under § 1188.

As the D.C. Circuit found in Dole, "[DOL] is obliged to balance the competing goals of the [IRCA]—providing an adequate labor supply and protecting the jobs of domestic workers." 923 F.2d at 187. And "[s]triking that balance is a judgment call which Congress entrusted to [DOL]." Id. The DOL made its judgment call. And it provided sufficient reasoning for its decision. See generally 89 Fed. Reg. 33,898; see also Dole, 923 F.2d at 186 ("[DOL] is entitled to change its policy so long as it supplies a reasoned explanation for its choice." (citations omitted)). The DOL also properly "consider[ed] [] and answer[ed] [] the criticisms" of the Final Rule as evidenced by its detailed discussion of the comments supplied during the notice-and-comment period. Id.; see also 89 Fed. Reg. 33,991–33,992 (reflecting the

DOL's extensive response to criticisms of the Final Rule's ability to alleviate adverse effects on American agricultural workers). Thus, the Court finds that the Final Rule does not exceed the Final Rulemaking authority granted to the DOL by Congress under § 1188.

### 2. The Final Rule violates the NLRA because the DOL attempts to unconstitutionally create law.

Finding that the DOL acted within its authority as proscribed by Congress through the IRCA does not end the Court's analysis. Indeed, "the [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law.'" FCC v. Nextwave Pers. Communs. Inc., 537 U.S. 293, 300 (2003) (quoting 5 U.S.C. § 706(2)(A)). "Law," in this context, "means, of course, any law, and not merely those laws that the agency itself is charged with administering." Id. (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–14 (1971)). To that end, Plaintiffs argue that the Final Rule should be set aside because it violates the NLRA. Dkt. No. 19-1 at 10–12. Plaintiffs contend that providing agricultural workers with collective bargaining rights is foreclosed by the NLRA's explicit exclusion of all agricultural workers from its definition of "employee[s]" who have a federal right to collectively bargain. Id.; see also 29 U.S.C. § 152(a)(3) ("The term 'employee' . . . shall not include any individual employed as an agricultural laborer."). The Court indeed finds that the Final Rule conflicts with the NLRA, and the

Final Rule is unconstitutional. The Court finds that, by implementing the Final Rule, the DOL has exceeded the general authority constitutionally afforded to agencies. "Agencies may play the sorcerer's apprentice but not the sorcerer himself." Alexander v. Sandoval, 532 U.S. 275, 291 (2001). The Final Rule is an attempt by the DOL to play the sorcerer. The DOL may assist Congress, but may not become Congress.

"The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is *not* the power to make law." Dixon v. United States, 381 U.S. 68, 74 (1965) (emphasis added) (quotations omitted). Put another way, "[l]anguage in a regulation . . . may not create a right that Congress has not." Alexander, 532 U.S. at 291; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002) (To determine whether a federal right exists, courts "must [] determine whether Congress *intended to create a federal right*." (emphasis in original)); Harris v. James, 127 F.3d 993, 1008 (11th Cir. 1997) ("[F]ederal rights" cannot be created "by regulations 'alone' or by any valid administrative interpretation of a statute creating some enforceable right."). Through this Final Rule, the DOL seeks to create law by affording some agricultural workers—H-2a workers and American workers similarly situated—the right to collectively bargain. Congress has not created that right. And in fact, the NLRA reflects Congressional intent to *not* create such a right.

The Court first considers Defendants' argument that the Final Rule does not create a right to collective bargaining. Dkt. No. 69 at 12–13. Defendants argue that the Final Rule in no way creates such a right because, in their view, the Final Rule "simply expands the existing anti-discrimination provisions of the H-2A program . . . to expressly protect from employer retaliation workers who engage in self-advocacy and self-organization." Id. at 13–14. That position does not square with the language of the Final Rule. In fact, much of the Final Rule's language mirrors that of the NLRA.

For example, the Final Rule provides protection for "concerted activity for mutual aid and protection which encompasses numerous ways that workers can engage, individually or collectively, to enforce their rights." 89 Fed. Reg. 34,005. The NLRA uses the same language, protecting employees' right to "engage[] in [] concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Removing the word "bargaining" and changing the location of the word "collective" does not change the fact that the Final Rule mirrors the NLRA. Furthermore, the Final Rule states that H-2A employers cannot "discharge, or in any manner discriminate against . . . any person who has engaged in activities related to self-organization," including "any effort to form, join, or assist a labor organization." 89 Fed. Reg. 34,062. This language effectively does the same thing as the NLRA, which makes it an

21

unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the[ir] rights," 29 U.S.C. § 158(a)(1), that is, their rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," id. § 157. Defendants have not shown a consequential difference between the rights protected by the Final Rule and those given to nonagricultural workers by the NLRA.

Defendants argue that the Final Rule is consequentially different from the NLRA because the Final Rule "does not require H-2A employers to recognize labor organizations or to engage in any collective bargaining activities." 89 Fed. Reg. 33,901. Point taken. But that is not the issue. The issue before the Court is whether the Final Rule creates a right not previously bestowed by Congress. The Court finds it does so. Regardless of the terminology used in the Final Rule—be it collective bargaining or otherwise—the Final Rule provides for agricultural workers' right to participate in concerted activity to further their interests. That is a right that Congress has not created by statute. And Defendants have not provided any source indicating that Congress intended to create such a right. See Gonzaga Univ., 536 U.S. at 283 (To determine whether a federal right exists, courts "must [] determine

whether Congress *intended to create a federal right*." (emphasis in original)). Instead, the NLRA exhibits Congress's intent to *refrain* from affording agricultural workers the right to participate in such concerted activity.[6] See 29 U.S.C. § 152(3) ("The term 'employee' . . . *shall not* include any individual employed as an agricultural laborer." (emphasis added)).

Both parties spend considerable space arguing whether the NLRA's exclusion of agricultural workers from its definition of employee means that agricultural workers are foreclosed from receiving the rights created by the NLRA. And in support of their position, Defendants argue that the NLRA's definition of employee "does not set the outer bounds of labor regulation by other means." Dkt. No. 69 at 14. Defendants also highlight several cases where courts have "upheld labor regulations of the categories of individuals excluded from the NLRA's definition of 'employee.'" Id. (collecting cases). The Court notes those cases but finds they do not control the issue presented today. Importantly, the Court does not hold, nor could it, that the DOL is barred from issuing *any* labor regulations governing agricultural workers. Indeed, the IRCA delegates rulemaking authority to the DOL to issue labor

---

[6] The parties agree that "IRCA did not repeal or modify the NLRA." Dkt. No. 69 at 15 (internal quotation marks omitted); see also Agri Processor Co. v. NLRB, 514 F.3d 1, 7 (D.C. Cir. 2008) ("IRCA neither explicitly nor implicitly amended the NLRA.").

regulations governing H-2A workers, which are, by definition, agricultural workers. See supra pp. 12–18. But rulemaking authority alone, absent Congressional intent otherwise, does not allow the DOL to create law or protect newly-created rights of agricultural workers. See Alexander, 532 U.S. at 291. And the DOL aims to do just that through the Final Rule.

Two of the cases cited by Defendants bear further discussion. See generally United Farm Workers v. Ariz. Agric. Emp. Rels. Bd., 669 F.2d 1249 (9th Cir. 1982) ("UFW"); Willmar Poultry Co. v. Jones, 430 F. Supp. 573 (D. Minn. 1977). In both UFW and Willmar Poultry, the court found that the NLRA did not preempt states from regulating agricultural workers' collective bargaining rights. UFW, 669 F.2d at 1257; Willmar Poultry, 430 F. Supp. at 576. Specifically, the UFW court found that Congress had not "precluded the states from regulating the collective bargaining process in the agricultural industry." UFW, 669 F.2d at 1257. Indeed, the court held that "[t]he states [are] fully competent to enact laws governing agricultural labor." UFW, 669 F.2d at 1257.[7] But that is not the issue presently before the Court. This case does not present the question of whether states may constitutionally enact

---

[7] The Court also notes that Minnesota and Arizona are not the only states to have regulated this area. See, e.g., Hunter Knapp, Essential, Not Expendable: Protecting the Economic Citizenship of Agricultural Workers, 93 U. COLO. L. REV. 459, 464–65 (2022) (noting that California, Washington, and Colorado provide collective bargaining rights to agricultural workers).

laws protecting the collective bargaining rights of agricultural workers within their boundaries. Instead, this case presents the question of whether an administrative agency can create a right that Congress has not. The answer is no. State governments can create law and protect rights in excess of those provided under federal law. See, e.g., Brigham City v. Stuart, 547 U.S. 398, 409 (2006) (Stevens, J., concurring) ("Federal interests are not offended when a single State elects to provide greater protection for its citizens than the Federal Constitution requires.").

The Court finds no evidence of federal Congressional intent to create a right to collective bargaining for agricultural workers. The Final Rule does just that. The Court therefore finds that the Final Rule exceeds the DOL's constitutional authority because it creates a right. This is not in "accordance with law" as required by the APA. See Nextwave, 537 U.S. at 300. "From the beginning of the Government various acts have been passed conferring upon executive officers power to make rules and regulations—not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power." United States v. Grimaud, 220 U.S. 506, 517 (1911). Administrative agencies, including the DOL, cannot create law, and the DOL cannot create rights that Congress has not. The DOL cannot make both executive rules and congressional

laws. The Court finds that the Final Rule violates federal law and that Plaintiffs are likely to succeed on the merits of their claim.

C. **Plaintiffs have met their burden with regard to the other preliminary injunction/stay factors.**

1. **Plaintiffs have shown that they would suffer irreparable harm if no preliminary relief is granted.**

Plaintiffs argue the second <u>Winter</u> factor is satisfied here because the Final Rule will cause two irreparable injuries if allowed to go into effect. First, Plaintiffs contend that the Final Rule will cause irreparable financial harm to both the Plaintiff-States and Plaintiffs Miles Berry Farm and Georgia Fruit and Vegetables Growers Association ("GFVGA"). Dkt. No. 19-1 at 29–31. And second, Plaintiffs assert that Miles Berry and GFVGA will suffer irreparable harm because the Final Rule will negatively impact the "efficient and effective operation of their farms." <u>Id.</u> at 31.

As to the asserted financial harm, Plaintiffs argue the "States' workforce agencies will incur administrative costs in the implementation of the [] Rule." <u>Id.</u> at 29. Specifically, Plaintiffs assert that the Final Rule will cause additional administrative costs associated with the state workforce agency review of applications for H-2A certification. <u>Id.</u> ("The [] Rule will result in state agencies having to change their approach and behavior, which will result in additional administrative costs." (citations omitted)). And "[d]ue to sovereign immunity, Plaintiff[-]States

cannot recover damages from the federal government," so "the unrecoverable costs the [] Rule inflicts on the [] States constitute irreparable harm." <u>Id.</u> Plaintiffs also argue that Miles Berry Farm and GFVGA will suffer additional monetary injury in two ways. First, employers (like Miles Berry and members of GFVGA) will suffer "an increase in payments to H-2A workers, which stems from changes to the annual effective date of new Adverse Effect Wage Rates (AEWRs)." <u>Id.</u> at 30. "Over a ten-year period, the DOL anticipates this change will cost farms across the country between $12 and $20 million." <u>Id.</u> (citing 89 Fed. Reg. 34,049). And second, the "Rule would increase [GFVGA's] costs and costs to its members by requiring compliance in administering a complex new rule that applies to farmworkers for the first time." <u>Id.</u> (citations omitted). As to both financial harms, Plaintiffs assert the DOL acknowledges the financial injury in the Final Rule itself. <u>Id.</u> at 30-31 (citing 89 Fed. Reg. 34,047, 34,044).

These arguments are in line with the Eleventh Circuit's holding that "unrecoverable monetary loss is an irreparable harm." <u>Georgia v. President of the United States</u>, 46 F.4th 1283, 1302 (11th Cir. 2022) (citations omitted). And "[t]hat includes situations where there is no adequate remedy at law to recover damages for the harm suffered." <u>Id.</u> (internal quotation marks omitted). In applying this standard, the Eleventh Circuit has found that irreparable monetary harm was shown where the district court

"identified several obvious costs of complying with [a] mandate—including lost employees, as well as time and effort needed to" implement the mandate. Id. (internal quotation marks omitted). Based on that understanding, the Court finds that Plaintiffs have shown an irreparable harm in the form of the alleged monetary injury. The Court relies not only Plaintiffs' assertions but also the affidavits submitted on behalf of Plaintiffs. See, e.g., Dkt. Nos. 19-3, 19-9, 19-12.

Defendants argue that any potential financial injury suffered by *Plaintiff-States* would be too minimal to warrant a finding of irreparable harm.[8] Dkt. No. 69 at 36–38. This is because, according to Defendants, Plaintiffs have not shown "how the Final Rule will require the States to expend their own funds on SWAs' H-2A-related activities, which are funded by the federal government." Id. at 37. Specifically, Defendants argue that both the Wagner-Peyser Act and the INA authorize, and in some cases require, the DOL to provide congressionally-appropriated funds to states (specifically SWAs) to facilitate the review of H-2A applications. Because the SWAs are federally funded, Defendants argue it is impossible for the Plaintiff-States to suffer any costs associated with the SWA review process. Id. Defendants further assert, even if SWAs were

---

[8] Defendants do not refute Plaintiffs' position that Plaintiffs Miles Berry Farm and GFVGA will suffer a financial injury due to the Final Rule. Defendants argue only against the States' alleged financial injury.

not federally funded, the costs of reviewing H-2A applications does not change under the Final Rule. Id. The Final Rule, according to Defendants, changes only the method of review, and "[t]he States cannot claim they suffer harm merely from DOL's updated paperwork." Id. at 38. But even if this is the case,[9] Defendants' argument still fails because Defendants have failed to address Plaintiffs Miles Berry Farm and GFVGA's alleged monetary injury. And as previously mentioned, Miles Berry Farm and GFVGA have shown an irreparable harm based on monetary injury. Plaintiffs have met their burden in satisfying the second Winter factor, and the Court finds the necessary showing of irreparable injury has been satisfied.

**2. Principles of equity and public interest favor relief.**

The third and fourth Winter factors "'merge' when, as here, the Government is the opposing party." Gonzalez, 978 F.3d at 1271. And the Court finds both factors are satisfied in this case. Plaintiffs argue that "[a] preliminary injunction would avoid harm to Plaintiffs" and "cause 'little or no harm' to Defendants." Dkt. No. 19-1 at 32 (quoting Moore v. Brown, 448 U.S. 1335, 1339

---

[9] To be clear, the Court does not conclude that Defendants' argument prevails. To the contrary, this issue presents an evidentiary question that is not determinable at this stage. As Plaintiffs point out in their reply, there is no proof that "federal grants are necessarily always enough to cover SWA's costs," and "DOL cannot show that amounts previously mandated or authorized by Congress are enough to keep up with the new requirements imposed by DOL on the States." Dkt. No. 84 at 16.

(1980)). They also point out that "[t]he public is harmed by 'the perpetuation of unlawful agency action.'" Id. at 33 (quoting Louisiana v. Biden, 55 F.4th 1017, 1035 (5th Cir. 2022)); see also Florida v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1315 (11th Cir. 2021) (Lagoa, J., dissenting) ("[T]here is 'no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.'" (quoting League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016))). Plaintiffs are right. Because the Court finds that the Final Rule is unlawful, it also finds that principles of equity and public interest favor relief. See, e.g., Scott v. Roberts, 612 F.3d 1279, 1297 (11th Cir. 2010) ("[T]he public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law.").

Plaintiffs have satisfied all four of the Winter factors. Therefore, the Court finds that Plaintiffs are entitled to preliminary relief.

## II. Plaintiffs are entitled to a tailored preliminary injunction—not universal, nationwide relief.

Because Plaintiffs are entitled to preliminary relief, the question now becomes: what kind? Plaintiffs argue that they are entitled to a preliminary injunction, a stay, or a temporary restraining order. Dkt. No. 19-1 at 1, 5. At the outset, a

temporary restraining order is no longer a viable option because the Court has held a hearing on Plaintiffs' motion and afforded Defendants an opportunity to be heard. <u>See</u> Fed. R. Civ. P. 65. Throughout their briefing, Plaintiffs requested the Court grant a preliminary injunction. <u>See</u> Dkt. Nos. 19-1 at 6, 84 at 21 ("The [C]ourt should maintain the status quo by granting the preliminary injunction."). At oral argument, however, Plaintiffs "advocate[d] for a stay in this case in terms of preserving the status quo." Dkt. No. 94 at 9:8-9. Regardless of whether the Court grants a preliminary injunction or a stay, Plaintiffs request universal or nationwide preliminary relief. Dkt. No. 19-1 at 33.

**A. Nationwide relief is disfavored.**

"Injunctions that prohibit the Executive Branch from applying a law or policy against anyone—often called 'universal' or 'nationwide' injunctions—have become increasingly common." <u>Trump v. Hawaii</u>, 585 U.S. 667, 713 (2018) (Thomas, J., concurring). While a district court may issue a nationwide injunction in appropriate circumstances, "those appropriate circumstances are rare." <u>Florida</u>, 19 F.4th at 1281-82 (citations omitted). Those rare circumstances include cases "where it is necessary to provide complete relief to the plaintiffs, to protect similarly situated nonparties, or to avoid the 'chaos and confusion' of a patchwork of injunctions," or "where the plaintiffs are dispersed throughout the United States, when immigration law is implicated, or when

31

certain types of unconstitutionality are found." Id. at 1282 (citations omitted). Although nationwide injunctions may be beneficial to achieving these ends, they also come at a cost.

Fundamentally, federal courts "render a judgment or decree upon the rights of the litigant parties." Rhode Island v. Massachusetts, 37 U.S. 657, 718 (1838). "Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff. If the court's remedial order affects nonparties, it does so only incidentally." United States v. Texas, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring). Providing party-specific relief comports with a federal court's Article III authority to decide cases and controversies for the parties to the litigation, not for any party anywhere. See U.S. Const. art. 3, § 2, cl. 1.; see also Texas, 599 U.S. at 693 (Gorsuch, J., concurring). By design, "district courts' authority to provide equitable relief is meaningfully constrained." Hawaii, 585 U.S. at 716 (Thomas, J., concurring); see also The Federalist No. 78, at 407 (Alexander Hamilton) (Liberty Fund ed., 2001) ("To avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them.").

A nationwide injunction "gives a single district court an outsized role in the federal system." Georgia, 46 F.4th at 1304. "[T]he federal court system allows courts to reach multiple answers to the same legal question, but nationwide injunctions frustrate that end." Id. "Conflicts are inevitable, and even helpful." Id. "This divergence of decisions is expected—encouraged—in cases challenging federal government action, because the federal government is often a repeat player in lawsuits that involve significant legal questions." Id. And when Congress determines that there is a need for nationwide uniformity in a specific area of the law, it may designate a specific court as the exclusive forum. Id. at 1304-05. Granting a nationwide injunction may, therefore, "have a detrimental effect by foreclosing adjudication by a number of different courts and judges." Califano v. Yamasaki, 442 U.S. 682, 702 (1979).

As for a stay, less guidance from the Supreme Court and the Eleventh Circuit exists. Section 705 of the APA provides that "the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." Id. Unlike nationwide injunctions, there is no precedential list of circumstances in which a nationwide stay would be appropriate or even permitted. Given that there is substantial overlap between the factors governing a Section 705 stay and a

preliminary injunction, Nken, 556 U.S. at 434, and that a nationwide stay would have the same effect as a nationwide preliminary injunction, the same risks associated with nationwide preliminary injunctions would attain.

**b. A nationwide injunction or stay is unwarranted.**

Neither a nationwide injunction nor a nationwide stay is appropriate in this case. Plaintiffs argue that universal relief is needed because this case implicates federal immigration laws, nationwide relief would protect similarly situated nonparties, and it would be more practical than party-specific preliminary relief. Dkt. No. 19-1 at 35–36. These arguments are unavailing.

Beginning with Plaintiffs' immigration implication argument, the Eleventh Circuit has said that a nationwide injunction may be appropriate in cases involving immigration laws. See Florida, 19 F.4th at 1282 ("[C]ourts have frequently found that a nationwide injunction can be warranted in the immigration law context."). That statement, however, was dicta. See Edwards v. Prime Inc., 602 F.3d 1276, 1298 (11th Cir. 2010) ("All statements that go beyond the facts of the case . . . are dicta" (citations omitted)). The Eleventh Circuit itself explained in Florida that "[t]he rule at issue here . . . has nothing to do with immigration." 19 F.4th at 1282. Because "dicta is not binding on anyone for any purpose," Edwards, 602 F.3d at 1298 (citations omitted), the Court is not persuaded to grant a nationwide injunction on this basis.

34

Plaintiffs' argument that a nationwide injunction is needed to support a uniform immigration system also fails. "[A] district court [should not] enter a nationwide injunction to serve the general interest of national uniformity." Georgia, 46 F.4th at 1307. "[N]onuniformity is a deliberate feature of our federal court system, and Congress—not one of the 94 federal district courts or 12 regional circuit courts—is best positioned to choose when to depart from that norm." Id. (footnote omitted). The Court sees no reason to depart from this well-established norm.

Turning next to Plaintiffs' argument that nationwide relief would protect similarly situated nonparties, "courts should also be skeptical of nationwide injunctions premised on the need to protect nonparties." Id. at 1306. Issuing a nationwide injunction to ensure that similarly situated individuals are treated the same as Plaintiffs is inconsistent "with the historical limits on equity and judicial power." Hawaii, 585 U.S. at 720 (Thomas, J., concurring). Historically, "American courts of equity did not provide relief beyond the parties to the case. If their injunctions advantaged nonparties, that benefit was merely incidental." Id. at 717. This is not a case where the plaintiffs are individuals dispersed among the states or federal jurisdictions. See Florida, 19 F.4th at 1282. Instead, Plaintiffs are Georgia, sixteen of her sister states, a Georgia farm, and a Georgia trade association. Thus, identifying Plaintiffs and fashioning a remedy to include

35

all Plaintiffs is not overly difficult. See id.; Georgia, 46 F.4th at 1307.

Finally, Plaintiffs contend that nationwide relief would be the most practical remedy and avoid inequitable outcomes. Dkt. No. 19-1 at 36. More specifically, Plaintiffs argue that "allowing union-like rights for H-2A workers in non-Plaintiff states but not in Plaintiff States would create an incentive for such labor in non-Plaintiff States, which would funnel foreign migrant agricultural labor away from Plaintiff States" and harm GFVGA's members. Id. Yet, national uniformity is not a proper consideration for issuing a nationwide injunction. Georgia, 46 F.4th at 1307. "When, as here, a regulatory challenge involves important and difficult questions of law, it is especially vital that various courts be allowed to weigh in so that the issues can percolate among the courts." Florida, 19 F.4th at 1283. The Court will not foreclose adjudication on this issue by other courts. See Califano, 442 U.S. at 702.

As the Eleventh Circuit observed in Georgia, "[t]his case shows both the difficulty and the importance of considering whether the courts can offer complete relief to the plaintiffs in federal regulatory challenges without issuing a nationwide injunction. Here, we can. So we must." 46 F.4th at 1308. The same rationale applies here. The Court can offer complete relief to Plaintiffs without issuing a nationwide injunction. So it must.

**c. Plaintiffs are entitled to a preliminary injunction tailored to the parties.**

A party-specific preliminary injunction offers complete relief to Plaintiffs. A tailored preliminary injunction would be no broader than necessary to address the harms that have been demonstrated by Plaintiffs. A preliminary injunction would also be a more workable form of relief than a stay, which both parties agree could have the same effect as a nationwide injunction. See Dkt. No. 94 at 8:1-10, 64:7-8. The Court, therefore, finds that Plaintiffs are entitled to a narrowly tailored, party-specific preliminary injunction.

CONCLUSION

Based on the findings of fact and conclusions of law stated herein, the Court **GRANTS** Plaintiffs' motion for a preliminary injunction, dkt. no. 19. Accordingly, the Court **ORDERS** that Defendants are **ENJOINED**, during the pendency of this action or until further Order of the Court, from enforcing the Final Rule, Improving Protections for Workers in Temporary Agricultural Employment in the United States, 89 Fed. Reg. 33,898 (Apr. 29, 2024) (to be codified at 29 C.F.R. pt. 501), within Georgia, Kansas, South Carolina, Arkansas, Florida, Idaho, Indiana, Iowa, Louisiana, Missouri, Montana, Nebraska, North Dakota, Oklahoma, Tennessee, Texas, and Virginia, and against Miles Berry Farm and Georgia Fruit and Vegetable Growers Association.

37

**SO ORDERED** this 26th day of August, 2024.

_____

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA