# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

| | |
|---|---|
| State of KANSAS, *ET AL.*,<br><br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR, *ET AL.*,<br><br>Defendants. | Civil Action No. 2:24-cv-76-LGW-BWC |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT & MEMORANDUM IN SUPPORT

i

TABLE OF CONTENTS

BACKGROUND ....................................................................................................................1

I. The National Labor Relations Act (NLRA) ...................................................................1

II. The H-2A program .........................................................................................................2

III. The Final Rule ...............................................................................................................3

IV. Plaintiffs .......................................................................................................................6

ARGUMENT ........................................................................................................................8

I.   The Final Rule is not in accordance with law .............................................................8

   A.   The Final Rule violates the NLRA ......................................................................10

   B.   The Final Rule exceeds DOL's limited statutory authority ...............................13

   C.   The Final Rule violates the major questions doctrine .........................................20

     1.   The Final Rule triggers the major questions doctrine .......................................21

     2.   Defendants lack clear congressional authorization for the Final Rule.............24

   D.   The Final Rule is arbitrary and capricious .........................................................27

     1.   DOL relied on factors that Congress did not intend for it to consider .............27

     2.   Defendants offer an implausible explanation for the Final Rule.......................29

     3.   The Final Rule is a sharp departure from decades of prior policy .....................30

II.   Plaintiffs are entitled to vacatur, a permanent injunction, and declaratory relief ...................31

CONCLUSION .....................................................................................................................32

TABLE OF AUTHORITIES

## Cases

*AFL-CIO v. Brock*, 835 F.2d 912 (D.C. Cir. 1987) ............................................................... 9

*AFL-CIO v. Dole*, 923 F.2d 182 (D.C. Cir. 1991) ............................................................... 9

*Agri Processor Co. v. NLRB*, 514 F.3d 1 (D.C. Cir. 2008) ............................................... 13

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758 (2021) ............ 23

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ...................................................................... 10

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592 (1982) ............... 17

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080 (11th Cir. 2013) ............... passim

*Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226 (1990) ........... 11

*Bittner v. United States*, 143 S. Ct. 713, 720 (2023) ........................................................... 16

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271 (11th Cir. 2015) ......... 31

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) .................................................... 13

*Burnett Specialists v. Abruzzo*, No. 4:22-cv-00605, 2023 U.S. Dist. LEXIS 154566 (E.D. Tex. Aug. 31, 2023) ............................................................................................................ 5

*Career Colls. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024) ....................... 31

*Chamber of Com. v. City of Seattle*, 275 F. Supp. 3d 1140 (W.D. Wash. 2017) ............... 10

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S. Ct. 2440 (2024) ............ 31

*Data Mktg. P'ship, LP v. Dep't of Labor*, 45 F.4th 846 (5th Cir. 2022) ............................. 30

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) ....................... 31

*F.E.C. v. Cruz*, 596 U.S. 289 (2022) .................................................................................... 32

*FCC v. Fox TV Stations, Inc.*, 556 U.S. 502 (2009) ............................................................ 30

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ................................... 20

*Florida Sugar Cane League, Inc. v. Usery*, 531 F.2d 299 (1976) ....................................... 18

*Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271 (11th Cir. 2021) ............... 27, 29

*Florida v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023) ...................................... 31

*Forest Serv. v. Cowpasture River Preservation Ass'n*, 590 U.S. 604 (2020) ....................... 24

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ........................................................................... 23

*Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1 (2023) ........................................................... 31

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454 (5th Cir. 2020) ............. 21

*In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239 (11th Cir. 2020). ................... 27

*Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024) ............... 32

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) ............................................................... 19

*Kiakombua v. Wolf*, 498 F. Supp. 3d 1 (D.D.C. 2020) ...................................................... 31

*La. Pub. Serv. Comm'n v. FCC (LPSC)*, 476 U.S. 355 (1986) .......................................... 13

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ...................................... 9, 17, 26

*Loper Bright Enters. v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022) ................................... 19

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ...................................................................... 14

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ..................................................... 17, 18

*Mendoza v. Sec'y, Dep't of Homeland Sec.*, 851 F.3d 1348 (11th Cir. 2017) ....................... 8

*Merck & Co., Inc. v. Dep't of Health & Hum. Servs.*, 962 F.3d 531 (D.C. Cir. 2020) ............ 19

*Michigan v. EPA*, 576 U. S. 743 (2015) .............................................................................. 17

*Mistretta v. United States*, 488 U.S. 361 (1989) ...................................................19

*NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975) ...................................................4

*North Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291 (4th Cir. 2023) ...... 23, 24

*Texas v. Becerra*, No. 6:24-cv-00211-JDK, ECF 41 (N.D. Tex. Aug. 30, 2024) ...................................................31

*Texas v. Nuclear Regulatory Comm'n*, 78 F.4th 827 (5th Cir. 2023) ...................................................21

*Texas v. United States*, 497 F.3d 491 (5th Cir. 2007) ...................................................13

*U.S. ex rel. Carson v. Kershner*, 228 F.2d 142 (6th Cir. 1955) ...................................................25

*Utility Air Regulatory Grp. v. EPA (UARG)*, 573 U.S. 302 (2014) ...................................................25

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825) ...................................................20

*Weirsum v. U.S. Bank, N.A.*, 785 F.3d 483 (11th Cir. 2015) ...................................................11

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) ...................................................21

## Statutes

29 U.S.C. § 152 ...................................................2, 10

29 U.S.C. § 157 ...................................................2, 4

29 U.S.C. § 158 ...................................................2, 3

29 U.S.C. § 159 ...................................................4

29 U.S.C. § 157 ...................................................11

8 U.S.C. § 1188 ...................................................17

8 U.S.C. § 1101 ...................................................2, 14

8 U.S.C. § 1103 ...................................................14

8 U.S.C. § 1188 ...................................................passim

Ariz. Stat. § 23-1381 ...................................................23

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 301, 100 Stat. 3416 ...................................................3

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 301, 100 Stat. 3416 ...................................................2, 14

K.S.A. § 44-828 ...................................................23

Wisc. Stat. § 111.115 ...................................................23

## Other Authorities

A. Scalia & B. Gardner, *Reading Law: The Interpretation of Legal Texts* (2012) ...................................................13

Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L. J. 2305 (2024) ...................................................31

Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2020) ...................................................31

INTRODUCTION

Defendants created a Final Rule that violates federal law that has been on the books for 89 years utilizing an unlawful interpretation of a statute that has also been on the books for 38 years. In addition, they promulgated a Final Rule that is the very definition of arbitrary and capricious rulemaking by considering factors Congress never intended it to consider, providing an implausible explanation for its actions, and taking a sharp departure from decades of past practice without reasonable explanation. The Court recognized the illegality of Defendants' actions and hit the pause button by issuing a preliminary injunction. Nothing has changed since that time and the Final Rule must be vacated.

Since it was created, the National Labor Relations Act of 1935 (NLRA) has protected collective bargaining rights of American workers. Congress, however, deliberately excluded agricultural laborers from the NLRA's protection. Now the Department of Labor (DOL) is trying to sneak in through the backdoor what Congress has explicitly prohibited. DOL is using a ministerial authority under the Immigration and Naturalization Act (INA) to illegally provide the rights to engage in concerted and collective labor activities to temporary, foreign-migrant farmworkers through the H-2A visa program. Meanwhile, American farmworkers are still barred from such protections under the NLRA. This is unlawful. It also injures all of the Plaintiffs in this case. It is time for this Court to issue a final judgment and grant summary judgment in favor of the Plaintiffs.

BACKGROUND

I. The National Labor Relations Act (NLRA)

In 1935, Congress passed the NLRA, which, among other things, established the right of certain employees to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concentrated

activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. As relevant here, it also considers it an "unfair labor practice" to (1) "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title," (2) "to dominate or interfere with the formation or administration of any labor organization," and (3) "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(1)-(3). Since its inception, the NLRA's definition of "employee"—the term that determines which groups of workers receive protection—has explicitly excluded "agricultural laborers." In the words of the statute: the definition of "employee" "shall not include any individual employed as an agricultural laborer." 29 U.S.C. § 152(3). Virtually all other employees are protected under the law.

    II. The H-2A program

    In 1986, Congress amended the Immigration and Naturalization Act (INA) with the Immigration Reform and Control Act (IRCA). Among other things, IRCA created a special class of temporary, foreign-migrant agricultural workers. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). These workers receive H-2A visas. The INA (including the IRCA amendments) is an immigration statute, primarily administered by the Department of Homeland Security (DHS) (specifically, U.S. Citizenship and Immigration Services (USCIS)). *See* 8 U.S.C. § 1103(a)(1).

    The IRCA gives the Department of Labor (DOL) a limited role. Section 301 of the IRCA establishes the H-2A program. Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 301, 100 Stat. 3416 (codified at 8 U.S.C. § 1188). Before USCIS can issue H-2A visas, the Secretary of Labor must certify that (1) there are not sufficient American or lawful permanent resident workers to perform the necessary work and (2) foreign workers will not adversely affect the wages and working conditions of workers in the United States who are similarly

2

employed. 8 U.S.C. § 1188(a)(1). This certification protects domestic workers by ensuring that H-2A visas are granted only when there are insufficient Americans available to do the work.

The IRCA gives DOL a correspondingly limited role in rulemaking. Section 301(e) of the IRCA amendments states, "The Attorney General, *in consultation with* the Secretary of Labor and the Secretary of Agriculture, shall approve all regulations to be issued implementing sections 101(a)(15)(H)(ii)(a) and 218 of the Immigration and Nationality Act [8 U.S.C. 1101(a)(15)(H)(ii)(a), 1188]." Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 301(e), 100 Stat. 3416 (emphasis added). The role of the Secretary of Labor is to consult with the Attorney General, while the Attorney General has broad rulemaking authority over the H-2A program. This is consistent with 8 U.S.C. § 1103 that grants general rulemaking authority over the entire INA to the Secretary of Homeland Security and the Attorney General but not the Secretary of Labor.

III. The Final Rule

On April 29, 2024, Defendants published a Final Rule: *Improving Protections for Workers in Temporary Agricultural Employment in the United States*, 89 Fed. Reg. 33,898 (Apr. 29, 2024) (Final Rule). The Final Rule was issued by two DOL sub-agencies: the Employment and Training Administration and the Wage and Hour Division.

The Final Rule requires that "with respect to any person engaged in agriculture... the employer has not and will not...discharge, or in any manner discriminate against... any person who has engaged in activities related to self-organization," which includes "any effort to form, join, or assist a labor organization" and "other concerted activities." 89 Fed. Reg. at 34,062. As this Court previously held, these protections track nearly identical provisions in the NLRA. *See* 29 U.S.C. § 158(a)(1) & (2).

The Final Rule purports to protect a range of concerted activities, including secondary boycotts and pickets. 89 Fed. Reg. at 33,997. For example, the Final Rule states that "a group of workers engaged in a labor dispute who meet with the management of a grocery store to explain their labor dispute and seek to persuade the store to stop carrying the products sold by the workers' employer until the labor dispute is resolved would be engaged in protected concerted activity." *Id.* at 34,007. Moreover, DOL announced its intention "to interpret the terms 'concerted activity' broadly, to include concerted activities for the broad purpose of 'mutual aid or protection' as well as for the narrower purpose of 'self-organization,' as long as the object of the activity is related to the workers' own wages and working conditions." *Id.* Here too, the Final Rule protects the same activities as the NLRA, in nearly identical language. *See* 29 U.S.C. § 157 (granting employees the right "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...").

The Final Rule also requires employers to "permit workers to designate a representative" in certain disciplinary meetings. 89 Fed. Reg. at 34,011. It further requires employers to "permit a worker to designate a representative to attend any investigatory interview that the worker reasonably believes might result in disciplinary action and must permit the worker to receive advice and active assistance from the designated representative during any such investigatory interview." *Id.* at 34,063. These protections mirror NLRA's 29 U.S.C. § 159(a), which requires employers to accept employee representatives when dealing with issues of "pay, wages, hours of employment, or other conditions of employment." They are also synonymous with § 7 of the NLRA's grant of the right for workers "to engage in... concerted activities for... mutual aid or protection," which the Supreme Court recognized includes the right to have a representative present at an investigatory interview the employee reasonably believes may result in disciplinary measures. *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 260–62 (1975).

Further, the Final Rule prohibits employers from discriminating in any manner against an employee who "refused to attend an employer sponsored meeting with the employer... if the primary purpose of the meeting is to communicate the employer's opinion concerning any activity protected in this subpart; or has refused to listen to employer-sponsored speech or view employer-sponsored communications, the primary purpose of which is to communicate the employer's opinion concerning any activity protected by this subpart." 89 Fed. Reg. at 34,063. This provision is consistent with recent efforts by the general counsel for the National Labor Relations Board (NLRB) to invoke § 7 of the NLRA as grounds to preclude employers from holding meetings at which employee attendance is required and the employer expresses anti-union sentiments. *See Burnett Specialists v. Abruzzo*, No. 4:22-cv-00605, 2023 U.S. Dist. LEXIS 154566, at *2–3 (E.D. Tex. Aug. 31, 2023) (citing Memorandum GC 22-04, issued by General Counsel Jennifer Abruzzo). This is all to say that the DOL did not invent new rights to address specific concerns when drafting the Final Rule; rather, it borrowed directly from the NLRA and two legal opinions flowing therefrom.

And the Final Rule alters the terms of payment due to H-2A workers. Specifically, it changes the effective date of the annual Adverse Effect Wage Rate (AEWR)—one of the measures used to determine the wage owed to an H-2A worker. 89 Fed. Reg. at 34,060. Whereas increases in the AEWR presently take effect on January 1 of the upcoming year, the Final Rule puts the increases into effect upon publication of the AEWR in the Federal Register, which usually occurs around December 14. *Id.* at 34,048‑49, 34,060.

The Final Rule is subject to a preliminary injunction issued by this Court on August 26, 2024. Dkt. 99.

IV. Plaintiffs

The States of Kansas, Georgia, South Carolina, Arkansas, Florida, Idaho, Indiana, Iowa, Louisiana, Missouri, Montana, Nebraska, North Dakota, Oklahoma, Tennessee, Texas, and Virginia are sovereign States of the United States of America. The Final Rule harms the States by requiring them to update their workforce agency policies, which imposes additional administrative costs. *See* Bassett Decl., Dkt. 19-7 at ¶5; Roth Decl., Dkt. 19-8 at ¶¶8-12; Goldwire Decl., Dkt. 19-9 at ¶¶8-15; Davis Decl., Dkt. 19-10 at ¶¶8-10; Potts Decl., Dkt. 19-11 at ¶¶10-14; York Decl., Dkt. 9-12 at ¶¶8-13; Waits Decl., Dkt. 19-13 at ¶6; Cabrera Decl., Dkt. 19-14 at ¶¶8-10.

Plaintiff Miles Berry Farm is a 400-acre blueberry, strawberry, zucchini, razzmatazz grape, and cabbage farm with its principal place of business in Baxley, Georgia. Miles Decl., Dkt. 19-2 at ¶7. Miles Berry Farm is owned by Allen and Dorothy Miles and is not a member of the Georgia Fruit and Vegetable Growers Association (GFVGA). *Id.* at ¶¶5–6.

Miles Berry Farm has employed H-2A workers since at least 2016. *See id.* at ¶10. It presently employs roughly 150 H-2A workers per year. *Id.* at ¶11. Miles Berry Farm is "fully dependent on H-2A workers" to operate its farm. *Id.* at ¶12. It provides housing for its H-2A workers. *Id.* at ¶15. It plans on filing an application in October or November of 2024 to participate in the H-2A program in 2025. *Id.* at ¶14. The Final Rule would impose new compliance costs on Miles Berry Farm. *Id.* at ¶21. The Final Rule's provision permitting an H-2A employee to have a representative attend an investigatory interview would place a "considerable burden" on Miles Berry Farm's "ability to timely and efficiently resolve personnel matters," particularly when disputes arise between employees in the fields. *Id.* at ¶20.

Plaintiff GFVGA is a trade organization for fruit and vegetable growers in Georgia. It is based in LaGrange, Georgia. Butts Decl., Dkt. 19-3 at ¶5.

The GFVGA has between 550 and 600 members across Georgia, which includes 175 to 200 member organizations. *Id.* at ¶6. Members of GFVGA rely upon its assistance with a range of labor supply and labor cost matters, particularly matters surrounding the H-2A program. *Id.* at ¶9.

On behalf of its members, GFVGA engages in lobbying efforts regarding attempts to reform and modify regulations governing the H-2A program. *Id.* at ¶12. GFVGA provides Georgia farms with educational resources, hosts farm and produce shows, hosts labor relations forums, and engages in legislative activities. *Id.* at ¶¶8, 11. A key part of the services GFVGA provides to its members centers on the H-2A program, including gathering information regarding changes to the program; assessing how the changes will impact members; and putting members in contact with congressional staff, agency personnel, and farm labor contractors to resolve operational challenges in the administration of the H-2A program. *Id.* at ¶¶9–10, 12.

GFVGA members participated in the H-2A program in the past to supply their workforce and will continue to do so in the future. GFVGA's membership includes at least one organization that has H-2A workers at present, at least one member organization that will file applications for new workers between August 2024 and January 2025, and at least one member organization that will be utilizing the work of H-2A visa holders between December 14, 2024, and December 31, 2024. *Id.* at ¶¶17–18; *see also* Minor Decl., Dkt. 19-4 at ¶15; Thompson Decl., Dkt. 19-6 at ¶14.

Included among GFVGA's members are J.E.T. Farms Georgia, Inc.; Spring Hill Produce, LLC; Minor Brothers Farm; and Minor Produce, Inc. These four businesses all currently use H-2A workers and provide housing for such workers. Minor Decl., Dkt. 19-4 at ¶¶5, 9–17; Brim Decl., Dkt. 19-5 at ¶¶5, 10–17; Thompson Decl., Dkt. 19-5 at ¶¶5–15.

Dick Minor owns Minor Brothers Farm and Minor Produce, Inc., in Andersonville, Georgia. Minor Decl., Dkt. 19-4 at ¶4. Bill Brim owns Spring Hill Produce LLC, in Tifton, Georgia. Minor Decl., Dkt. 19-5 at ¶4. Joseph Thompson, Jr. owns J.E.T. Farms Georgia, Inc., in Camilla Georgia. Thompson Decl., Dkt. 19-6 at ¶4. Each is a member of GFVGA. Absent the court's preliminary injunction, Brim and Thompson, like other members of the GFFVA, would experience harm from increased compliance costs as a result of the Final Rule. *See* Butts Decl., Dkt. 19-3 at ¶19; Brim Decl., Dkt. 19-5 at ¶23; Thompson Decl., Dkt. 19-6 at ¶21. Additionally, by the permitting H-2A employees to have a designee present at investigatory interviews, the Final Rule places a considerable burden on the ability of these farmers to timely and efficiently resolve workplace matters, particularly when disputes arise between employees in the fields or in produce packaging areas. Butts Decl., Dkt. 19-3 at ¶19; Minor Decl., Dkt. 19-4 at ¶22; Brim Decl., Dkt. 19-5 at ¶¶22; Thompson Decl., Dkt. 19-5 at ¶20.

<div align="center">ARGUMENT</div>

"Summary judgment is appropriate where the evidence 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Mendoza v. Sec'y, Dep't of Homeland Sec.*, 851 F.3d 1348, 1352 (11th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). Summary judgment in favor of the Plaintiffs is appropriate here because there is no genuine dispute of material fact and because the Final Rule (1) is contrary to federal law, (2) exceeds Defendants' statutory authority; (3) violates the major questions doctrine, and (4) is arbitrary and capricious. The Court should therefore grant judgment to the Plaintiffs and vacate the rule under the Administrative Procedure Act.

I.      The Final Rule is not in accordance with law

Under the Administrative Procedure Act (APA), a court "must hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A)(C). The Final Rule is not in accordance with law. It violates the NLRA and exceeds DOL's limited authority under the IRCA amendments to the INA. Furthermore, it flunks the major questions doctrine test.

As a starting point, the Court does not owe any deference to Defendants' interpretation of the statute. In *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), the Supreme Court held that "courts need not and under the APA may not defer to an agency interpretation of the law simply because the statute is ambiguous." The Court also recognized that if "the *best reading* of a statute is that it delegates authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limitations." *Id.* at 2263 (emphasis added). Finally, the Court stated, "statutory ambiguity... is not a reliable indicator of actual delegation of discretionary authority to agencies." *Id.* at 2272. In short, this Court cannot presume statutory delegation if the statute is ambiguous. It must determine the "best reading" of the statute in order to decide whether such delegation exists.

Prior cases reviewing DOL's H-2A rulemaking authority under the IRCA were not decided under *Loper Bright*. They relied on *Chevron* deference, where courts assumed statutory ambiguity was always a delegation of authority to the agency.[1] No prior H-2A case is challenged here, but those cases cannot justify *this* Final Rule without resurrecting *Chevron*.

---

[1] For example, in *AFL-CIO v. Dole*, 923 F.2d 182, 184 (D.C. Cir. 1991), the court held, "Congress did not, however, further define adverse effect and left it in the Department's discretion how to ensure that the importation of farmworkers met the statutory requirements." And it cited *AFL-CIO v. Brock*, 835 F.2d 912, 915 n. 5 (D.C. Cir. 1987) for its proposition that striking the balance on providing adequate labor supply and protecting domestic workers under the H-2A program was "a judgment call which Congress entrusted to the Department of Labor." *Dole*, 923 F.2d at 187.

As this Court recognized at the preliminary injunction stage, "[t]he Court owes no *Chevron* deference to the DOL's interpretation of the IRCA." Dkt. 99 at 12 n.5. Instead, the Court must find the best reading of the statute by "'exercis[ing] its independent judgment in deciding whether an agency has acted within its statutory authority.'" *Id.* (quoting *Loper Bright Enters.*, 144 S. Ct. at 2273).

A.  The Final Rule violates the NLRA

"Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). As the Court already ruled, the Final Rule is a crude attempt by DOL to play sorcerer. It also violates the NLRA because it gives collective bargaining protections to a subset of agricultural workers and the NLRA explicitly excludes them from such protections. 29 U.S.C. § 152(3) (the definition of "employee" "*shall not include* any individual employed as an agricultural laborer" (emphasis added)). This exclusion served a legislative purpose. When § 152(3) was initially enacted, it excluded only two other groups of direct employees, "domestic workers" and "individuals employed by a parent or spouse."[2] *Chamber of Com. v. City of Seattle*, 275 F. Supp. 3d 1140, 1152 (W.D. Wash. 2017). Agricultural laborers are the only large category of workers, whose employment affords them a real opportunity to use collective action, who are excluded from NLRA protection. *See* 29 U.S.C. § 152(3). The Court must give this language and Congressional choice meaning; for how else could Congress have signaled that agricultural laborers were not to receive the protections granted by the NLRA? *Cf.*

However, *Brock* stated that the "evidence supports the Department's argument that Congress did not circumscribe the Department's discretion under either Act." *Brock*, 835 F.2d at 915 n. 5.

[2] For the sake of completeness, Congress has amended the NLRA to exclude independent contractors, supervisors, and individuals employed by an employer subject to the Railway Labor Act. 29 U.S.C. § 152(3). Despite these amendments, however, Congress has not amended the NLRA to remove the exclusion of agricultural laborers from protection.

*Weirsum v. U.S. Bank, N.A.*, 785 F.3d 483, 488 (11th Cir. 2015) ("'We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable'; 'we *must give effect to the text Congress enacted*.'" (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008))).

The Final Rule erases this Congressional choice and eliminates the NLRA's exclusion of some agricultural workers. In it, Defendants disingenuously avoided any mention of "collective bargaining," apparently believing that using slightly different words would permit them to contradict the NLRA. *See* 89 Fed. Reg. 33,991 ("This final rule does not provide for collective bargaining rights."). The Final Rule purports that the "right to engage in concerted activity" is merely a "powerful tool to empower worker voice." *Id*.

But there is no substantive difference between the collective bargaining rights protected by the NLRA and the "collective action" rights protected by the Final Rule. *See Bd. of Educ. of Westside Cmty. Sch. v. Mergens By & Through Mergens*, 496 U.S. 226, 244 (1990) (rejecting an attempt "to evade the Act" through "strategic[]" definitions).As discussed *supra* at 4–5, each of the rights conferred to H-2A workers, and, arguably to some U.S. workers employed alongside H-2A workers, track directly with a right established by the NLRA's text, case law, or by NLRB general counsel opinions.

Under the Final Rule, "*with respect to any person engaged in agriculture…*the employer has not and will not…discharge, or in any manner discriminate against…any person who has engaged in activities related to self-organization," which includes "any effort to form, join, or assist a labor organization." 89 Fed. Reg. at 34,062 (emphasis added). And where the NLRA protects "concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C.§ 157, the Final Rule's proposed § 655.135(i) protects "concerted activities for the purpose of mutual aid or protection…" 89 Fed. Reg. at 34,062. Similarly, many of the unfair labor practices that appear in the NLRA appear nearly verbatim in the Final Rule. *Compare* 29 U.S.C.

11

§ 158(a)(1) (making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [i.e. collective bargaining rights]."), *with* 89 Fed. Reg. at 34,062 (prohibiting H-2A employers from taking any action that would "intimidate, threaten, restrain, coerce… any person because such person (i) has engaged in activities related to self-organization, including any effort to form, join, or assist a labor organization.").[3]

DOL argues that it can contradict the NLRA because it is not pre-empted from doing so. *See* Dkt 99, at 24-25. Putting aside that the Plaintiffs are not claiming DOL is pre-empted from issuing regulations, DOL primarily relies on authority that indicates a *state* is not pre-empted from allowing agricultural workers to have collective bargaining rights. This goes without saying. Under federalism principles, states are always free to create their own laws unless specifically pre-empted by the federal government. But DOL is not a state, so federalism principles do not apply to it.

DOL cites cases where they issued regulations in relation to labor law as evidence that the NLRA does not usurp all authority from the agency. Whatever the full scope of DOL's regulatory authority may be, a federal agency cannot use a broad delegation of statutory authority in one section of law to rewrite a clear provision of the NLRA. The Final Rule would render the NLRA's exclusion of agricultural workers ineffective. This Court should follow a presumption against ineffectiveness in statutory interpretation and favor the interpretation that is consistent with the NLRA. *See* A. Scalia & B. Gardner, *Reading Law: The Interpretation of Legal*

---

[3] As another example, whereas the Supreme Court has affirmed the NLRB's interpretation of § 7 of the NLRA that permits workers covered by the NLRA to have a representative present for certain investigatory interviews, *see J. Weingarten, Inc.*, 420 U.S. at 260–62, the Final Rule grants H-2A employees, and U.S. agricultural laborers in corresponding employment, the very same privilege, *see* proposed 20 C.F.R. § 655.135(m), 89 Fed. Reg. at 34,063.

*Texts* 63-65 (2012). That means upholding the NLRA's exclusion of agricultural workers from federally protected collective bargaining against DOL's attempt to bring them in. Nothing in the text or history of IRCA suggests that Congress intended to repeal or modify the relevant provisions of the NLRA. *Agri Processor Co. v. NLRB*, 514 F.3d 1, 7 (D.C. Cir. 2008) (noting "all available evidence" indicates that Congress did not intend for IRCA to amend or repeal the NLRA).

The Final Rule's protections of agricultural worker are mirror images of the protections NLRA purposefully denies to agricultural workers. This Court preliminarily enjoined the Final Rule under the APA precisely because it violated federal law. Dkt. 99, at 26. Nothing has changed since that ruling. The Court should now grant Plaintiffs' request for summary judgment on Count I of their complaint.

B.   The Final Rule exceeds DOL's limited statutory authority

Even if it did not violate the NLRA, DOL's narrow and limited statutory authority under the IRCA amendments to the INA does not give it the sweeping powers it exercises in the Final Rule. Constitutionally, "an agency literally has no power to act... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC* (*LPSC*), 476 U.S. 355, 357 (1986); *see also Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1084 (11th Cir. 2013) ("[A]n agency's power to promulgate legislative regulations is limited to the authority delegated to it by Congress..." (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). Further, "[t]he authority of administrative agencies is constrained by the language of the statute they administer." *Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007) (citing *Massachusetts v. EPA*, 549 U.S. 497

(2007)). If an agency issues a rule without statutory authority, then the rule is unlawful and should be vacated. *See Bayou Lawn*, 713 F.3d at 1080.[4]

The statute at hand is the INA, as amended by IRCA. This is a large, complex immigration statute, which gives general oversight and authority to the Attorney General and the Secretary of Homeland Security. *See* 8 U.S.C. § 1103. DOL's part is narrow and limited to specific regulatory tasks. For instance, DOL is authorized to define "agricultural labor services," 8 U.S.C. § 1101(a)(15)(H)(ii)(a), to set fees for the processing of H-2A certification applications, *id.* § 1188(a)(2), and to "issue regulations which address the specific requirements of housing for employees principally engaged in the range production of livestock," *id.* § 1188(c)(4). And DOL is authorized to publish findings regarding the so-called 50-percent rule, which requires H-2A employers to "provide employment to any qualified United States worker who applies to the employer until 50 percent of the period of the work contract, under which the foreign worker who is in the job was hired, has elapsed." 8 U.S.C. § 1188(c)(3)(B)(i); *id.* at § 1188(c)(3)(B)(iii) (directing Secretary to "immediately publish findings required by this clause").

More generally, all regulations under § 1188—except those *specifically* tasked to DOL— must be approved by the Attorney General. Section 301(e) of the IRCA amendments states: "The Attorney General, in consultation with the Secretary of Labor and the Secretary of Agriculture, shall approve all regulations to be issued implementing sections 101(a)(15)(H)(ii)(a) and 216 of the Immigration and Nationality Act [codified as 8 U.S.C. § 1101(a)(15)(H)(ii)(a), § 1188]." Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 301(e), 100 Stat. 3416. The

---

[4] Although the case held that Defendants have rulemaking authority for the H-2A program under 8 U.S.C. § 1101(a)(15)(H)(ii)(a), that provision is limited to defining "agricultural or labor services" and not a general grant of rulemaking over the entire program.

role of the Secretary of Labor is to *consult* with the Attorney General as the latter approves

regulations, not to plot an entirely new—and heretofore undiscovered—regulatory path.

Indeed, the Eleventh Circuit has already reviewed DOL's "consultation" authority under

the parallel H-2B program. In *Bayou Lawn*, DOL claimed that a provision requiring the DHS to

"consult" with DOL gave it the authority to regulate on any topic subject to consultation, so as

"to structure its consultation with DHS." *Bayou Lawn*, 713 F.3d at 1084. The Eleventh Circuit

called this reading "absurd" and rejected it, holding that DOL had no authority to issue rules on

the matters it had attempted to regulate in that case. *Id.*

The Final Rule states that DOL's statutory authority[5] is based on 8 U.S.C. § 1188(a)(1).[6]

Yet this section does not say anything about DOL regulations. It tells DOL to issue certifications

---

[5] *See* 89 Fed. Reg. 33,901 ("the Department believes that these protections are important to prevent adverse effect on the working conditions of workers in the United States similarly employed. 8 U.S.C. 1188(a)(1)); 89 Fed. Reg. 33,970-1 (noting that DOL "has long maintained that regulating the employment decisions made by an employer using the H-2A program is necessary to achieve statutory objectives—specifically, to ensure that H-2A workers are employed only when there are insufficient qualified, able, and available U.S. workers to complete the work, and to ensure that the employment of H-2A workers does not adversely affect the wages and working conditions of workers in the United States similarly employed, *see* 8 U.S.C. 1188(a)(1)— and has a long history of regulating in this space."); 89 Fed. Reg. 33972 ("The Department therefore has a responsibility pursuant to 8 U.S.C. 1188(a)(1) to ensure that an employer is relieved of these obligations only in situations where the employer has sufficient justification to terminate a worker for cause.").

[6] Only the statutory justification described in the Final Rule may be considered. Agencies are not permitted to rely on *post hoc* justifications for their rulemaking, in order to promote agency accountability and justiciability. "The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted. *DHS v. Regents*, 591 U.S. 1, 24 (2020). If a statutory justification for the Final Rule existed, but was not discussed in the Final Rule itself, that would constitute arbitrary and capricious rulemaking. Although Plaintiffs, at the preliminary injunction stage, argued that the Final Rule cited only § 1188(a)(1) for statutory authority, *see* Dkt. 19-1 at 13; Dkt. 98 at 5–6, the Court, in preliminarily determining whether DOL had authority under the H-2A visa program to enact the Final Rule, did not explicitly address this argument but, instead, considered whether some combination of § 1188(a)(1) and § 1188(c) conferred authority to the DOL, *see* Dkt. 99 at 13–19.

that facilitate the H-2A program. Where the INA contains affirmative grants of rulemaking authority, it implies an absence of rulemaking authority elsewhere—including under § 1188(a)(1). *See Bittner v. United States*, 143 S. Ct. 713, 720 (2023) (When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning (*expressio unius est exclusio alterius*).”); *see also Bayou Lawn*, 713 F.3d at 1085 (“[I]f congressional silence is a sufficient basis upon which an agency may build a rulemaking authority, the relationship between the executive and legislative branches would undergo a fundamental change and agencies would enjoy virtually limitless hegemony….” (internal quotes omitted)). Congress knew how to grant rulemaking authority to DOL. In § 1188(a)(1), it did not do so.

DOL’s § 1188(a)(1) authority should therefore not be construed as a broad rulemaking authority over the entire H-2A program. Instead, it is tasked with a simple certification role, based on (1) whether “there are…sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition,” and (2) whether “the employment of…alien[s] in such labor or services will…adversely affect the wages and working conditions of workers in the United States similarly employed.” 8 U.S.C. § 1188(a)(1). Just as “consultation” could not be read to extend into rulemaking authority in *Bayou Lawn*, neither can “certification” provide such authority here. To hold otherwise would be “an absurd reading of the statute,” 713 F.3d at 1084. Because DOL has promulgated a broad rule when the statute grants it only certification authority, the Final Rule exceeds the statutory authority and is unlawful under the APA.

Finally, even assuming DOL has authority to issue regulations establishing wages and working conditions for migrant labor in the H-2A program, this authority is narrow and limited. Even if the Final Rule did not *violate* the NLRA, DOL has still created a right to collective

16

bargaining among agricultural workers that did not previously exist. And there is nothing in the IRCA/INA or any other law that allows it to create this right. *Accord*. Dkt 99, at 25 ("The Court therefore finds that the Final Rule exceeds the DOL's constitutional authority because it creates a right."). Thus, the Final Rule is "not in accordance with law" as required by the APA.

Section 1188 cannot be the source for just *any* rule. Congress did not use a phrase that "leaves agencies with flexibility." *Michigan v. EPA*, 576 U. S. 743, 752 (2015); *see Loper Bright Enters.*, 144 S. Ct. at 2263 (recognizing that phrases like "necessary" or "appropriate" delegate broad discretion in rulemaking). This is not a rule where the "best reading of a statute" is that Congress gave broad rulemaking authority to DOL to do anything so consequential as to create new statutory rights under the H-2A program. *See Loper Bright Enters.*, 144 S. Ct. at 2263. Section 1188(c)(3)(A) only allows DOL to set "criteria for the recruitment of eligible individuals."[7] The single, best meaning of this provision does not allow regulations that are not strictly related to the criteria for eligibility.

In any case, DOL has no authority to improve migrant worker wages and working conditions at all, with or without collective bargaining. DOL is limited to certifying that domestic workers will not be "adversely affect[ed]" by alien labor. 8 U.S.C. § 1188(a)(1)(B). *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 596 (1982); *Mendoza v. Perez*, 754 F.3d 1002, 1017 (D.C. Cir. 2014).

H-2A are not the intended beneficiaries of the statute. In *Williams v. Usery*, 531 F.2d 305, 306 (5th Cir. 1976), the court reviewed a provision of the INA similar to § 1188(a)(1) and held

---

[7] Section 1188(c) only squarely provides rulemaking authority in § 1188(c)(3)(B)(iii). It just says, "[t]he following rules shall apply in the case of the filing and consideration of an application for a labor certification," before then setting out that DOL "rules," not *rulemaking authority*. One of those rules is that the DOL can set "criteria" for recruitment of eligible individuals. 8 U.S.C. § 1188(c)(3)(A).

that "the Secretary [of Labor] has no authority to set a wage rate on the basis of attractiveness to workers. His authority is limited to making an economic determination of what rate must be paid all workers to neutralize any 'adverse effect' resultant from the influx of temporary foreign workers." DOL's attempt to increase wages reflected "misunderstanding of the nature of the regulatory scheme authorized under the [INA]." *Id*. Instead, the court wrote that DOL has only "limited" authority to make "an economic determination of what rate must be paid all workers to neutralize any adverse effect resultant from the influx of temporary foreign workers."[8] *Id*. Accordingly, DOL's "authority to insure against a lowering of wages is hardly synonymous with the affirmative power to raise wages." *Id*. Just the same under § 1188(a)(1), DOL is limited to neutralizing adverse effects *on the domestic workforce* caused by a potential influx of foreign labor.

The legislative history of the IRCA confirms that preventing adverse effects, rather than improving conditions for foreign labor, was Congress' chief concern. *See Mendoza*, 754 F.2d at 1017 (discussing the text of IRCA and the legislative history of the INA). Both the text and history of the statute show that DOL has only a limited role in the H-2A program. *Accord Bayou Lawn*, 713 F.3d at 1084-85 (rejecting argument that "text, structure and object" of INA conferred rulemaking authority on DOL).

Thus, nothing in the IRCA/INA authorizes DOL to improve wages and working conditions beyond what can be obtained by domestic workers, no matter how much such

---

[8] Neither *Williams*—nor its companion case *Florida Sugar Cane League, Inc. v. Usery*, 531 F.2d 299 (5th Cir. 1976)—challenged the DOL's authority to issue regulations at all. *Florida Sugar Cane*, however, notes that the DOL's regulatory authority was premised on a "consultation" provision. 531 F.2d at 300. Thus, any implicit finding that DOL had regulatory authority is of questionable validity after *Bayou Lawn*—especially given the statutory changes that came to the INA with the IRCA amendments (the visa program that *Williams* and *Florida Sugar Cane* addressed does not even exist anymore). *Williams* is cited merely to show that, even if there is some silent, implied regulatory authority under § 1188(a)(1), it must be exercised with a much closer tie to the statutory language than what Defendants have proffered here.

improvement might prevent any adverse effects. But that is precisely what the Final Rule does. It offers protections and benefits to foreign migrant farmworkers that are not legally available to domestic farmworkers.

If DOL really had this broad authority to *improve* H-2A workers' wages and working conditions beyond what is available to domestic workers, then it would hold a grand regulatory authority that goes far beyond the narrow and limited authority actually granted to it under the IRCA/INA. The implication of the Final Rule is that DOL can do *anything* so long as it prevents adverse effects on American wages by helping improve the incomes and working conditions of H-2A visa holders. *See Merck & Co., Inc. v. Dep't of Health & Hum. Servs.*, 962 F.3d 531, 541 (D.C. Cir. 2020) ("[T]he breadth of the Secretary's asserted authority is measured not only by the specific application at issue, but also by the implications of the authority claimed."); *see also Loper Bright Enters. v. Raimondo*, 45 F.4th 359, 377 (D.C. Cir. 2022) (Walker, J., dissenting) (noting possible "strange results" of government's claimed statutory authority: "Could the agency require the fishermen to drive regulators to their government offices if gas gets too expensive?"), *rev'd*, 144 S. Ct. 2244 (2024). And if DOL actually had this authority, then DOL has "unlimited power," *Nebraska*, 143 S. Ct. at 2372, which would make 8 U.S.C. § 1188(a) unconstitutional under the non-delegation doctrine. See *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989) ("[O]ur application of the nondelegation doctrine principally has been limited to… giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional.").

In *Kentucky v. Biden*, 23 F.4th 585, 606 n.14 (6th Cir. 2022), the court noted that accepting the President's interpretation that he could "do essentially whatever he want[ed] so long as he determines it necessary to make federal contractors more 'economical and efficient'… *certainly* would present non-delegation concerns." Similarly, if DOL's interpretation is accepted and the

Secretary of Labor can use an immigration statute as a backdoor to providing collective bargaining rights to agricultural workers, there would be serious non-delegation concerns. The Court can exercise constitutional avoidance here—rather than ruling the statute unconstitutional under the non-delegation doctrine, it can hold DOL to the appropriately limited and specific authority it was granted in the IRCA/INA. The Court should therefore grant Plaintiffs' motion for summary judgment with respect to Count II of the complaint.

C.   The Final Rule violates the major questions doctrine

The major questions doctrine is a new name for an old idea: that Congress legislates on "important subjects" while delegating to "fill up the details." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825). The doctrine asks courts to use "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Courts apply the major-questions doctrine by first determining whether the agency action concerns a "major question," and then looking for clear congressional authorization. *E.g.*, *West Virginia v. EPA*, 597 U.S. 697, 746 (2022) (Gorsuch, J., concurring).

Agency action can implicate the major questions doctrine when the agency "claims the power to resolve a matter of great political significance," when it "seeks to regulate a significant portion of the American economy," and "when the agency seeks to intrude into an area that is the particular domain of state law." *West Virginia*, 597 U.S. at 743-744 (2022) (Gorsuch, J., concurring) (internal citations omitted); *See also, e.g., Nebraska*, 143 S. Ct. at 2375 (concluding doctrine applies to a "mass [student] debt cancellation program"); *West Virginia*, 597 U.S. at 724-25 (concluding doctrine applies to EPA regulation that would "substantially restructure the American energy market").

Because "a decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to clear delegation from that representative body," *West Virginia*, 597 U.S. at 735, courts look for "clear authorization" from Congress, *id.* at 724. A "colorable" or "plausible" textual basis is not sufficient to clearly authorize the agency action. *Id.* at 722. This is because Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

1. The Final Rule triggers the major questions doctrine

The Final Rule grants collective bargaining protections to foreign H-2A farmworkers. This is a question of vast political and economic significance, intruding on a traditional domain of state authority. In other words, a major question.

Start with the Final Rule's "vast political significance." *West Virginia*, 597 U.S. at 716 (quotation marks and ellipses omitted). Few could doubt that unionization and immigration have long been vigorously debated, politically fraught issues in the United States. *Cf. Texas v. Nuclear Regulatory Comm'n*, 78 F.4th 827, 844 (5th Cir. 2023) (nuclear waste disposal is major question because it "has been hotly politically contested for over a half century").

The NLRA was serious legislation aimed at combatting a national problem. As this Court recognized, it "represent[ed] extensive compromises." Dkt 99, at 8 n. 3. And its excision of agricultural workers represents one of the purposeful compromises that arose out of competing interests debated by Congress. For nearly a century, it has remained the law, and Congress has not taken any action to change it. *See generally Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 465 (5th Cir. 2020) (observing that congressional inaction, despite awareness of the issue, was "fundamental problem with the agency's position"). Changes to the labor law compromise that produced the exclusion of agricultural workers remains an issue of vast political significance.

21

The Final Rule operates at the intersection of agricultural policy, labor rights and immigration, arguably the most politically significant topic in 2024. Polling data shows there is great debate among Americans about immigration (both legal and illegal) into this country and the conditions of entry.[9] Regulations that grant foreign workers more collective-bargaining protections than other American agricultural laborers would stifle a live controversy with serious arguments on both sides. Resolving these debates is the task of Congress, not an unaccountable executive agency.

And it is not only immigration and labor generally which are politically significant. The Final Rule itself elicited thousands of impassioned comments from organizations and individuals across the country. "Improving Protections for Workers in Temporary Agricultural Employment in the United States," https://www.regulations.gov/docket/ETA-2023-0003/comments (last visited October 1, 2024), as well as the attention of members of Congress[10] and major media outlets, Adam Shaw, *Republicans Warn Biden Admin's Foreign Farm Worker Rule Is 'Giveaway to Big Labor*,*'* Fox News (Nov. 15, 2023), https://www.foxnews.com/politics/republicans-warn-biden-admins-foreign-farm-worker-rule-

---

[9] *See generally* Gallup, Immigration, https://news.gallup.com/poll/1660/immigration.aspx#:~:text=In%202023%2C%2041%25%20say%20they,least%2Dpopular%20view%20through%202017 (reviewing decades of polling on the topic).

[10] Press Release, Sen. Tim Scott, "Sen. Scott, Colleagues Slam DOL's New H-2A Rule Imposing Union Pressure on Temporary Farm Workers" (Dec. 8, 2023), *available at* https://www.scott.senate.gov/media-center/press-releases/sen-scott-colleagues-slam-dols-new-h-2a-rule-imposing-union-pressure-on-temporary-farm-workers/; Letter from Virginia Fox, Chairwoman, H. Comm. on Educ. & the Workforce, & Glenn Thompson, Chairman, H. Comm. on Ag., to Julie A. Su, Acting Sec'y of Labor (Nov. 14, 2023), *available at* https://www.scribd.com/document/684702853/GOP-Education-and-Workforce-Committee-on-H-2A; Letter from Rep. Pramila Jayapal to Julie Su, Acting Sec'y of Labor, and Alejandro Mayorkas, Sec'y of Homeland Sec. (Nov. 14, 2023), *available at* https://jayapal.house.gov/wp-content/uploads/2023/11/Quill-Letter-L13779-H2A-Reg-Letter-Version-2-11-14-2023-@-09-06-PM.pdf.

is-giveaway-to-big-labor. Thus, unionization of H-2A workers is plainly "the subject of an earnest and profound debate across the country," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (internal quotation marks and citation omitted).

 The Final Rule also triggers the major questions doctrine because it "intrudes into an area that is the particular domain of state law." *Ala. Ass'n of Realtors*, 594 U.S. at 764. "[C]ourts must be certain of Congress's intent before finding that it legislate[d] in areas traditionally regulated by the States." *West Virginia*, 597 U.S. at 746–48 (Gorsuch, J., concurring) (internal quotations omitted); *see also North Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC (Coastal Fisheries)*, 76 F.4th 291, 297 (4th Cir. 2023) (requiring clear showing of authority when "the asserted power raises federalism concerns").

 Collective bargaining rights of agricultural workers are a particular domain of state law. Ever since the NLRA excluded those workers, states have stepped in to prescribe the collective action rights, if any, of the agricultural workers in their jurisdiction. For example, in Kansas it is unlawful for agricultural workers to "engage in a strike during periods of marketing of livestock or during a critical period of production or harvesting of crops." K.S.A. § 44-828(c)(6). Other states have similar statutes. *See, e.g.* Ariz. Stat. § 23-1381; Wisc. Stat. § 111.115.

 These laws protect farmers and the food supply by preventing damaging strikes during peak harvesting. Yet the Final Rule would supplant these state laws. DOL announced that it would "interpret the terms 'concerted activity' broadly, to include concerted activities for the broad purpose of 'mutual aid or protection' as well as for the narrower purpose of 'self-organization,' as long as the object of the activity is related to the workers' own wages and working conditions." 89 Fed. Reg. at 34,007. The Final Rule places no limitation on when this concerted activity can occur, and any H-2A employer risks liability if they follow state law on

the matter. And it deprives the states of their traditional responsibility over collective action by agricultural workers.

Finding that the Final Rule triggers the major questions doctrine is consistent with findings from other courts. For example, in *Coastal Fisheries*, that court held that "whether returning bycatch qualifies as a 'discharge' of a 'pollutant' under the Act is a major question." *Coastal Fisheries*, 76 F.4th at 297. The court noted that the rule's "economic and social consequences would be enormous" because "[f]ishing in America generates hundreds of billions of dollars, employs millions of people, and provides recreational sport for millions more" and "forcing virtually every fisherman to risk punishment or obtain a permit from the EPA—separate from the existing state and federal schemes—would work an enormous effect." *Id.* at 300. It would be even more applicable here.

2.  Defendants lack clear congressional authorization for the Final Rule

The Final Rule addresses major questions that should make any court "hesitate and look for clear congressional authorization before proceeding." *Coastal Fisheries*, 76 F.4th at 297. When a major question indicates that a court should be skeptical of agency action, Defendants have the burden of demonstrating that Congress gave them *clear* authorization to enact the Final Rule. *See West Virginia*, 142 S. Ct. at 732 (quoting *Utility Air Regulatory Group v. EPA (UARG)*, 573 U.S. 302, 324 (2014)); *see also Forest Serv. v. Cowpasture River Preservation Ass'n*, 590 U.S. 604, 621-22 (2020) ("Our precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power..."). As discussed above, Defendants lack broad rulemaking authority over the H-2A program, *see also* Slip op. at 13–14, and the Final Rule is unlawful. So it is not surprising they will not be able to show anything like clear authorization.

No precise formula exists to demonstrate clear authorization, but a court may look to factors including: (1) where the statutory provision the agency relies on fits within the broader statutory scheme, (2) "the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address," and (3) "the agency's past interpretations of the relevant statute." *West Virginia*, 597 U.S. at 746–48 (Gorsuch, J., concurring) (citation omitted). For this review, the burden is on the agency to demonstrate that it has clear authorization. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023).

Beginning with the first factor, consideration of the broader statutory scheme shows the Final Rule is out of place. *See Coastal Fisheries*, 76 F.4th at 297 (noting "hallmark" of major questions cases is "when the Act's structure indicates that Congress did not mean to regulate the issue in the way claimed"). The Final Rule addresses a major question, but the statute which allegedly authorizes it—8 U.S.C. § 1188(a)(1) (*see* 89 Fed. Reg. at 33,899)—is a small part of a large and complex immigration statute, the IRCA amendments to the INA. *See U.S. ex rel. Carson v. Kershner*, 228 F.2d 142, 147 (6th Cir. 1955), *rev'd on other grounds sub nom. Lehmann v. U.S. ex rel. Carson*, 353 U.S. 685 (1957) (noting the INA is "lengthy and complex"). And that small provision assigns to the DOL a mere ministerial function—issuing certifications to H-2A employers.[11] The Final Rule therefore represents a "transformative expansion in [the DOL's] regulatory authority." *UARG*, 573 U.S. at 324. The Court should not presume Congress to have authorized consequential regulations from an agency tasked with ministerial functions.

---

[11] And even that authority is secondary to the Attorney General's overriding authority. The DOL can issue the required certifications, and the Attorney General cannot approve the importation of H-2A workers without that certification, but the ultimate approval still lies within the Attorney General's discretion. *See* § 1188(a)(1).

Turning to the age and focus of 8 U.S.C. § 1188(a)(1), it is a 38-year-old statute focused on protecting American workers, not foreign workers. It says that the Attorney General "may not" approve petitions to import H-2A workers "*unless* the petitioner has applied to the Secretary of Labor for a certification that... there are *not* sufficient workers [already available]... *and* [that] the employment of the alien... will *not* adversely affect the wages and working conditions of *workers in the United States* similarly employed." *Id.* (emphases added). Notwithstanding the focus of § 1188(a)(1), the Final Rule focuses on conferring benefits on migrants, and only in a roundabout way considers the plight of American workers. *See* 89 Fed. Reg. at 33,987.

Finally, Defendants have never previously asserted authority under 1188(a)(1) to protect collective bargaining rights. *Cf. Loper Bright Enters.*, 144 S. Ct. at 2262 ("interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning."). Yet, 38 years later—and without reasonable explanation—the DOL suddenly posits that § 1188(a)(1) gives them the authority to override almost 90 years of settled law. If this authority had been clearly authorized by the IRCA amendments—in 1986—then why is DOL only using it now? Defendants did not suddenly find clearly authorized delegation after almost four decades. Consideration of these factors points emphatically in one direction: Defendants do not have clear authorization for this rule.

The Final Rule, therefore, deals with a subject of vast political significance and tramples over a domain of traditional state authority. Defendants fail to show they have clear authorization from Congress to promulgate it. So the Final Rule violates the major questions doctrine. The Court should grant Plaintiffs' motion for summary judgment on Count III of the Complaint.

D.  The Final Rule is arbitrary and capricious

The statutory arguments weigh heavily against the Final Rule. But it is also unlawful because it is arbitrary and capricious. Agency action is arbitrary and capricious if:

> the factors the agency relied on were not what Congress would intend, if the agency entirely failed to consider an important aspect of the problem, if the agency offered an explanation counter to the evidence before the agency, or if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1290 (11th Cir. 2021) (internal citations omitted). Although this standard is deferential to the agency, courts "are not a rubber stamp." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1263 (11th Cir. 2020). In promulgating the Final Rule, Defendants (1) relied on factors that were not what Congress would intend, (2) came up with an implausible explanation for its actions that could not be ascribed to difference in views or the product of agency expertise, and (3) took a sharp departure from past practice without reasonable explanation.

1.  DOL relied on factors that Congress did not intend for it to consider

The Final Rule relies on factors Congress did not intend should be part of the H-2A program. Defendants focused on the importance of unionization within the agricultural workforce and the harm these workers have endured without union protections.[12] But since Congress already considered the benefits of collective action for farm workers in the NLRA—

---

[12] *See, e.g.*, 89 Fed. Reg. 33,992 ("[T]he Department seeks to prevent adverse effect on similarly employed workers by ensuring that workers have the tools to ensure that their rights under the H-2A program are not violated and to advocate regarding the terms and conditions of their employment, on more equal footing with similarly employed workers in the United States. Though such similarly employed workers may be excluded from the NLRA's protections, they may be less likely to face the unique vulnerabilities and forms of retaliation experienced by H-2A workers described above.").

and explicitly rejected them—those benefits could not have been something Congress intended them to consider.

The Final Rule also focuses heavily on the protection of foreign workers.[13] But Congress did not intend for DOL to consider prevention of foreign migrant labor exploitation in 8 U.S.C § 1188(a)(1). That statute focuses the agency on whether "the employment of the alien in such labor or services will not adversely affect the wages and working conditions *of workers in the United States* similarly employed." *Id.* § 1188(a)(1)(B) (emphasis added). And their consideration of adverse effects on domestic workers comes only after Defendants ensure "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition." *Id.* § 1188(a)(1)(A).

The Final Rule largely ignores these concerns and primarily focuses on benefits to H-2A workers (and by extension the unions who increase their membership with H-2A workers).[14] The Final Rule reflects that misplaced attention on foreign workers: they end up with more workplace protections for collective bargaining than American agricultural workers. Defendants do not even provide any evidence or data that unionization of migrant workers would help Americans. They just insist that whatever helps H-2A workers is good for American workers

---

[13] *See, e.g.,* 89 Fed. Reg. at 33,968 ("Failure to clearly and fully disclose any available overtime pay in the job order harms prospective workers who may be more interested in the job opportunity if they are aware of the availability of overtime pay."); 89 Fed. Reg. 33,934 ("[T]he Department believes that its interest in protecting workers from the harmful, potentially dangerous situations giving rise to immediate discontinuation outweighs any burden employers may experience while services are discontinued."); 89 Fed. Reg. 33,040 ("[D]elayed start dates are harmful to workers, who value predictability and certainty in employment start dates.").

[14] *See, e.g.,* 89 Fed. Reg. at 33,991 ("The Department concludes that these provisions [including "safeguard collective action"], which safeguard worker voice and empowerment, will prevent adverse effect on similarly employed workers in the United States by alleviating some of the barriers H-2A workers face when raising complaints about violations of their rights under the program and advocating regarding working conditions.").

too, even if Americans are explicitly prohibited from sharing those benefits.[15] This is not an explanation based on a difference in view or a product of agency expertise. It is simply an attempt to create though regulation a new right for foreign workers that Congress explicitly forbade. This obvious observation runs directly contrary to the Congressional intent expressed in IRCA. Thus, the Final Rule considers factors Congress did not intend for it to rely on and provides an explanation so implausible that it cannot be ascribed to a difference in view o r a product of agency expertise.

2.   Defendants offer an implausible explanation for the Final Rule

Defendants explanation of the Final Rule is implausible. *See Florida v. HHS*, 19 F.4th at 1290. The Final Rule effectively provides NLRA rights to H-2A workers. These are rights that American farmworkers explicitly do not have under federal law. But Defendants refuse to admit this. And they try to make it appear that offering collective bargaining protections to foreign migrants *benefits* American farmworkers who cannot share those benefits.[16]

The H-2A program requires certification to be based on prevention of adverse effects for American farmworkers. But merely repeating that the Final Rule prevents adverse effects is not a plausible explanation, especially when the Final Rule benefits only foreign workers, and not

---

[15] To the extent DOL argues that some American agricultural workers, specifically those on farms with H-2A workers, have to be offered the same benefits, that makes the Final Rule *more* unlawful. It would be a clear violation of the NLRA and exceed DOL's statutory authority under the INA if they are now regulating collective bargaining type rights as it pertains to American farmworkers.

[16] *See, e.g.*, 89 Fed. Reg. at 33,992 ("The tools adopted in this final rule include the right for [H-2A] workers to engage in protected, concerted activity without fear of retaliation and additional worker protections to empower workers in order to engage in advocacy regarding the terms and conditions of employment. In adopting these provisions, the Department is exercising its long-recognized authority to establish the minimum terms and conditions of employment ( *i.e.*, the "baseline" of working conditions) necessary to "neutralize any 'adverse effect' [on domestic workers] resultant from the influx of temporary foreign workers.").

American workers. The most likely result would be the opposite of what Defendants assert: an adverse effect on American workers who receive a lower level of protection than their foreign competition.

Clearly, Defendants wanted to promote unionization of H-2A farmworkers, and this Final Rule does so while giving the only explanation that the statute allows. But by giving protections to foreign workers and not to Americans, the Final Rule shows that protecting American workers is a pretext, not a plausible explanation of the agency's rulemaking.

3.   The Final Rule is a sharp departure from decades of prior policy

Arbitrary-and-capricious review requires that the agency provide "a reasoned explanation for its action." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). This is especially true when an agency action is a sharp departure from past practice. *See Data Mktg. P'ship, LP v. Dep't of Labor*, 45 F.4th 846, 857 (5th Cir. 2022). The Final Rule departs from 38 years of past practice by requiring employers to allow H-2A workers to unionize. Yet Defendants do not even "display awareness that [they *are*] changing position," *Fox TV Stations*, 556 U.S. at 515, let alone provide a reasonable explanation for their turn-about. And the Final Rule is not just a change of agency policy—it creates a new federal right for H-2A farmworkers and effectively rewrites the NLRA. It was arbitrary and capricious not to acknowledge and explain this significant change in policy.

To sum up: Defendants considered factors irrelevant to the governing statute in order to achieve policy objectives that existing law has foreclosed since the 1930s. They dramatically reversed course on decades of law and policy without any acknowledgement that they were doing so, and then implausibly offered the conclusory and unsupported explanation that they were acting to prevent adverse effects on American workers. The Final Rule is therefore

arbitrary and capricious, not reasoned decision-making. The Court should grant Plaintiffs'
motion for summary judgment on Count IV of the Complaint.

II.        Plaintiffs are entitled to vacatur, a permanent injunction, and declaratory relief

The Final Rule is unlawful. The only real question for the court to answer is the remedy.
The "set aside" language in 5 U.S.C. § 706 authorizes vacatur. *See Dep't of Homeland Sec. v. Regents of
the Univ. of Cal.*, 591 U.S. 1, 9 (2020) (unlawful agency action must "be vacated"); *Corner Post, Inc. v.
Bd. of Governors of the Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2460 (Kavanaugh, J., concurring) (2024) ("[T]he
APA authorizes vacatur of agency rules."); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
781 F.3d 1271, 1290 (11th Cir. 2015) ("vacatur . . . is the ordinary APA remedy.") (quotation omitted).

Vacatur, therefore, "operates to set aside a rule generally, not as a partial remedy for the
plaintiffs." *Florida v. United States*, 660 F. Supp. 3d 1239, 1284 (N.D. Fla. 2023). Vacatur is not
limited to the parties because, unlike an injunction, vacatur operates on the Rule itself—not the
parties—by denying it legally operative effect and treating it as void as to all regulated parties.
*See Career Colls. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (vacatur under
sections 705 and 706 "is not party restricted"); Mila Sohoni, *The Past and Future of Universal Vacatur*,
133 Yale L. J. 2305, 2311 (2024) ("The APA authorizes the universal vacatur of rules."); *see also
Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (Jackson, J.) (vacatur of a rule "for
everyone" is normal APA remedy).

Once vacated, a rule is "treated as though it had never happened." *Griffin v. HM Fla.-ORL,
LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J., statement respecting denial of application).
Because vacatur removes the legal source of the agency's action, the agency cannot legitimately
act unlawfully as to anyone. See Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev.
1121, 1131 (2020); *e.g. Texas v. Becerra*, No. 6:24-cv-00211-JDK, ECF 41 (N.D. Tex. Aug. 30, 2024).

DOL, like any agency, "literally has no power to act—including under its regulations— unless and until Congress authorizes it to do so by statute." *F.E.C. v. Cruz*, 596 U.S. 289, 301 (2022).[17]

<center>CONCLUSION</center>

This Court has already found Plaintiffs are likely to succeed on the merits on Count I of their claims, without ruling on all the others. *See generally* Dkt. 99. Plaintiffs now request this Court to grant Plaintiffs' motion for Summary Judgment on each of its four Claims and vacate the Final Rule.

<div style="margin-left: 40%;">

Respectfully submitted,

**KRIS W. KOBACH**
**Attorney General of Kansas**

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
James R. Rodriguez, Kan. SC No. 29172
*Assistant Attorney General*
KANSAS OFFICE OF THE
 ATTORNEY GENERAL
Topeka, Kansas 66612-1597
Phone: (785) 368-7109
Email: abhishek.kambli@ag.ks.gov
jay.rodriguez@ag.ks.gov
*Counsel for Plaintiff State of Kansas*

</div>

---

[17] For the same reasons, GFVGA respectfully requests that this Court make it clear to Defendants that they may not limit any relief to only GFVGA members who joined prior to the issuance of the Court's injunction, as they attempted to do with the Court's preliminary injunction. *See Kansas v. U.S. Dep't. of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *20 (D. Kan. July 2, 2024); *Foreign Labor Certification, Announcements*, Department of Labor (last visited Sept. 30, 2024), https://perma.cc/6KGJ-EDUK (suggesting compliance with the preliminary injunction order by processing H-2A applications for members of GFVGA "as of August 26, 2024" in accordance with regulations in effect prior to Rule).

<center>32</center>

**CHRISTOPHER M. CARR**
**Attorney General of Georgia**

Stephen J. Petrany
*Solicitor General*
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

/s/ G. Todd Carter
G. Todd Carter, Esq.
   Georgia Bar No: 113601
Special Assistant Attorney General
OFFICE OF THE GEORGIA ATTORNEY
GENERAL
BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue
P. O. Box 220
Brunswick, GA 31521-0220
Tel:  912-264-8544
Fax: 912-264-9667
tcarter@brbcsw.com
*Counsel for Plaintiff State of Georgia*

**ALAN WILSON**
**Attorney General of South Carolina**

/s/ Joseph D. Spate
Joseph D. Spate
Assistant Deputy Solicitor General
Office of the Attorney General of South
Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

/s/ Thomas T. Hydrick
Thomas T. Hydrick
Assistant Deputy Solicitor General
Office of the Attorney General
P.O. Box 11549
Columbia, SC 29211
803-734-4127
*Counsel for Plaintiff State of South Carolina*

**TIM GRIFFIN**
**Arkansas Attorney General**

/s/Michael Cantrell
Michael Cantrell
 *Assistant Solicitor General*
Nicholas J. Bronni
 *Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201
Telephone: (501) 682-2401
michael.cantrell@arkansasag.gov
*Counsel for Plaintiff State of Arkansas*

**ASHLEY MOODY**
**Attorney General of Florida**

/s/ Christine Pratt
Christine Pratt (FBN 100351)
COUNSELOR TO THE ATTORNEY GENERAL
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
(850) 410-2672 (fax)
christine.pratt@myfloridalegal.com
*Counsel for Plaintiff State of Florida*

RAÚL R. LABRADOR
ATTORNEY GENERAL IDAHO

/s/ Alan Hurst
Alan Hurst, *pro hac vice*
Solicitor General
700 W. Jefferson St., Suite 210,
PO Box 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@ag.idaho.gov
*Counsel for Plaintiff State of Idaho*

THEODORE E. ROKITA
**Attorney General of Indiana**

/s/ James A. Barta
JAMES A. BARTA
*Solicitor General*
Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
Phone: (317) 232-0709
Email: james.barta@atg.in.gov
*Counsel for Plaintiff State of Indiana*

BRENNA BIRD
**Attorney General of IOWA**

/s/ Eric H. Wessan
Eric H. Wessan, *pro hac vice*
*Solicitor General*
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
*Counsel for Plaintiff State of Iowa*

LIZ MURRILL
**Attorney General of Louisiana**

/s/ Zachary Faircloth
Zachary Faircloth (La #39875)
  *Principal Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 North Third Street
Baton Rouge, Louisiana 70804
(225) 326-6766
fairclothz@ag.louisiana.gov
*Counsel for Plaintiff State of Louisiana*

ANDREW BAILEY
**Attorney General of Missouri**

/s/ Reed C. Dempsey
Reed C. Dempsey #1697941DC
  *Deputy Solicitor General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel. (573) 751-1800
Fax. (573) 751-0774
reed.dempsey@ago.mo.gov
*Counsel for Plaintiff State of Missouri*

AUSTIN KNUDSEN
**Attorney General of Montana**

/s/ Christian B. Corrigan
Christian B. Corrigan
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov
*Counsel for Plaintiff State of Montana*

**MICHAEL T. HILGERS**
**Attorney General of NEBRASKA**

/s/ Lincoln J. Korell
Lincoln J. Korell
   *Assistant Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
OF NEBRASKA
2115 State Capitol
Lincoln, Nebraska 68509
(402) 471-2682
Lincoln.Korell@nebraska.gov
*Counsel for Plaintiff State of Nebraska*

**DREW H. WRIGLEY**
**North Dakota Attorney General**

/s/ Philip Axt
PHILIP AXT
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov
*Counsel for the State of North Dakota*

**GENTNER DRUMMOND**
**Attorney General of Oklahoma**

/s/ Garry M. Gaskins
Garry M. Gaskins, II, OBA # 20212
Solicitor General
Zach West, OBA # 30768
Director of Special Litigation
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
*Counsel for Plaintiff State of Oklahoma*

**JONATHAN SKRMETTI**
**Attorney General and Reporter of Tennessee**

/s/ J. Matthew Rice
J. Matthew Rice
  *Solicitor General*
Whitney Hermandorfer
  *Director of Strategic Litigation*
Office of the Attorney General and Reporter of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207
Phone: (615) 741-7403
Email: Matt.Rice@ag.tn.gov
Whitney.Hermandorfer@ag.tn.gov
*Counsel for State of Tennessee*

KEN PAXTON
Attorney General of the State of Texas

BRENT WEBSTER
First Assistant Attorney General
RALPH MOLINA
Deputy Attorney General for Legal Strategy
RYAN D. WALTERS
Chief, Special Litigation Division

/s/ Kathleen T. Hunker
KATHLEEN T. HUNKER
Special Counsel
Tex. State Bar No. 24118415

GARRETT GREENE
Special Counsel
Tex. State Bar No. 24096217
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Kathleen.Hunker@oag.texas.gov
Garrett.Greene@oag.texas.gov
Counsel for Plaintiff State of Texas

/s/ Braden H. Boucek
Braden H. Boucek
   Tenn. BPR No. 021399
   Ga. Bar No. 396831

/s/ Jordan Miller
Jordan Miller
   Michigan Bar. No. P81467
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Tel.: (770) 977-2131
bboucek@southeasternlegal.org
jmiller@southeasternlegal.org
Counsel for Plaintiffs GFVGA & Miles Berry Farm

JASON S. MIYARES
Attorney General of Virginia

/s/ Kevin M. Gallagher
Kevin M. Gallagher
Principal Deputy Solicitor General
Brendan T. Chestnut
Deputy Solicitor General
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
Counsel for Plaintiff Commonwealth of Virginia

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 2nd day of October, 2024, I electronically filed the above and foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>/s/ Abhishek S. Kambli</u>
Abhishek S. Kambli, Kan. SC No. 29788
*Deputy Attorney General*
*Counsel for the State of Kansas*

37